IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

REGINALD L. BUTLER,

       *Plaintiff*,

v.

DISTRICT OF COLUMBIA HOUSING
FINANCE AGENCY,

       *Defendant*.

_____

Case No.: 07-CV-2046 (HHK)
Next Event:  Status Conference
       11/14/2008 at 10:00 a.m.

### DISTRICT OF COLUMBIA HOUSING FINANCE AGENCY'S
### MOTION FOR SUMMARY JUDGMENT

Defendant District of Columbia Housing Finance Agency ("DCHFA") hereby moves this Court for summary judgment on all claims brought by Plaintiff Reginald L. Butler in the above-captioned case.  Specifically, DCHFA moves for summary judgment on Plaintiff's claims for interference and retaliation under Sections 2614 and 2615 of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.* and Section 32-507 of the District of Columbia Family and Medical Leave Act ("DC FMLA"), D.C. Code Ann. §§ 32-501 *et seq.*  DCHFA is entitled to summary judgment for at least three reasons.  First, as to Mr. Butler's claim for retaliation, Mr. Butler cannot establish the necessary causal connection as his supervisor was unaware of any protected leave taken or requested.  Second, even if Mr. Butler can establish a *prima facie* case of retaliation, DCHFA had legitimate, nonretaliatory reasons for making the employment determinations at issue in this case.  Third, Mr. Butler's interference claim fails because DCHFA would have terminated him regardless of any family medical leave taken or requested.

Respectfully submitted,


 /s/  Charles W. Chotvacs
Constantinos G. Panagopoulos #430932
Jeffrey W. Larroca #453718
Charles W. Chotvacs #484155
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
601 13th Street, N.W.
Suite 1000 South
Washington, D.C.  20005-3807
Telephone: (202) 661-2200
Facsimile: (202) 661-2299
cgp@ballardspahr.com
larroca@ballardspahr.com
chotvacsc@ballardspahr.com

*Counsel for Defendant*
*District of Columbia Housing Finance Agency*

August 22, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of August, 2008, I electronically filed the District of Columbia Housing Finance Agency's Motion for Summary Judgment; Statement of Undisputed Material Facts (w/ corresponding exhibits); Memorandum of Points and Authorities in Support of Its Motion for Summary Judgment; and Proposed Order with the Clerk of the Court using the CM/ECF system, which shall send notification of such filing to counsel of record for Plaintiff listed below:

> Jonathan L. Gould
> LAW OFFICE OF JONATHAN L. GOULD
> 1730 M Street, N.W.
> Suite 412
> Washington, D.C.  20036
> E-mail: jgould@igc.org
>
> *Counsel for Plaintiff*
> *Reginald L. Butler*

　/s/  Charles W. Chotvacs　　　　　
Charles W. Chotvacs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

REGINALD L. BUTLER,

        *Plaintiff*,

v.

DISTRICT OF COLUMBIA HOUSING
FINANCE AGENCY,

        *Defendant*.

_____

Case No.: 07-CV-2046 (HHK)
Next Event:  Status Conference
                11/14/2008 at 10:00 a.m.

## DISTRICT OF COLUMBIA HOUSING FINANCE AGENCY'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS <u>MOTION FOR SUMMARY JUDGMENT</u>

Defendant District of Columbia Housing Finance Agency ("DCHFA") is entitled to summary judgment on all claims brought by Plaintiff Reginald L. Butler.  Specifically, DCHFA is entitled to summary judgment on Plaintiff's claims for interference and retaliation under Sections 2614 and 2615 of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*, and Section 32-507 of the District of Columbia Family and Medical Leave Act ("DCFMLA"), D.C. Code Ann. §§ 32-501 *et seq.*  First, as to Mr. Butler's claim for retaliation, he cannot establish the necessary causal connection as his supervisor was unaware of any protected leave taken or requested when the decision to terminate was made.  Second, even if Mr. Butler can establish a *prima facie* case, DCHFA had legitimate, nonretaliatory reasons for terminating Mr. Butler.  Third, Mr. Butler's interference claim fails because DCHFA would have terminated Mr. Butler regardless of any family medical leave taken or requested.  As such, DCHFA cannot be found liable under FMLA and DCFMLA and judgment must be entered in its favor.

# I.  BACKGROUND

*Mr. Butler's Duties and Responsibilities*

Mr. Butler was employed at DCHFA as the Director of Business Services.  (Deposition of Reginald L. Butler, 17:9-11, hereinafter "Butler Depo." (**Exhibit 1**)).  As the Director of Business Services, Mr. Butler's main function was to oversee the operation and maintenance of DCHFA's facility.  (Id. at 17:18-20).  As part of these duties, Mr. Butler was responsible for monitoring the cleaning of the facility; addressing and contracting out necessary repairs to the facility; coordinating inspections and certifications; and overseeing all other ancillary services associated with the building, such as extermination and trash collection.  (Id. at 17:20-22, 18:1-4, :18-22, 19:1-7, 47:18-22, 48:1-4, 90:6-16).  In addition, Mr. Butler was also responsible for the security and telephone systems and maintaining the vehicles used by the DCHFA.  (Id. at 18:1, 324:14-22, 325:1-7).

*Arrival of New Executive Director – Harry Sewell*

In June 2006, Harry Sewell was appointed Executive Director of DCHFA.  (Deposition of Harry Sewell, 7:11-12, 8:5-6, hereinafter "Sewell Depo." (**Exhibit 2**)).  During his first three months in the position, Mr. Sewell observed the performance of the individuals who reported directly to him in order to evaluate them.  (Id. at 25:9-12, 32:10-22, :33:1).  Thereafter, in September 2006, Mr. Sewell announced that he would be conducting 90-day performance evaluations of all direct reports, including evaluations of Harry Alexander (General Counsel), Francis Dyson (Sewell's Executive Assistant), and Mr. Butler.  (Id. at 25:9-15, 156:22, 157:1-4; Deposition of Harry Alexander, 22:21-22, 23:1-2, hereinafter "Alexander Depo." (**Exhibit 3**)).

Mr. Sewell found Mr. Alexander to be doing a good job.  (Alexander Depo., 23:6-8).  Mr. Sewell also told Mr. Alexander, however, that he was concerned with Mr. Butler's performance.

(Id. at 22:11-20, 23:9-14).  Mr. Sewell stated that he was going to take discipline against Mr. Butler.  (Id. at 23:19-22, 24:1-9).  Mr. Sewell was concerned that the building was not clean and that there were bugs, and said that Mr. Butler needed to improve.  (Id. at 24:7-15).

In evaluating his Executive Assistant, Francis Dyson, Mr. Sewell found that her performance was unsatisfactory.  (Sewell Depo., 157:1-3, 16-18).  He warned her to improve. (Id. at 157:16-18).  As set forth below, she failed to improve and, like Mr. Butler, was terminated.  (Sewell Depo., 156:18-22, 157:1-6).

Mr. Butler's 90-day performance evaluation took place in late September 2006.  (Sewell Depo., 24:16-22, 25:4-6; Butler Depo., 44:2-5).  In evaluating Mr. Butler's performance, Mr. Sewell considered the conditions in the building, attendance at meetings, completion of assignments, and similar items.  (Sewell Depo., 34:1-5).  Mr. Sewell was dissatisfied with the cleanliness of the building.  (Id. at 43:4-7, 44:1-3, :20-22, 45:1-4, 53:1-4).  Mr. Butler concedes that cleanliness was a problem since he had to repeatedly complain to the cleaning contractor. (Butler Depo., 38:3-22, 39:1-7).  Mr. Sewell was also discontent due to the problem with insects in the building.  (Sewell Depo., 43:4-8, 44:1-3).  Mr. Butler also concedes this point since he himself had seen insects and other employees had also talked to Mr. Butler about insects and rodent droppings.  (Butler Depo., 109:3-12, 113:22, 114:1-12, 115:6-13).  Mr. Sewell also found that sufficient progress had not been made regarding various building components such as the problems with the garage, roof, and elevator, nor had an issue with insurance and registration of DCHFA's vehicles been remedied.  (Sewell Depo., 48:5-9, :19, 49:6-8, 20-21, 51:7-9, 52:9-19, 118:7-22, 119:1-17, 120:10-22, 162:3-21, 163:12-22, 164:1-4; Butler Depo. 327:19-22, 328:1-5).

At the 90-day evaluation, Mr. Sewell described his concerns about the cleanliness of the building and informed Mr. Butler that his job performance was unsatisfactory.  (Sewell Depo,

52:20-22, 53:1-12). Indeed, Mr. Butler concedes that Mr. Sewell showed him dust on a chest in his office. (Butler Depo., 123:5-14). Neither Mr. Butler nor any of Mr. Sewell's other direct reports for which he did 90-day reviews received a written performance evaluation. (Sewell Depo., 55:6-10; Butler Depo., 136:17-22; Alexander Depo., 23:3-5).

Tellingly, Mr. Butler understood that at the time of his 90-day review, there were still issues involving the facility that had to be worked on. (Butler Depo., 127:10-22, 128:1-10). Mr. Butler admitted that the DCHFA was dealing with an old facility that had problems. (Id. at 46:15-22, 47:1). For example, the roof had been leaking since at least 2004. (Id. at 64:9-19, 65:3-5, 72:3-22, 73). In addition, as set forth above, Mr. Butler admitted that cleanliness and bugs were an ongoing issue.

*Gate Incident -- October 13, 2006*

The issue with Mr. Butler's performance came to a head when he failed to have the building open on time. Specifically, Mr. Butler was the supervisor in charge of ensuring that the rear gate and building were open in the mornings. (Butler Depo., 138:4-22, 139:1-2). The parking lot of the building was surrounded by a fence and a gated entryway. In order for employees to get to work, the gate had to be opened in the morning, the rear door opened, the alarm disarmed, and the front door unlocked. (Id. at 139:3-22, 140:1-10). On October 13, 2006, merely two and a-half weeks after his unsatisfactory 90-day performance review, Mr. Butler failed to get the building opened. (Id. at 137:1-10).

Normally, Tony Ulmer, an employee who reported to Mr. Butler, was responsible for actually opening the gate and building. (Butler Depo., 137:11-14). On days in which Mr. Ulmer was not in, Mr. Butler, as his supervisor, was responsible for making alternative arrangements. (Id. at 138:4-14). On October 13, Mr. Ulmer was on leave and Mr. Butler decided that he

himself would open the building.  (Id. at 137:7, 140:19-21, 142:17-20).  However, Mr. Butler did

not get in on time or open the gate as required.  (Id. at 141:3-11).  His excuse was as follows:

> Q.     . . . Why didn't you show up at the appropriate time to open up?
>
> A.     *I had planned to show up at the appropriate time.  I didn't get out as early
>        as I had expected.*
>        *. . . .*
>
> Q.     Why didn't you get out at the time you expected?
>
> A.     *It just didn't work out, and I had more traffic than I had anticipated.*

(Id. at 144:2-5, 10-13).

When Mr. Sewell arrived that morning, he found that the entry had not been unlocked.

(Sewell Depo., 82:8-10; Butler Depo., 137:8-9).  Mr. Sewell pulled up to the gate and a line of

vehicles, including the cleaning crew and several employees, pulled up behind him.  (Sewell

Depo., 82:10-12, 83:3-6).  Mr. Sewell got out of his car, reached through the bars, unlocked the

gate, swung the gate open, disarmed the alarm, and opened the building for the day.  (Id. at

88:11-14, 89:1-3).

*Termination Decision*

Mr. Butler's failure to open the building on October 13, 2006, so close on the heels of his

negative evaluation, convinced Mr. Sewell that Mr. Butler should be terminated.  (Sewell Depo.,

105:19-22, 106:1-2).  In fact, Mr. Butler admits that he knew Mr. Sewell was displeased.  (Butler

Depo., 137:1-10, 150:14-18).  As described above, there had been an accumulation of failures

and Mr. Butler's failure to show up on time and open the gate was "the straw that broke the

camel's back."  (Sewell Depo., 106:6-9).  In addition, there had been no improvements, in that

bugs and dirt were still an issue and other projects Mr. Butler was working showed very little

progress.  (Id. at 108:20-22, 109:1-6, 117:12-19, 127:7-22, 128:1-2, 129:1-5).

Significantly, Mr. Butler cannot dispute that Mr. Sewell made the decision to terminate him at the time of the October 13 gate incident. (Butler Depo., 174:15-22, 175:1-11). Indeed, Mr. Alexander's testimony that Mr. Sewell talked to him about terminating Mr. Butler, long before any family medical leave request form had been made, bolsters that conclusion. (Alexander Depo., 24:21-22, 25:1-14; Butler Depo., 270:16-22, 271:1-6, 299:1-3).

The events occurring after Mr. Butler's eventual arrival at work on October 13, 2006, further bolster that conclusion. Mr. Butler admits that upon arriving at work, Mr. Sewell wanted to speak with him. (Butler Depo., 148:2-5). Mr. Butler admits that when he walked into Mr. Sewell's office, Mr. Sewell said he needed to talk to Mr. Butler about the gate. (Id. at 149:19-21, 150:1-2). Mr. Butler admits that Mr. Sewell wanted to talk to him, but that Mr. Sewell said that he did not have time to talk right then as he had a meeting to attend. (Id. at 151:10-14). Mr. Butler was concerned that Mr. Sewell was upset. (Id. at 150:14-18, 151:18-22, 152:1-2). Mr. Butler admits that he did not talk to Mr. Sewell any further that day and that, in fact, he did not talk to Mr. Sewell until two days after he returned from leave on October 25, 2006. (Id. at 151:15-17, 171:10-12).

After the October 13 incident, Mr. Sewell spoke with both Sam Thomas (H.R. Director) and Mr. Alexander (General Counsel) regarding Mr. Butler's termination. (Sewell Depo., 149:18-22, 150:1-8, 153:21-22, 154:1-16, :20-22, 155:1-5). Mr. Sewell consulted with Mr. Alexander for legal advice regarding what the employee handbook said about terminating an employee. (Alexander Depo., 24:21-22, 25:1-22, 26:1-8; Sewell Depo., 150:4-5). Mr. Alexander advised Mr. Sewell that he could terminate Mr. Butler because he was an at-will employee. (Alexander Depo., 26:16-20).

6

*Mr. Butler Takes Leave*

On October 13, Mr. Butler was preparing to take leave. (Butler Depo., 252:17-19). Mr. Butler made travel arrangements to leave Saturday, October 14 and return Wednesday, October 18. (Butler Depo., 253:6-13, 254:19-22, 255:1-2). Mr. Butler submitted a leave form. (Id. at 242:4-6). Mr. Butler left early on October 13. (Id. at 240:14-22, 241:3-4, 17-19). It is undisputed that Mr. Butler did not tell Mr. Sewell he was taking leave. (Id. at 245:6-12). It is also undisputed that Mr. Sewell had no idea that Mr. Butler was leaving to take care of his mother. (Sewell Depo., 68:8-10). Moreover, Mr. Butler is not aware if anyone else told Mr. Sewell that he was leaving to take care of his mother. (Butler Depo., 245:6-22, 246:1-17).

Mr. Butler was on leave from work the week of October 16, 2006. Although Mr. Butler was originally to return on October 18, this was extended to October 22. (Butler Depo., 253:11-12, 255:7-21). A second change moved Mr. Butler to returning on Monday, October 23 at around 10 a.m. (Id. at 261:13-15). It is undisputed that Mr. Butler did not talk with Mr. Sewell about extending his leave. (Id. at 157:8-17). Nor is Mr. Butler aware if anyone else told Mr. Sewell about extending the leave. (Id. at 259:18-22, 260:1). In fact, Mr. Butler did not speak to Mr. Sewell at all while he was on leave. (Id. at 157:8-17). Mr. Butler did not return to work until the afternoon of October 23. (Butler Depo., 153:7-10, 157:22, 158:1, 8-13). As a result, Mr. Sewell was unaware of Mr. Butler's reason for taking the leave, (Sewell Depo., 68:8-10), and neither Mr. Butler nor anyone else had any discussions with Mr. Sewell about why Mr. Butler was taking the requested leave, (Sewell Depo., 72:16-22, 73:1-7; Butler Depo., 245:6-22, 246:1-17).

In addition, as a result of the change in plans, Mr. Butler missed the meeting with the vendor that Mr. Butler himself had scheduled and that involved an issue for which Mr. Butler

was responsible.  (Butler Depo., 155:8-14, :22, 156:1, :14-22, 157:1-7, 260:2-9; Sewell Depo.,

67:9-12, 16-18).  Instead, Mr. Sewell attended the meeting alone. (Sewell Depo., 67:22, 68:1-2).

*Mr. Butler Returns from Leave*

Although he returned from leave on October 23, Mr. Butler did not speak with Mr.

Sewell until Thursday, October 25.  (Butler Depo., 159:3-6, :14-16, 171:10-12).  Mr. Butler

asked of Mr. Sewell what had happened at the meeting he had missed.  (Butler Depo., 171:15-17;

Sewell Depo., 74:16-17, 75:10-11, 15-16).  Mr. Sewell told Mr. Butler that he would take care of

it.  (Butler Depo., 171:16-19; Sewell Depo., 75:15-20).  Mr. Butler became concerned that Mr.

Sewell might still be upset regarding the gate incident.  (Butler Depo., 171:3-12, :15-22, 172:1,

173:1-22, 174:1-22, 175:1-11).  He was, of course, correct since Mr. Sewell already had decided

to terminate him because of the gate incident.  (Sewell Depo., 105:21-22, 106:1-2).

On October 26, 2006, Mr. Sewell sent Mr. Butler an e-mail asking him to confirm the

responsibilities for opening and securing the building.

> Reggie:
>
> Who has primary responsibility for securing the building in the evening and what
> time does that occur.  Who has primary responsibility for opening the building in
> the morning and what time does that occur.  Who are the designated alternates in
> the absence of the above people.
>
> Please respond by COB today.
>
> H

(E-mail from Harry D. Sewell to Reginald Butler, dated Oct. 26, 2006 (**Exhibit 4**); Butler Depo.,

219:16-17, 220:4-7, 14-19; Sewell Depo., 81:3-22).  Mr. Butler typed up a response that set out

the procedure for opening and closing the building in which he admitted that in Mr. Ulmer's

absence, he was responsible.  (Response from Reginald Butler (**Exhibit 5**); Butler Depo., 222:3-

5).  Mr. Sewell thought that Mr. Butler's response and the arrangements he had made for

opening and closing the building were inadequate as evidenced by the fact that it resulted in the building not being opened. (Sewell Depo., 91:19-21, 93:12-14, 94:10-15). At this same time, Mr. Alexander was preparing a termination letter for Mr. Butler. (Sewell Depo., 150:19-20; Alexander Depo., 27:10-22).

*Mr. Butler Finally Requests Family and Medical Leave*

Almost two weeks after Mr. Sewell had decided to terminate him, and while Mr. Alexander was preparing a termination letter, Mr. Butler approached Mr. Thomas on October 26 to request family medical leave to take care of his mother. (Butler Depo., 274:2-4, :16-22, 275:1-9; E-mail from Reginald Butler to Samuel Thomas, dated Oct. 26, 2006 (**Exhibit 6**)). Mr. Butler filled out the Family and Medical Leave Request Form. (Family and Medical Leave Request Form (**Exhibit 7**); Butler Depo., 287:3-5, 291:11-21). The form he filled out requested 25 days of leave, including the past leave already taken the prior week. (Exhibit 7, p. 2). Up until that point, Mr. Butler had never discussed needing leave to take care of his mother with Mr. Sewell. (Butler Depo., 271:7-21, 280:18-21). He also never discussed the request for future leave submitted on October 26 with Mr. Sewell. (Butler Depo., 271:7-21, 280:18-21, 298:12-15).

*Termination Meeting*

On the morning of October 27, 2006, Mr. Sewell, in the presence of Mr. Alexander and Mr. Thomas, met with Mr. Butler. (Sewell Depo., 147:11-22). At the meeting, Mr. Butler was given a termination letter by Mr. Sewell and was told that he was being separated from DCHFA that day. (Termination Letter, dated Oct. 27, 2006 (**Exhibit 8**); Sewell Depo., 148:3-22). Mr. Sewell reiterated that Mr. Butler's performance was previously unsatisfactory and continued to be unsatisfactory, and that he was being terminated. (Sewell Depo., 148:18-22; Butler Depo.,

179:10-19).  The decision to terminate Mr. Butler was arrived at and made solely by Mr. Sewell. (Sewell Depo., 150:21-22, 151:1; Alexander Depo., 35:19-21).  It is undisputed that during the course of the termination, Mr. Butler never mentioned family medical leave, nor did anyone else present mention leave.  (Butler Depo., 301:13-19).[1]

DCHFA did not hire anyone to take over Mr. Butler's position after he was terminated. (DCHFA's Answer to Plaintiff's Interrogatories (**Exhibit 9**)).  His overall job responsibilities regarding facilities maintenance were incorporated into the position of Fran Makle, the Deputy Executive Director.  (Exhibit 9; Sewell Depo., 130:3-9, 131:1:6-11).

*Other Terminations*

Further bolstering DCHFA's position that Mr. Butler's termination was due to performance and not family and medical leave is the fact that Mr. Sewell also terminated Francis Dyson at around the same time he terminated Mr. Butler.  Aside from Mr. Butler, only one other employee, Ms. Dyson, was informed by Mr. Sewell that her performance was less than satisfactory as part of the 90-day review process in the fall of 2006.  (Sewell Depo., 156:22, 157:1-4).  As already set forth above, Ms. Dyson "got the same warning as Mr. Butler, that her performance was unsatisfactory and that it needed to be improved."  (Sewell Depo., 157:16-18). Like Mr. Butler, Ms. Dyson's performance failed to improve.  As a result, like Mr. Butler, she was terminated.  (Sewell Depo., 158:1-7).  Ms. Dyson did not receive a written notice other than the oral warning at her 90-day review, same as Mr. Butler.  (Sewell Depo., 157:11-16).

---

1.      It is undisputed that Mr. Thomas said nothing at the termination meeting regarding family medical leave.  However, Mr. Thomas, a disgruntled and terminated former employee, alleges that he told Mr. Sewell and Mr. Alexander about Mr. Butler's request for family medical leave on October 26.  Both Mr. Sewell and Mr. Alexander deny that any such disclosures occurred. That dispute, however, is not material for purposes of this motion because the decision to terminate Mr. Butler had been made on or about October 13, 2006 following the incident with the gate and before anyone mentioned any family medical leave at all.

## II. <u>ARGUMENT</u>

A court should grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A dispute about a material fact is not 'genuine' unless the evidence is such that a reasonable jury could return a verdict for the nonmoving party . . . ." *Haynes v. Williams*, 392 F.3d 478, 481 (D.C. Cir. 2004) (internal citations omitted). "The moving party may successfully support its motion by 'informing the district court of the basis for its motion, and identifying . . . [that evidence] . . . which it believes demonstrate[s] the absence of a genuine issue of material fact.'" *Winder v. Erste*, 511 F. Supp. 2d 160, 170 (D.D.C. 2007) (quoting *Celotex*, 477 U.S. at 323). Once the movant points to the absence of a genuine issue of material fact, the burden then shifts to the non-moving party to come forward with competent evidence setting forth specific facts sufficient to create a triable issue. *Celotex*, 477 U.S. at 322. The mere existence of a factual dispute by itself, however, is insufficient to bar summary judgment, *Pilates, Inc. v. Georgetown Bodywoks Deep Muscle*, 157 F. Supp. 2d 75, 79 (D.D.C. 2001), and "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

Based on the foregoing standard, summary judgment should be entered for DCHFA on both Mr. Butler's FMLA and DCFMLA claim because DCHFA did not interfere with any rights provided to Mr. Bulter under the relevant statutes, nor did it retaliate against him for taking any leave that allegedly may have fallen under the auspices of FMLA or DCFMLA.

Mr. Butler asserts in his Second Amended Complaint that, in terminating his employment right after he returned from family medical leave and right after he requested additional family medical leave, DCHFA interfered with, restrained, and denied Mr. Butler his rights as an employee eligible for family medical leave under FMLA and DCFMLA and that DCHFA retaliated against him for requesting and taking such leave pursuant to 29 U.S.C. §§ 2614 & 2615 and D.C. Code § 32-507. (Second Amended Complaint, ¶¶2, 16). Based on the undisputed facts in this case, Mr. Butler cannot prove that DCHFA interfered with his family medical leave rights or that it retaliated against him for requesting and/or taking such leave. Mr. Butler was not a good employee that was terminated for taking family medical leave. Instead, Mr. Butler had been warned that his job performance was unsatisfactory and was ultimately terminated for performance lapses. Leave played no role in the decision to terminate Mr. Butler and he would have been terminated regardless of any leave taken or requested.

Under both FMLA and DCFMLA, an employee of a covered employer is entitled to take protected leave in order to care for a family member with a serious health condition. *See* 29 U.S.C. § 2612(1); D.C. CODE § 32-502. The D.C. Court of Appeals has recognized the similarity of the two statutes and has stated that it will look to FMLA case law and regulations for guidance. *See Chang v. Inst. for Public-Private P'ships, Inc.*, 846 A.2d 318, 327 (D.C. 2004). Both this Court and the D.C. Court of Appeals have recognized two types of claims under FMLA and DCFMLA: "'(1) *interference claims*, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act,' and (2) '*retaliation claims*, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act.'" *Gaghan v. Guest Servs., Inc.*, 2005 WL 3211591, at *3 (D.D.C. Oct. 26, 2005) (Kennedy, J.) (emphasis added); *Wash. Convention Ctr.*

*Auth. v. Johnson*, 2008 WL 2915115, at *8 (D.C. July 31, 2008) (noting that "[l]ike its federal counterpart, the DCFMLA recognizes two theories for recovery").

"To state a prima facie claim of interference with any substantive right provided by the FMLA [or DCFMLA], an employee must demonstrate, by a preponderance of the evidence, that [he] was entitled to the right allegedly denied." *Gaghan*, 2005 WL 3211591, at *3.  Under FMLA and DCFMLA, an employer may not interfere with, restrain, or deny the exercise of or attempt to exercise any substantive right.  *See* 29 U.S.C. § 2615(a)(1); D.C. Code ANN. § 32-507(a).  The relevant substantive rights are two-fold: (1) the guarantee to unpaid leave to eligible employees for specified reasons, including to care for a family member with a serious health condition; and (2) the assurance that the employee will be restored to his former position upon returning to work.  *See* 29 U.S.C. §§ 2612, 2614; D.C. Code ANN. §§ 32-502, -505.  However, the statutes do not provide for strict liability and DCHFA can prevail if it proves that Mr. Butler would have been dismissed regardless of his request for, or taking of, FMLA and DCFMLA leave.  *See Campbell v. Healthcare, Inc.*, 478 F.3d 1282, 1289 (10th Cir. 2007); *see also* 29 C.F.R. § 825.216(a) (stating "[a]n employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period"); *Johnson*, 2008 WL 2915115, at *9 (same).

This Court and the D.C. Court of Appeals have approved the *McDonnell Douglas* burden-shifting framework for analyzing retaliation claims under FMLA and DCFMLA.  *See Winder v. Erste*, 511 F. Supp. 2d 160, 184 (D.D.C. 2007); *Chang*, 846 A.2d at 329; *cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Under this framework, Mr. Butler first bears the burden of establishing a prima facie case of retaliatory termination.  To meet this requirement, he must show: (1) that he was engaged in a protected activity, (2) that he

suffered an adverse employment action, and (3) the protected activity and the adverse employment action were causally connected. *See Winder*, 511 F. Supp. 2d at 184; *Chang*, 846 A.2d at 329. If Mr. Butler establishes a prima facie case, the burden shifts to DCHFA "to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Winder*, 511 F. Supp. 2d at 184; *accord Chang*, 846 A.2d at 329-30. However, DCHFA's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). If DCHFA articulates legitimate, non-discriminatory reasons for its actions, "the *McDonnell Douglas* framework -- with its presumptions and burdens -- disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). To survive summary judgment, Mr. Butler must show that DCHFA's stated reasons were in fact a pretext for retaliating against him for having taken and requested FMLA and DCFMLA leave. *See Glecklen v. Demoncratic Cong. Campaign*, 199 F.3d 1365, 1367 (D.C. Cir. 2000).

**A.    DCHFA Did Not Retaliate Against Mr. Butler for Allegedly Taking or Attempting to Take FMLA and/or DCFMLA Leave**

1.    There Is No Causal Connection Between Mr. Butler's Alleged Leave and the Decision to Terminate.  Accordingly, There Can Be No Retaliation

As set forth above, Mr. Butler bears the burden of establishing a prima facie case. He cannot do so because he cannot establish a causal connection between his termination and any family and medical leave usage. As this Court has stated: "there can be no retaliatory intent unless there is knowledge." *Jones v. Bernanke*, 538 F. Supp. 2d 53, 64 (D.D.C. 2008). In this case, the decision maker, Harry Sewell, had no knowledge of any family medical leave request

when he made the decision to terminate Mr. Butler's employment.  As such, his decision cannot be tied to a retaliatory animus.

Mr. Sewell made the decision to terminate Mr. Butler's employment following his failure to have the gate and building open on October 13, 2006.  As he stated in his deposition, the gate incident was "the straw that broke the camel's back."  (Sewell Depo., 106:8).  Additionally, Mr. Butler himself has admitted that he only talked to Mr. Sewell once that day, to briefly discuss the gate incident, and that subsequently, Mr. Butler did not see or speak to Mr. Sewell again until after he returned from his leave on Monday, October 23.  Thus, when the decision to terminate Mr. Butler was made, no family medical leave can be said to have motivated the decision maker or otherwise influenced his judgment so as to infer a causal connection.

Courts have found that "[t]here is . . . a lack of a causal connection when an employer makes a decision before the protected activity occurs and then proceeds with that decision." *Vinnett v. Gen. Elec. Co.*, 271 Fed. Appx. 908, 91 (11th Cir. 2008); *accord Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (holding that when an employer contemplated transferring an employee before the employer learned that the employee filed a Title VII suit, the employer's decision to proceed "along lines previously contemplated, though not yet definitively defined" did not establish evidence of causality); *see also Beno v. United Tel. Co.*, 969 F. Supp. 723, 726 (M.D. Fla. 1997) (no prima facie case found where allegations undermined by undisputed fact that employer's steps toward termination were already underway before employee requested leave).  Here, Mr. Sewell did not have any knowledge regarding any family medical leave that Mr. Butler might be taking and that forms the basis of his claims in this case when he made the decision to terminate him on or about October 13, 2006.  More importantly, Mr. Butler himself had not even submitted a family and medical leave request form at the time of

the decision, nor did he until October 26, 2006—some 13 days later.  As such, the causal chain required to satisfy Mr. Butler's prima facie case is lacking.

Notwithstanding the foregoing, even if Mr. Butler can demonstrate a prima facie case, that is all he will be able to prove because DCHFA had legitimate, nonretaliatory reasons for terminating Mr. Butler and he cannot demonstrate that the stated reasons are a pretext for retaliation.  *See Winder*, 511 F. Supp. 2d at 187 (finding summary judgment for defendant employer on FMLA and DCFMLA claims based on the weakness of plaintiff's prima-facie case, which relied solely on temporal proximity to support an inference of causation, and the overwhelming evidence that factors unrelated to employee's sick leave motivated the termination).

    2.    <u>DCHFA Had Legitimate, Nonretaliatory Reasons for Its Decision to Terminate Mr. Butler's Employment</u>

DCHFA should be granted summary judgment because of its uncontroverted and legitimate, nonretaliatory reasons for terminating Mr. Butler and, moreover, because Mr. Butler cannot demonstrate that DCHFA's reasons are pretext.  *See Brown v. Brody*, 199 F.3d 446, 458-59 (D.C. Cir. 1999) (noting that "[a]s courts are not free to second-guess an employer's business judgment, a plaintiff's mere speculations are insufficient to create a genuine issue of fact regarding [an employer's] articulated reasons for [its decisions] and avoid summary judgment" (internal quotations omitted)); *Chang*, 846 A.2d at 330 (finding that employer met its burden of production by presenting evidence that it was dissatisfied with employee's behavior at work and was actively contemplating her termination well before she ever took protected leave under DCFMLA); *see also Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006) (stating that "we do not sit as super-personnel departments reviewing the wisdom or fairness of the

business judgment made by employers, except to the extent those judgment involve intentional discrimination" (internal quotations omitted)).

As the Director of Business Services, Mr. Butler's main function was to oversee the maintenance, operations, and functions of the DCHFA's facility. (Butler Depo., 17:18-20; Sewell Depo., 64:2-3). When Mr. Sewell came on board as Executive Director of the DCHFA in June 2006, there were many problems with the building. The roof at the facility was leaking, and had been so since 2004, and only stopgap measures had been implemented. (Butler Depo., 64:9-19, 72:3-22, 73, 74:1-6). The garage had structural problems that were being reviewed. (Sewell Depo., 43:9-16). The gate to the facility posed a two-fold problem because not only was it difficult for DCHFA employees to operate, but once opened, the general public could park in DCHFA's lot. (Butler Depo., 127:19-22, 128:1-10).

During the first several months of his tenure, Mr. Sewell noticed an issue with the cleanliness of the facility and that there was an insect problem. He discovered dust and dirt around the facility. (Sewell Depo., 44:20-22, 45:1-7). Mr. Butler was responsible for monitoring the cleaning contractor's work and for dealing with extermination issues. (Butler Depo., 17:22, 18:1-4).

Mr. Sewell also discovered that the DCHFA's vehicles, one which he himself drove as part of his compensation package, did not have the required proofs of insurance or registrations included in the vehicles. Maintaining the vehicles fell under Mr. Butler's responsibilities, and Mr. Sewell notified him of this during the summer of 2006. (Butler Depo., 324:14-22, 325:1-7, 326:9-13; Sewell Depo., 20:13-15).

Mr. Sewell also was made aware of the fact that an elevator at the facility had not been inspected and was found to have safety deficiencies that needed to be addressed. (Sewell Depo.,

162:8-21, 163:12-22, 164:1-4). This too fell under the auspices of Mr. Butler's job description. (Sewell Depo., 163:3-8; Butler Depo., 90:6-16).

In September 2006, Mr. Sewell announced that he would be conducting 90-day evaluations of all individuals who reported directly to him. (Sewell Depo., 25:9-15; Butler Depo., 119:15-20). Mr. Sewell evaluated the employees based on his observations of their performance. (Sewell Depo., 32:10-22, 33:1-22).

For Mr. Butler, the two major areas with which Mr. Sewell had issues were conditions in the building and completion of assignments. As for conditions in the building, Mr. Sewell was unsatisfied with the cleanliness and insect problem in the building. (Sewell Depo., 44:1-3). Regarding completion of assignments, Mr. Sewell found that sufficient progress had not been made regarding various building components. (Sewell Depo, 48:5-22, 49:1-21, 51:7-9, 52:9-19, 120:16-22).

Mr. Butler's performance evaluation took place in late September 2006. (Sewell Depo., 24:16-22, 25:1-6; Butler Depo., 119:21-22, 120:1-18). At the performance review, Mr. Sewell specifically addressed the issue regarding the cleanliness of the building and informed Mr. Butler that his job performance was unsatisfactory. (Sewell Depo, 52:20-22, 53:1-12).

Approximately two and a-half weeks after the 90-day review and after Mr. Sewell told Mr. Butler that his performance was *unsatisfactory*, Mr. Butler failed to have the gate and building open at the prescribed time. (Butler Depo., 137:1-4). Mr. Butler was supervisor responsible for overseeing that the building was open in the morning and secured in the evening. On October 13, the person normally responsible for opening the building was on leave and Mr. Butler committed himself to the responsibility. (Butler Depo., 137:7, 140:19-21, 142:17-20). Mr. Butler failed to complete that task. (Sewell Depo., 82:8-10; Butler Depo., 137:8-9).

Mr. Butler's failure to open the building on October 13 was the determinative event that led to his termination. (Sewell Depo., 105:19-22, 106:1-2). Over the course of the previous months, there had been an accumulation of failures, but that was "the straw that broke the camel's back." (Sewell Depo., 106:6-9). Mr. Sewell determined that there had been no improvements in the conditions of the building and that many of the projects Mr. Butler was working on showed very little progress. (Sewell Depo., 108:20-22, 109:1-6; 117:12-19).

Clearly, DCHFA had a legitimate, nonretaliatory reason for terminating Mr. Butler's employment that was not related to any leave taken or requested by Mr. Butler. As such, DCHFA has met it burden of production. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981) (stating that the employer's burden is merely one of production, and it "need not persuade the court that it was actually motivated by the preferred reasons"); *Chang*, 846 A.2d at 330 (finding that employer met burden of producing legitimate, non-retaliatory explanation for termination when it presented evidence that it was dissatisfied with employee's behavior and was actively contemplating her termination before she took protected leave under the DCFMLA).

3. <u>Mr. Butler Cannot Establish that DCHFA's Reason for Terminating Him Was Pretext</u>

As DCHFA has proffered a legitimate, non-retaliatory reason for its action, the *McDonnell Douglas* framework evaporates and the sole remaining issue is discrimination *vel non*. *See Reeves*, 530 U.S. at 142-43; *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (stating that "to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all the evidence that the adverse employment decision was made for a [retaliatory] reason"). In order to prove that DCHFA's reason is a pretext for retaliation and, thus, survive summary judgment, Mr. Butler must show both that the reason was false and that

retaliation was the real reason.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 207 (1993). This Mr. Butler cannot do.

Mr. Butler does not have any evidence to demonstrate that DCHFA's legitimate reason for terminating him was merely a pretext.  Moreover, Mr. Butler does not have any evidence that demonstrates the ultimate issue—that DCHFA retaliated against him on the basis of his leave.

In his Second Amended Complaint, Mr. Butler alleges the following: (a) Mr. Sewell was upset due to the missed vendor meeting; (b) Mr. Butler was terminated without notice for performance lapses that occurred prior to his leave; (c) the inconsequential nature of the performance lapses and their failure to be included in the employee handbook; and (d) the failure of Mr. Butler to receive written performance evaluation.  (Second Amended Complaint, ¶ 11-15).  None of these issues demonstrate pretext.

### a.      *Missed Vendor Meeting*

Mr. Butler raises the issue of his brief meeting with Mr. Sewell following the missed vendor meeting as support for his FMLA and DCFMLA claims.  Whatever the purpose of this inclusion, it is irrelevant because Mr. Sewell's decision to terminate Mr. Butler had already been made almost two weeks prior, on October 13, 2006.

### b.      *Termination Without Prior Notice*

Mr. Butler raises the issue that he was terminated for alleged performance lapses on October 27, 2006, and "[d]espite the fact that Sewell knew that these alleged lapses occurred before Mr. Butler took family leave and before Mr. Butler requested additional family leave, Sewell said nothing to Butler about his intentions until that day."  (Second Amended Complaint, ¶ 13).  This argument, however, fails to stand up.

First, Mr. Sewell had raised concerns regarding Mr. Butler's job performance

approximately one month before, during the 90-day review. Notwithstanding, Mr. Sewell was

not tied to a specific track to take in going about his decision to terminate Mr. Butler. Mr. Butler

was an at-will employee at the DCHFA and, as such, could be terminated without cause or prior

notice. (Butler Depo., 224:1-3; DCHFA Employee Handbook, dated June 2006, p. 2 (**Exhibit**

**10**)).[2] The "Employee Conduct, Corrective Action" section of the Employee Handbook in effect

at the time of Mr. Butler's termination stated in relevant part that:

> In the event of an infraction of an established policy or procedure, a sequence of
> corrective actions may take place, including:
>
> • Oral warning
>
> • Written warning
>
> • Suspension
>
> • Dismissal
>
> No particular procedure or sequence of procedures need be followed.

(Exhibit 10, p. 17). Based on the foregoing language, while the enumerated sequence of

corrective actions *may* take place, it was not required and an employee could be terminated at

any time. Mr. Butler conceded this point: that DCHFA did not have to take any of the three

enumerated steps before deciding to dismiss an employee. (Butler Depo., 226:3-22, 227:1-22,

228:1-3).

Second, while Mr. Sewell did consider Mr. Butler's performance to be unsatisfactory in

September 2006 and had issues with the progress Mr. Butler was making on his assigned tasks, it

was Mr. Butler's failure to open the building on October 13 that was the determinative event that

---

2. The Employee Handbook specifically states: "Employment with the Agency is at will. . .
. [A]n employee may be terminated at any time without cause or prior notice." (Exhibit 10). Mr.
Butler acknowledged receipt of DCHFA's Employee Handbook on July 5, 2006. (Employee
Acknowledgement, dated July 5, 2006 (**Exhibit 11**)).

led Mr. Sewell to decide to terminate Mr. Butler's employment.  (Sewell Depo., 105:19-22, 106:1-2).  As Mr. Sewell stated at his deposition:

> A.  *The failure to open the building was the determinative, the failure to have the building open on time was the determinative event where I decided to terminate Mr. Butler.*
>
> Q.  So that was the reason?
>
> . . . .
>
> A.  *I said the determinative event.  It had been an accumulation of failures and that was the straw that broke the camel's back, if you will.*

(Sewell Depo., 105:21-22, 106:1-3, 6-9).  Thus, it was not until at October 13, 2006, the day Mr. Butler failed to open the gate and building, that the determination to terminate Mr. Butler was reached.  On that day, which was a Friday, Mr. Butler and Mr. Sewell were not able to discuss the gate issue as Mr. Sewell had a meeting to attend.  Mr. Butler did not talk to Mr. Sewell any further about the gate issue that day.  (Butler Depo., 151:15-17).  Mr. Butler then went on leave for the entire following week, from October 16-20, and did not return to work until the following Monday afternoon, October 23.  (Butler Depo., 153:7-10, 157:22, 158:1, 8-13).  After returning, however, Mr. Butler did not speak with Mr. Sewell on October 23.  (Butler Depo., 159:3-6).  Nor did Mr. Butler speak with Mr. Sewell on October 24.  (Butler Depo., 159:14-16).  In fact, Mr. Sewell did not even see Mr. Butler next until October 25, and then only briefly.  The timing of the termination had nothing to do with leave—it had been in the works.  *See Ahmarani v. Sieling & Jones, Inc.*, 211 F. Supp. 2d 658, 660 (D. Md. 2002) (finding summary judgment for defendant where demonstrated that "[w]hile the exact date that [the employee] would be fired may not have been set when he requested FMLA leave, [the employer] had already decided to fire him before he requested the leave").

c.    *"Inconsequential" Performance Lapses*

Mr. Butler also asserts that the "alleged performance lapses were also so inconsequential that the defendant's personnel rules did not even list them as grounds for immediate termination." (Second Amended Complaint, ¶ 14). First, it is not Mr. Butler's decision to make regarding what is or is not consequential, it's his employer's prerogative.

Second, as an at-will employee, Mr. Butler could be terminated anytime and the "Employee Conduct, Corrective Action" portion of the Employee Handbook provided as such: "No particular procedure or sequence of procedures need be followed. Each situation is evaluated on its own facts by management." (Exhibit 10, p. 17). Mr. Sewell evaluated Mr. Butler's situation, found it lacking, and terminated him.

Moreover, while the Employee Handbook sets out certain actions or behavior that *may* result in immediate suspension or termination, it is specifically prefaced that such items "include, but are not limited to, the following"; thus, denoting that the list is nonexclusive. (Exhibit 10, p. 17).

d.    *Failure to Document and/or Receive Written Performance Evaluation*

Lastly, Mr. Butler asserts that Mr. Sewell failed to document some of Mr. Butler's performance issues in a written performance evaluation, that Mr. Butler should have received at the end of FY 2006. (Second Amended Complaint, ¶ 15). This issue is a *non sequitur*. Mr. Sewell did not fail to document "some of" the lapses, none were documented. Mr. Butler was treated no differently than any other of Mr. Sewell's direct reports who underwent the 90-day review process, the evaluations were oral, not written, and no one received one. (Sewell Depo., 55:6-10; Butler Depo., 136:17-22; Alexander Depo., 23:3-5).

e.    *Evidence Demonstrating No Pretext*

Further demonstrating that DCHFA did not retaliate against Mr. Butler is the fact that both employees who were informed by Mr. Sewell that their performance was less than satisfactory at the 90-day review—Mr. Butler and Francis Dyson—were subsequently terminated at about the same time by Mr. Sewell.  (Sewell Depo., 156:22, 157:1-2); *cf. Metzler v. Fed. Home Loan Bank*, 464 F.3d 1164, 1175 (10th Cir. 2006) (stating that a plaintiff may show pretext by providing evidence that he was treated differently from other similarly-situated employees, defined as "those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline").  Ms. Dyson "got the same warning as Mr. Butler, that her performance was unsatisfactory and that it needed to be improved," (Sewell Depo., 157:16-18), at her 90-day review and the same end result.

Additionally, DCHFA did not hire anyone to take over Mr. Butler's position after he was terminated.  (Exhibit 9).  His overall job responsibilities regarding facilities maintenance were incorporated into the position of Fran Makle, the Deputy Executive Director.  (Exhibit 9; Sewell Depo., 130:3-9, 131:1:6-11).

**B.    Mr. Butler Cannot Prove that DCHFA Interfered with, Restrained, or Denied His Rights Under FMLA and DCFMLA**

In this case, there is no genuine issue of material fact as to whether DCHFA's actions were related to the exercise of Mr. Butler's family medical leave rights.  DCHFA would have terminated Mr. Butler regardless of his request for, or taking of, FMLA and DCFMLA leave. *See Serio v. Jojo's Bakery Rest.*, 102 F. Supp. 2d 1044, 1052 (S.D. Ind. 2000) (granting employer's motion for summary judgment on interference claim as employer "lawfully could have terminated [employee] for poor performance either before, during, or after his request for medical leave without interference from the FMLA").

Mr. Butler's Second Amended Complaint asserts that because DCHFA terminated Mr. Butler after he allegedly returned from family medical leave and after he requested additional future leave, that DCHFA interfered with his rights under FMLA and DCFMLA.  Thus, it appears that Mr. Butler is asserting two substantive rights: (1) the right to be restored to his former position following his initial leave period—October 16-20, 2006; and (2) the right to take additional future family medical leave.

"It is well settled . . . that an employee who requests leave under the FMLA is not entitled to 'any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave.'" *Lochridge v. City of Winston-Salem*, 388 F. Supp. 2d 618, 628 (M.D.N.C. 2005) (citing 29 U.S.C. § 2614(a)(3)(B)); *accord* 29 U.S.C. § 2614(a)(3)(B); D.C. Code § 32-505(e)(2); 29 C.F.R. § 825.216(a) (stating that "[a]n employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period"); *Maldonado v. Frio County, Tex.*, 2004 WL 1304951, at *4 (W.D. Tex. 2004) (finding that "an employer is entitled to dismiss an employee for any lawful reason at any time, whether before, during, or after an employee requests or takes leave pursuant to FMLA, as long as the employer does not discriminate or retaliate against the employee for requesting or taking such leave").  Further, the D.C. Court of Appeals has stated that "the federal FMLA, to which we may look for guidance, 'simply does not force an employer to retain an employee [who is] on FMLA leave when the employer would not have retained the employee had the employee not been on FMLA leave.'"  *Johnson*, 2008 WL 2915115, at *8 (quoting *Throneberry v. McGhee Desha Cnty. Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005)).  "In other

words, the FMLA does not insulate employees from legitimate disciplinary action by the employer." *Lochridge*, 388 F. Supp. 2d at 628.

As discussed in detail in Section A, *supra*, the decision to terminate Mr. Butler was unrelated to his request for, or taking of, leave. In September 2006, during the 90-day review, Mr. Sewell was unsatisfied with the condition of the building, i.e., the cleanliness and insect problems, (Sewell Depo., 44:1-3), and found that sufficient progress had not been made regarding various building components and projects assigned to Mr. Butler. (Sewell Depo, 48:5-22, 49:1-21, 51:7-9, 52:9-19, 120:16-22). Mr. Sewell informed Mr. Butler that his job performance was unsatisfactory. (Sewell Depo, 52:20-22, 53:1-12).

Two and a-half weeks later, on October 13, 2006, Mr. Butler failed to have the gate and building open at the prescribed time. (Butler Depo., 137:1-4). On or about that day, the decision to terminate Mr. Butler was reached by Mr. Sewell. It is clear that from that time, the wheels of Mr. Butler's termination were in motion, and Mr. Butler was not treated any differently than had he not subsequently requested or utilized any alleged family and medical leave. *See Metzler*, 464 F.3d at 1180 (stating that "an employee may be dismissed, preventing her from exercising her statutory right to FMLA leave [or reinstatement after leave] . . . if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave" (quoting *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 961 (10th Cir. 2002))); *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1262 (10th Cir. 1998) (stating that "[u]nder FMLA, an employee who requests leave or is on leave has no greater rights than an employee who remains at work"); *Lochridge*, 388 F. Supp. 2d at 628 (finding that employee's request for FMLA leave, submitted after termination process had begun, did not require the employer to discontinue its termination

proceedings against her or to afford her additional unpaid leave under the FMLA).[3]

## III.  CONCLUSION

For the foregoing reasons, DCHFA should be granted summary judgment on Plaintiff's claims for violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.* and the District of Columbia Family and Medical Leave Act ("DCFMLA"), D.C. Code Ann. §§ 32-501 *et seq.*

Respectfully submitted,


 /s/  Charles W. Chotvacs
Constantinos G. Panagopoulos #430932
Jeffrey W. Larroca #453718
Charles W. Chotvacs #484155
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
601 13th Street, N.W.
Suite 1000 South
Washington, D.C.  20005-3807
Telephone: (202) 661-2200
Facsimile: (202) 661-2299
cgp@ballardspahr.com
larroca@ballardspahr.com
chotvacsc@ballardspahr.com

August 22, 2008

*Counsel for Defendant*
*District of Columbia Housing Finance Agency*

---

3.     To the extent the interference claim relates to future leave, it must fail because an employee who is terminated is no longer an eligible employee and, thus, DCHFA could not unlawfully interfere with Mr. Butler's rights under FMLA and DCFMLA.  *See Maldonado v. Frio County, Tex.*, 2004 WL 1304951, at *4 (W.D. Tex. June 1, 2004).

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

REGINALD L. BUTLER,

               *Plaintiff*,

v.

DISTRICT OF COLUMBIA HOUSING
FINANCE AGENCY,

               *Defendant*.

_____

Case No.: 07-CV-2046 (HHK)
Next Event:  Status Conference
              11/14/2008 at 10:00 a.m.

**DISTRICT OF COLUMBIA HOUSING FINANCE AGENCY'S
STATEMENT OF UNDISPUTED MATERIAL FACTS**

Defendant District of Columbia Housing Finance Agency ("DCHFA") submits the following undisputed material facts for consideration by the Court:

*Mr. Butler's Duties and Responsibilities*

1.     Mr. Butler was employed at DCHFA as the Director of Business Services. (Deposition of Reginald L. Butler, 17:9-11, hereinafter "Butler Depo." (**Exhibit 1**)).  Mr. Butler's main function was to oversee the operation and maintenance of DCHFA's facility.  (Id. at 17:18-20).  As part of these duties, Mr. Butler was responsible for monitoring the cleaning of the facility; addressing and contracting out necessary repairs to the facility; coordinating inspections and certifications; and overseeing all other ancillary services associated with the building, such as extermination and trash collection.  (Id. at 17:20-22, 18:1-4, :18-22, 19:1-7, 47:18-22, 48:1-4, 90:6-16).  Mr. Butler was also responsible for the security and telephone systems and maintaining the vehicles used by the DCHFA.  (Id. at 18:1, 324:14-22, 325:1-7).

*Arrival of New Executive Director – Harry Sewell*

2.      In June 2006, Harry Sewell was appointed Executive Director of DCHFA. (Deposition of Harry Sewell, 7:11-12, 8:5-6, hereinafter "Sewell Depo." (**Exhibit 2**)).

3.      During Mr. Sewell's first three months in the position, Mr. Sewell observed the performance of the individuals who reported directly to him in order to evaluate them.  (Sewell Depo., 25:9-12, 32:10-22, :33:1).

4.      In September 2006, Mr. Sewell announced that he would be conducting 90-day performance evaluations of all direct reports, including evaluations of Harry Alexander (General Counsel), Francis Dyson (Sewell's Executive Assistant), and Mr. Butler.  (Sewell Depo., 25:9-15, 156:22, 157:1-4; Deposition of Harry Alexander, 22:21-22, 23:1-2, hereinafter "Alexander Depo." (**Exhibit 3**)).

5.      Mr. Sewell found Mr. Alexander to be doing a good job.  (Alexander Depo., 23:6-8).  Mr. Sewell also told Mr. Alexander, however, that he was concerned with Mr. Butler's performance.  (Id. at 22:11-20, 23:9-14).  Mr. Sewell stated that he was going to take discipline against Mr. Butler.  (Id. at 23:19-22, 24:1-9).  Mr. Sewell was concerned that the building was not clean and that there were bugs, and said that Mr. Butler needed to improve.  (Id. at 24:7-15).

6.      In evaluating his Executive Assistant, Francis Dyson, Mr. Sewell found that her performance was unsatisfactory.  (Sewell Depo., 157:1-3, :16-18).  He warned her to improve. (Id. at 157:16-18).  She failed to improve and, like Mr. Butler, was terminated.  (Id. at 156:18-22, 157:1-6).

7.      Mr. Butler's 90-day performance evaluation took place in late September 2006. (Sewell Depo., 24:16-22, 25:4-6; Butler Depo., 44:2-5).

8.      In evaluating Mr. Butler's performance, Mr. Sewell considered the conditions in

the building, attendance at meetings, completion of assignments, and similar items. (Sewell Depo., 34:1-5).

9.      Mr. Sewell was unsatisfied with the cleanliness of the building. (Sewell Depo., 43:4-7, 44:1-3, :20-22, 45:1-4, 53:1-4).

10.     Mr. Butler repeatedly complained to the cleaning contractor. (Butler Depo., 38:3-22, 39:1-7).

11.     Mr. Sewell was also discontent due to the problem with insects in the building. (Sewell Depo., 43:4-8, 44:1-3).

12.     Mr. Butler himself had seen insects in the building and other employees had also talked to Mr. Butler about insects and rodent droppings. (Butler Depo., 109:3-12, 113:22, 114:1-12, 115:6-13).

13.     Mr. Sewell found that sufficient progress had not been made regarding various building components such as the problems with the garage, roof, and elevator, nor had an issue with insurance and registration of DCHFA's vehicles been remedied. (Sewell Depo., 48:5-9, :19, 49:6-8, 20-21, 51:7-9, 52:9-19, 118:7-22, 119:1-17, 120:10-22, 162:3-21, 163:12-22, 164:1-4; Butler Depo. 327:19-22, 328:1-5).

14.     At the 90-day evaluation, Mr. Sewell described his concerns about the cleanliness of the building and informed Mr. Butler that his job performance was unsatisfactory. (Sewell Depo, 52:20-22, 53:1-12).

15.     Mr. Butler concedes that Mr. Sewell showed him dust on a chest in his office. (Butler Depo., 123:5-14).

16.     Neither Mr. Butler nor any of Mr. Sewell's other direct reports for which he did 90-day reviews received a written performance evaluation. (Sewell Depo., 55:6-10; Butler

Depo., 136:17-22; Alexander Depo., 23:3-5).

17.    Mr. Butler understood that at the time of his 90-day review, there were still issues involving the facility that had to be worked on.  (Butler Depo., 127:10-22, 128:1-10).

18.    Mr. Butler admitted that the DCHFA was dealing with an old facility that had problems. (Butler Depo., 46:15-22, 47:1).

19.    The roof of the DCHFA facility had been leaking since at least 2004.  (Butler Depo., 64:9-19, 65:3-5, 72:3-22, 73).

20.    The garage at the DCHFA had structural problems that were being reviewed. (Sewell Depo., 43:9-16).

21.    The gate to the facility posed a two-fold problem because not only was it difficult for DCHFA employees to operate, but once opened, the general public could park in DCHFA's lot.  (Butler Depo., 127:19-22, 128:1-10).

*Gate Incident -- October 13, 2006*

22.    Mr. Butler was the supervisor in charge of ensuring that the rear gate and building were open in the mornings.  (Butler Depo., 138:4-22, 139:1-2).

23.    The parking lot of the building was surrounded by a fence and a gated entryway. In order for employees to get to work, the gate had to be opened in the morning, the rear door opened, the alarm disarmed, and the front door unlocked.  (Butler Depo., 139:3-22, 140:1-10).

24.    On October 13, 2006, two and a-half weeks after his unsatisfactory 90-day performance review, Mr. Butler failed to get the building opened.  (Butler Depo., 137:1-10).

25.    Normally, Tony Ulmer, an employee who reported to Mr. Butler, was responsible for actually opening the gate and building.  (Butler Depo., 137:11-14).  On days in which Mr. Ulmer was not in, Mr. Butler, as his supervisor, was responsible for making alternative

arrangements.  (Id. at 138:4-14).

26.     On October 13, Mr. Ulmer was on leave and Mr. Butler decided that he himself would open the building.  (Butler Depo., 137:7, 140:19-21, 142:17-20).  However, Mr. Butler did not get in on time or open the gate as required.  (Id. at 141:3-11, 144:2-13).

27.     When Mr. Sewell arrived that morning, he found that the entry had not been unlocked.  (Sewell Depo., 82:8-10; Butler Depo., 137:8-9).  Mr. Sewell pulled up to the gate and a line of vehicles, including the cleaning crew and several employees, pulled up behind him. (Sewell Depo., 82:10-12, 83:3-6).  Mr. Sewell got out of his car, reached through the bars, unlocked the gate, swung the gate open, disarmed the alarm, and opened the building for the day. (Id. at 88:11-14, 89:1-3).

*Termination Decision*

28.     Mr. Butler's failure to open the building on October 13, 2006 convinced Mr. Sewell that Mr. Butler should be terminated.  (Sewell Depo., 105:19-22, 106:1-2, :6-9, 108:6-9). Mr. Sewell found that there had been an accumulation of failures and Mr. Butler's failure to show up on time and open the gate was "the straw that broke the camel's back."  (Id. at 106:6-9).

29.     Mr. Butler admits that he knew Mr. Sewell was displeased regarding the gate incident.  (Butler Depo., 137:1-10, 150:14-18).

30.     In addition to the gate incident, there had been no improvements, in that bugs and dirt were still an issue and other projects Mr. Butler was working showed very little progress. (Sewell Depo., 108:20-22, 109:1-6, 117:12-19, 127:7-22, 128:1-2, 129:1-5).

31.     Mr. Butler cannot dispute that Mr. Sewell made the decision to terminate him at the time of the October 13, 2006 gate incident.  (Butler Depo., 174:15-22, 175:1-11).

32.     Mr. Sewell talked to Mr. Alexander about terminating Mr. Butler long before any

family medical leave request form had been made. (Alexander Depo., 24:21-22, 25:1-14; Butler Depo., 270:16-22, 271:1-6, 299:1-3).

33.    Mr. Butler admits that upon arriving at work on October 13, 2006, Mr. Sewell wanted to speak with him. (Butler Depo., 148:2-5). Mr. Butler admits that when he walked into Mr. Sewell's office, Mr. Sewell said he needed to talk to Mr. Butler about the gate. (Id. at 149:19-21, 150:1-2). Mr. Butler admits that Mr. Sewell wanted to talk to him, but that Mr. Sewell said that he did not have time to talk right then as he had a meeting to attend. (Id. at 151:10-14).

34.    Mr. Butler was concerned that Mr. Sewell was upset with him about the gate incident. (Butler Depo., 150:14-18, 151:18-22, 152:1-2).

35.    Mr. Butler admits that he did not talk to Mr. Sewell any further on October 13, 2006. (Butler Depo., 151:8-22, 152:1-2).

36.    Mr. Butler admits that he did not talk to Mr. Sewell again until two days after he returned from leave on October 25, 2006. (Butler Depo., 151:15-17, 171:10-12).

37.    After the October 13 incident, Mr. Sewell spoke with both Sam Thomas (H.R. Director) and Mr. Alexander (General Counsel) regarding Mr. Butler's termination. (Sewell Depo., 149:18-22, 150:1-8, 153:21-22, 154:1-16, :20-22, 155:1-5).

38.    Mr. Sewell consulted with Mr. Alexander for legal advice regarding what the employee handbook said about terminating an employee. (Alexander Depo., 24:21-22, 25:1-22, 26:1-8; Sewell Depo., 150:4-5). Mr. Alexander advised Mr. Sewell that he could terminate Mr. Butler because he was an at-will employee. (Alexander Depo., 26:16-20).

*Mr. Butler Takes Leave*

39.    On October 13, Mr. Butler was preparing to take leave. (Butler Depo., 252:17-

6

19).

40.    Mr. Butler made travel arrangements to leave Saturday, October 14 and return Wednesday, October 18.  (Butler Depo., 253:6-13, 254:19-22, 255:1-2).

41.    Mr. Butler submitted a leave form.  (Butler Depo., 242:4-6).

42.    Mr. Butler left early on October 13.  (Butler Depo., 240:14-22, 241:3-4, :17-19).

43.    It is undisputed that Mr. Butler did not tell Mr. Sewell he was taking leave. (Butler Depo., 245:6-21, 246:4-17).

44.    It is also undisputed that Mr. Sewell had no idea that Mr. Butler was leaving to take care of his mother.  (Sewell Depo., 68:8-10, 72:16-22, 73:1-4, 143:20-22, 144:1-3).

45.    Mr. Butler was on leave from work the week of October 16, 2006.  Although Mr. Butler was originally to return on October 18, this was extended to October 22.  (Butler Depo., 253:11-12, 255:7-21).  A second change moved Mr. Butler to returning on Monday, October 23 at around 10 a.m.  (Id. at 261:13-15).

46.    It is undisputed that Mr. Butler did not talk with Mr. Sewell about extending his leave.  (Butler Depo., 157:8-17, 259:18-22, 260:1).

47.    Mr. Butler did not speak to Mr. Sewell at all while he was on leave.  (Butler Depo., 157:8-17; Sewell Depo., 73:5-7).

48.    Mr. Butler did not return to work until the afternoon of October 23.  (Butler Depo., 153:7-10, 157:22, 158:1, :8-13).

49.    Mr. Sewell was unaware of Mr. Butler's reason for taking the leave.  (Sewell Depo., 68:8-10, 72:16-22, 73:1-4, 143:20-22, 144:1-3).

50.    Neither Mr. Butler nor anyone else had any discussions with Mr. Sewell about why Mr. Butler was taking the requested leave.  (Sewell Depo., 72:16-22, 73:1-7; Butler Depo.,

245:6-22, 246:1-17).

51.     As a result of the change in plans, Mr. Butler missed the meeting with the vendor that Mr. Butler himself had scheduled and that involved an issue for which Mr. Butler was responsible.  (Butler Depo., 155:8-14, :22, 156:1, :14-22, 157:1-7, 260:2-9; Sewell Depo., 67:9-12, :16-18).  Instead, Mr. Sewell attended the meeting alone. (Sewell Depo., 67:22, 68:1-2).

*Mr. Butler Returns from Leave*

52.     Mr. Butler did not speak with Mr. Sewell until Thursday, October 25.  (Butler Depo., 159:3-6, :14-16, 171:10-12).

53.     On October 25, 2006, Mr. Butler asked of Mr. Sewell what had happened at the meeting he had missed.  (Butler Depo., 171:15-17; Sewell Depo., 74:16-17, 75:10-11, :15-16).  Mr. Sewell told Mr. Butler that he would take care of it.  (Butler Depo., 171:16-19; Sewell Depo., 75:15-20).

54.     Mr. Butler became concerned that Mr. Sewell might still be upset regarding the gate incident.  (Butler Depo., 171:3-12, 15-22, 172:1, 173:1-22, 174:1-22, 175:1-11).

55.     On October 26, 2006, Mr. Sewell sent Mr. Butler an e-mail asking him to confirm the responsibilities for opening and securing the building.  (E-mail from Harry D. Sewell to Reginald Butler, dated October 26, 2006 (**Exhibit 4**); Butler Depo., 219:16-17, 220:4-7, :14-19; Sewell Depo., 81:3-22).

56.     Mr. Butler typed up a response that set out the procedure for opening and closing the building in which he admitted that in Mr. Ulmer's absence, he was responsible.  (Response from Reginald Butler (**Exhibit 5**); Butler Depo., 222:3-5).

57.     Mr. Sewell thought that Mr. Butler's response and the arrangements he had made for opening and closing the building were inadequate as evidenced by the fact that it resulted in

the building not being opened.  (Sewell Depo., 91:19-21, 93:12-14, 94:10-15).

58.    At this same time, Mr. Alexander was preparing a termination letter for Mr. Butler.  (Sewell Depo., 150:19-20; Alexander Depo., 27:10-22).

*Mr. Butler Finally Requests Family and Medical Leave*

59.    On October 26, 2006, Mr. Butler approached Mr. Thomas to request family medical leave to take care of his mother.  (Butler Depo., 274:2-4, :16-22, 275:1-9; E-mail from Reginald Butler to Samuel Thomas, dated October 26, 2006 (**Exhibit 6**)).

60.    Mr. Butler filled out the Family and Medical Leave Request Form.  (Family and Medical Leave Request Form (**Exhibit 7**); Butler Depo., 287:3-5, 291:11-21).

61.    Prior to October 26, 2006, Mr. Butler had never discussed needing leave to take care of his mother with Mr. Sewell.  (Butler Depo., 271:7-21, 280:18-21; Sewell Depo, 143:13-14, :20-22, 144:1-3).

62.    Mr. Butler never discussed the request for future leave submitted on October 26, 2006 with Mr. Sewell.  (Butler Depo., 271:7-21, 280:18-21, 298:12-15; Sewell Depo, 143:13-14, :20-22, 144:1-3).

*Termination Meeting*

63.    On the morning of October 27, 2006, Mr. Sewell, in the presence of Mr. Alexander and Mr. Thomas, met with Mr. Butler.  (Sewell Depo., 147:11-22).  At the meeting, Mr. Butler was given a termination letter by Mr. Sewell and was told that he was being separated from DCHFA that day.  (Termination Letter, dated October 27, 2006 (**Exhibit 8**); Sewell Depo., 148:3-22).  Mr. Sewell reiterated that Mr. Butler's performance was previously unsatisfactory and continued to be unsatisfactory, and that he was being terminated.  (Sewell Depo., 148:18-22; Butler Depo., 179:10-19).

64. The decision to terminate Mr. Butler was arrived at and made solely by Mr. Sewell. (Sewell Depo., 150:21-22, 151:1; Alexander Depo., 35:19-21).

65. It is undisputed that during the course of the termination, Mr. Butler never mentioned family medical leave, nor did anyone else present mention leave. (Butler Depo., 301:13-19).

66. DCHFA did not hire anyone to take over Mr. Butler's position after he was terminated. (DCHFA's Answers to Plaintiff's Interrogatories, Answer No. 5 (**Exhibit 9**). His overall job responsibilities regarding facilities maintenance were incorporated into the position of Fran Makle, the Deputy Executive Director. (Exhibit 9; Sewell Depo., 130:3-9, 131:1:6-11).

*Other Terminations*

67. Mr. Sewell also terminated his Executive Assistant, Francis Dyson, at around the same time he terminated Mr. Butler. Aside from Mr. Butler, only one other employee, Ms. Dyson, was informed by Mr. Sewell that her performance was less than satisfactory as part of the 90-day review process in the fall of 2006. (Sewell Depo., 156:22, 157:1-4). Ms. Dyson "got the same warning as Mr. Butler, that her performance was unsatisfactory and that it needed to be improved." (Id. at 157:16-18). Ms. Dyson's performance failed to improve and she was terminated. (Id. at 158:1-7). Ms. Dyson did not receive a written notice other than the oral warning at her 90-day review, same as Mr. Butler. (Id. at 157:11-16).

68. Mr. Butler was an at-will employee with the DCHFA. (Butler Depo., 224:1-3; DCHFA Employee Handbook, dated June 2006, p. 2 (**Exhibit 10**)). The DCHFA Employee Handbook provides that "Employment with the Agency is at will. . . . [A]n employee may be terminated at any time without cause or prior notice." (Exhibit 10, p.2).

69. The DCHFA Employee Handbook did not require Mr. Sewell to undertake

progressive discipline before terminating Mr. Butler.  (Butler Depo., 226:3-22, 227:1-22, 228:1-3; Exhibit 10, p. 17).

70.     Mr. Butler signed an "Employee Acknowledgement" form on July 5, 2006, acknowledging receipt of DCHFA's Employee Handbook.  (**Exhibit 11**).

Respectfully submitted,


 /s/  Charles W. Chotvacs
Constantinos G. Panagopoulos #430932
Jeffrey W. Larroca #453718
Charles W. Chotvacs #484155
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
601 13th Street, N.W.
Suite 1000 South
Washington, D.C.  20005-3807
Telephone: (202) 661-2200
Facsimile: (202) 661-2299
cgp@ballardspahr.com
larroca@ballardspahr.com
chotvacsc@ballardspahr.com

*Counsel for Defendant*
*District of Columbia Housing Finance Agency*

August 22, 2008

*Reginald L. Butler v. District of Columbia Housing Finance Agency*
Case No. 07-CV-2046 (HHK)

—Defendant's Motion for Summary Judgment—

# EXHIBIT 1

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA
 2

 3    - - - - - - - - - - - - - - -x
                                   :
 4    REGINALD L. BUTLER,          :
                                   :
 5              Plaintiff,         :
                                   :
 6          vs.                    : Civil Action No.
                                   : 07-cv-2046 (HHK)
 7    DISTRICT OF COLUMBIA         :
      HOUSING FINANCE AGENCY,      :
 8                                 :
                Defendant.         :
 9    - - - - - - - - - - - - - - -x

10

11                              Washington, D.C.

12                              Friday, June 20, 2008

13        Deposition of

14            REGINALD L. BUTLER

15        Plaintiff, taken on behalf of counsel for

16    the Defendant in the above-entitled matter, before

17    Denise M. Brunet, RPR and Notary Public in and for the

18    District of Columbia, taken at the offices of Ballard,

19    Spahr, Andrews & Ingersoll, 601 13th Street,

20    Northwest, Suite 1000, Washington, D.C., commencing at

21    9:42 a.m., when were present on behalf of the

22    respective parties:
```

COPY

a1c8a12b-7527-4a52-b027-ba053332992b

Page 4

1                    P R O C E E D I N G S

2        Thereupon,

3                    REGINALD L. BUTLER

4    was called for examination by counsel for the

5    Defendant and, after having been sworn by the Notary

6    Public, was examined and testified as follows:

7            EXAMINATION BY COUNSEL FOR THE DEFENDANT

8            BY MR. PANAGOPOULOS:

9        Q       Good morning, Mr. Butler.

10       A       Good morning.

11       Q       My name is Dino Panagopoulos.  I represent

12   the District of Columbia Housing Finance Agency in the

13   lawsuit you have filed against the Agency.  We are

14   here today to take your deposition in the case.

15   Co-counsel, Charles Chotvacs, will be sitting with me

16   today and your lawyer is here with you.  You sat in on

17   the deposition of Mr. Sewell yesterday, so you've seen

18   how the process in general works.

19               Have you ever been deposed before, sir?

20               MR. GOULD:  Excuse me, Dino, I hate to

21   interrupt you, but there are certain housekeeping

22   things we agreed to take care of, first of all, with

a1c8a12b-7527-4a52-b027-ba053332992b

1    position I had was -- was titled chief of compliance.

2    There may have been a slight variation, but that's

3    what it was.

4         I had the title of director of business

5    development and director of business services.   I

6    believe that's all.  And a short tenure as associate

7    director of a branch office under the single family

8    loan program.

9         Q    Okay.  And what was your title at the time

10   you were terminated?

11        A    Director of business services.

12        Q    Other than the DCHFA, have you ever been

13   terminated from a job?

14        A    No.

15        Q    Describe for me, if you would, your duties

16   and responsibilities as the director of business

17   services at DCHFA.

18        A    One of the main functions was the

19   operations of the facility, operation and maintenance

20   of the facility, from cleaning and repairs,

21   inspections, certifications, those kinds of things.

22             In addition, I was responsible for the

a1c8a12b-7527-4a52-b027-ba053332992b

Page 18

1    security system, for the telephone system and

2    reception and, you know, all the ancillary services

3    associated with operating the building, trash

4    collection and extermination, those kinds of things.

5         Q    Okay.

6         A    And special projects as requested by the

7    director.

8         Q    Okay.  At what point in time did you obtain

9    the title director of business services?  Do you

10   remember the year?

11        A    I don't remember exactly.  Around 1999 or

12   shortly thereafter, I would think.

13        Q    Okay.  You mentioned several items with

14   respect to your duties and responsibilities as they

15   related to the operation and maintenance of the

16   building.  I'd like to go over those in a bit more

17   detail.  The first thing you mentioned was cleaning.

18             What were your responsibilities with

19   respect to the cleaning of the building at the DCHFA?

20        A    Well, we had an outside contractor, and I

21   was the primary contact with the contractor.

22        Q    Okay.

a1c8a12b-7527-4a52-b027-ba053332992b

1      A      And interfaced with the contractor.

2      Q      Okay.

3      A      And that included monitoring the work.

4      Q      So any types of problems or issues, it was

5  your responsibility to talk to the contractor about

6  those issues?

7      A      Yes.

8      Q      Did you have any overall contracting

9  responsibility?

10     A      What do you mean?

11     Q      Well, did you negotiate contracts for the

12  cleaning contractor?

13     A      I was involved in that end of it, but I did

14  not -- of course, I didn't sign contracts but was

15  involved in the negotiation.

16     Q      Okay.  You were involved in the negotiation

17  of procurement of the contract?

18     A      Involved in the bid process, securing bids

19  and evaluating bids and making recommendations.

20     Q      Okay.  When you say you interfaced with the

21  maintenance company, tell me what that means.

22             Does that mean that you were talking to

a1c8a12b-7527-4a52-b027-ba053332992b

Page 38

1    point in time?

2        A    I'm not sure at that particular juncture.

3    One of the -- I'm just going to speak to the

4    complaints that I made to him.  I'm not going to say

5    for sure that it was in the spring.

6            But there were occasions when I found in

7    the corners of the facility in different places that

8    looked like perhaps they had not cleaned as thoroughly

9    as they should have.

10       Q    When you say the corners of the facility,

11   what do you mean?  Are you talking about the corners

12   of every room?  The corners of every corridor?  The

13   corners of the stairwell?  Some combination thereof,

14   or just the four corners of the building?  What are we

15   talking about?

16       A    I'm talking about the corners of maybe a

17   corridor or a stairwell.  One other thing that I

18   complained to him about was the need to clean the

19   elevators better.

20       Q    Okay.  So the corners of stairwells and

21   elevators -- I'm sorry, the corners of stairwells and

22   corridors and the cleanliness of the elevators.

a1c8a12b-7527-4a52-b027-ba053332992b

Page 39

1          Do you recall complaining about any other

2    issues?

3          A     The outside of the building.

4          Q     What did you complain about with respect to

5    the outside of the building?

6          A     That some days they didn't do a thorough

7    job.

8          Q     All right.  Anything else you recall

9    complaining about with respect to their performance?

10          A     That's all I can recall at this time.

11          Q     What about their performance with respect

12    to dusting offices and rooms in other areas of the

13    building, did you ever complain about that?

14          A     I don't recall a conversation about that

15    except the conversation I did have after my session

16    with Mr. Sewell.

17          Q     So you spoke to someone at MGM after your

18    conversation with Mr. Sewell?

19          A     Yes.

20          Q     After your conversation -- well, let's go

21    ahead and talk about that conversation real quick, and

22    then we'll get back to this area.

a1c8a12b-7527-4a52-b027-ba053332992b

Page 44

1    something unusual.  You know, once a week.

2        Q    All right.  Did there come a point in time

3    roughly 90 days after Mr. Sewell started that he spoke

4    to you about his view of your performance?

5        A    Yeah.  I mean, at the end of September.

6        Q    Okay.  Do you know whether or not you were

7    the only direct report he spoke to relating to his

8    views of performance of his direct reports?

9        A    Well, he had indicated, I believe in a

10   staff meeting, that that was one of the things that he

11   had been charged to do.  This was close to the time

12   that he was doing it.  It wasn't like, you know, we

13   knew it all along that he had been charged with doing

14   a 90-day evaluation.

15       Q    Okay.  He told you that shortly before the

16   90-day evaluation?

17       A    Yes.

18       Q    And do you know whether or not he provided

19   90-day evaluations to other of his direct reports

20   other than you?

21       A    I mean, I wasn't privy to any of them.

22       Q    Okay.  Did any of the other direct reports

a1c8a12b-7527-4a52-b027-ba053332992b

Page 46

1   Q     Did anyone appear nervous?

2   A     I don't know what appearing nervous means.

3   Q     Were you nervous about receiving your

4   evaluation?

5   A     Not particularly.

6   Q     Did you have any idea what Mr. Sewell

7   thought about your performance prior to that 90-day

8   evaluation?

9   A     I didn't expect what he said.

10  Q     My question was did you have a sense of

11  what he thought about your performance.

12  A     My sense was that he knew we had some

13  difficult issues to deal with there and solely that I

14  was dealing with.

15  Q     What were the difficult issues that you

16  were dealing with?

17  A     An old facility.

18  Q     I'm sorry?

19  A     I said an old facility.

20  Q     Okay.

21  A     We had had some roof problems.

22  Q     What else?

a1c8a12b-7527-4a52-b027-ba053332992b

Page 47

1    A    We had some heating/cooling problems.

2    Q    What else?

3    A    Those are the main things that come to

4  mind.

5    Q    All right.  We're going to go back and talk

6  about that meeting in detail in a couple of moments.

7    A    Which meeting?

8    Q    The evaluation meeting.

9    A    Okay.

10    Q    However, before we do that, I'd like to

11  complete the discussion about your other duties and

12  services, your duties and responsibilities.  We've

13  already talked about MGM.  The next thing you

14  mentioned after cleaning was repairs, that you were

15  responsible for repairs to the building.

16        Do you recall that testimony, sir?

17    A    Yes.

18    Q    All right.  Describe for me what your

19  responsibilities were with respect to repairs to the

20  building.

21    A    Well, we had several different contractors

22  who we would call, depending upon the trade involved,

a1c8a12b-7527-4a52-b027-ba053332992b

Page 48

1    when a repair was necessary.  And typically, my

2    responsibilities included the solicitation for the

3    contractors, making a recommendation to the director,

4    and then working with the contractor who was selected.

5        Q       Approximately how many repair contractors

6    did you have to deal with?

7        A       You said repair contractors?

8        Q       Yes, sir.

9        A       Four, five on a -- four or five.  And there

10   were situations where items that, you know, didn't

11   require monthly maintenance or things like that, that

12   when they broke down, I would have to call a

13   specific -- you know, a company to come in.

14       Q       Sure.  Okay.  The next item you mentioned

15   was inspections, that you were responsible for

16   inspections.  What type of inspections were you

17   responsible for?

18       A       Elevator.

19       Q       All right.

20       A       Which was current, by the way, when I left

21   there.

22       Q       Anything else other than the elevator?

a1c8a12b-7527-4a52-b027-ba053332992b

Page 64

1    there were roof problems.  So were you dealing with a

2    roofing contractor?

3        A      At different points, I did deal with

4    roofing contractors.

5        Q      And were there any problems with respect to

6    that particular contract or that particular issue?

7        A      I'm trying to get the time frame straight

8    in my mind.

9        Q      Well, let's do it this way:  When

10    Mr. Sewell arrived in June of 2006, was the roof

11    leaking?

12        A      We did have -- we had leaks on occasion at

13    one particular area -- I'd say a couple of different

14    areas.

15        Q      And when did those leaks begin,

16    approximately what year?

17        A      We've been dealing -- we've been -- we've

18    had contractors working on the roofs for three or four

19    years at different times.

20        Q      So three or four years prior to 2006.  So

21    sometime in 2002, 2003?

22        A      No.  I'm saying that we've had repairs done

a1c8a12b-7527-4a52-b027-ba053332992b

Page 65

1    at different points in time.  The roof was not

2    continually leaking during all that time period.

3        Q    But you had problems with a leaking roof

4    from 2002 or 2003 on to the date you were terminated?

5        A    Maybe 2004.

6        Q    Okay.  So from maybe 2004 through 2006,

7    through October 2006, correct?

8        A    Not continuously.

9        Q    I understand.  But on and off, right?

10       A    We did have some problems.  And let me just

11   add something to that.  Part of the problem that we

12   had were design related issues.  And by that, I mean

13   when there was an excessive heavy rain, which the

14   drainage system could not handle, we sometimes had

15   problems.

16       Q    All right.  And when did you first discover

17   that there was a design problem?

18       A    I can't say when I first discovered it.  I

19   think one of our contractors suggested that to me as

20   an issue.

21       Q    When did a contractor first suggest to you

22   that there was a design problem?

a1c8a12b-7527-4a52-b027-ba053332992b

Page 72

1    whatever this engineer recommended, correct?

2        A    Yes.

3        Q    Okay.  Because the DCHFA was considering

4    selling the building, a decision was made not to

5    repair the roof as recommended, but to enter into some

6    type of stopgap measures to stop the leaking, correct?

7        A    I think you could say that, yeah.

8        Q    All right.  Well, after the decision was

9    made not to sell the building, you understood that

10   what you had on the roof of the building that you were

11   responsible for was a stopgap measure that would not

12   permanently stop leaks, right?

13       A    If not -- if not maintained.

14       Q    Okay.  Did leaks start again in that area

15   of the roof?

16       A    We did.

17       Q    So at that point in time, you knew that

18   this area where there were historical problems hadn't

19   been fixed in a way to stop those problems, right?

20       A    Not without some additional work.

21       Q    Well, yeah.  That's my point, additional

22   work needed to be done.  You knew that whatever had

a1c8a12b-7527-4a52-b027-ba053332992b

Page 73

1    been done wasn't enough to fix it, right?

2         A    Wasn't enough to fix it permanently.

3         Q    Well --

4         A    It could be -- the patchwork that was done

5    could be redone.

6         Q    How long after it was patched did it start

7    leaking again?

8         A    I don't know.

9         Q    Weeks?

10        A    I can't say.

11        Q    Months?

12        A    I can't say for sure.

13        Q    All right.  Well, we know the roof was

14   leaking in 2006, right?

15        A    At times, yes.

16        Q    Okay.  Was it leaking in 2005?

17        A    It did at some point sometime.

18        Q    And you told me that it was repaired

19   sometime in the 2004, 2005 time frame.

20             Do you recall that?

21        A    We had interim repairs done at several

22   different points in the time period.

a1c8a12b-7527-4a52-b027-ba053332992b

Page 90

1      Q      Did those city inspections expire at any

2  point in time?

3      A      They did.

4      Q      How often did they expire?

5      A      It was one or two years.

6      Q      Okay.  In your view, did you have any

7  duties and responsibilities if an elevator inspection

8  certificate had expired?

9      A      Yes.

10     Q      What were your duties and responsibilities

11 in that regard?

12     A      To make sure they didn't.

13     Q      And if they did, that would be a failing,

14 correct?

15     A      If they did, that would have been an

16 oversight, yes.

17     Q      All right.  Are you aware that there was at

18 least one elevator with an expired certificate?

19     A      When?

20     Q      In September, October 2006.

21     A      Which?

22     Q      My question was are you aware that there

a1c8a12b-7527-4a52-b027-ba053332992b

1    worked most of the time.  I mean, I can't say we had

2    any real, real problems other than, you know,

3    different times in the season we often -- ants would

4    become an issue.

5         Q    Okay.  Were roaches ever an issue in 2006?

6         A    I saw the occasional -- I can't classify

7    what they were.  Water bugs is what I would call them.

8         Q    Large insects.  I guess large is a relative

9    term, but --

10        A    It is relative.

11        Q    But large -- certainly larger than ants?

12        A    Yes.

13        Q    All right.

14        A    Which was not atypical for that area based

15    on my conversation with other people in the area.

16        Q    What other businesses are in that area?

17        A    There are restaurants.  There are trinket

18    type stores.  There's florists, barbershops.

19        Q    Any other commercial buildings like the

20    DCHFA?

21        A    What do you mean commercial, as in --

22        Q    I mean a large, 30,000 square foot, you

a1c8a12b-7527-4a52-b027-ba053332992b

Page 113

1      Q      Well, you just noted that ah-ha, he has a

2  bug problem, so do I?

3      A      No, I didn't say ah-ha.

4      Q      What did you say?

5      A      I said he has bug issues, too.

6      Q      And this was -- how far away is that

7  barbershop from the DCHFA?

8      A      Three blocks, something like that.

9      Q      All right.  Did you talk to anyone else in

10  the area who mentioned their bug problems?

11      A      I can't say that I did.

12      Q      How about rodent problems?  Did you ever

13  notice any rodents in the building?

14      A      I saw one rodent in that building in the

15  seven years that I was there.

16      Q      And what year was that?

17      A      That was like early, early on.  That would

18  have been like the first year.

19      Q      All right.

20      A      Well, I take that -- I mean, yeah, the

21  first year.

22      Q      Did anyone ever tell you that they saw

a1c8a12b-7527-4a52-b027-ba053332992b

Page 114

1    rodents in the building in the year 2006?

2         A    Someone told me -- I don't know whether --

3    I can't say whether it was --

4         Q    Mr. Butler, it might help if you uncover

5    your mouth for the court reporter.

6         A    I can't say that it was 2006, but someone

7    did mention to me they had seen droppings.

8         Q    Had you ever noticed droppings?

9         A    I had never seen any.  I had never seen any

10   until somebody pointed them out to me.

11        Q    Someone pointed them out to you?

12        A    Yes.

13        Q    Who pointed them out to you?

14        A    I believe it was someone in -- Mary Patton,

15   I believe.

16        Q    And do you recall when it was?

17        A    No.

18        Q    Do you recall -- well, was it sometime in

19   your last year there?

20        A    I don't think so.

21        Q    Sometime in 2005?

22        A    Perhaps.  Probably, perhaps.

a1c8a12b-7527-4a52-b027-ba053332992b

Page 115

1    Q    Did anyone else ever mention rodents to you

2    in the year 2006?  And when I say that, I mean having

3    seen rodents or droppings or any other evidence of

4    rodents in the building in 2006.

5    A    I don't recall any other.

6    Q    Did anyone talk to you about insects in the

7    building in 2006?

8    A    Yes.

9    Q    Who?  Several people?

10    A    I'm trying to remember.  You know, I think

11    we had -- as I said, in the springtime, there were

12    ants and someone had referred to me about ants, I

13    believe.  I don't remember who it was.

14    Q    Did you ever check with the barber as to

15    whether he had any rodent problems in his shop?

16    A    What do you mean, did I go inspect?

17    Q    No.  You talked to him about bugs.  I'm

18    just wondering if you ever talked to him about

19    rodents.

20    A    No.

21    Q    With respect to -- the final item you

22    mentioned was special projects as requested, and you

a1c8a12b-7527-4a52-b027-ba053332992b

Page 119

1          A F T E R N O O N   S E S S I O N   (1:28 p.m.)

2          BY MR. PANAGOPOULOS:

3     Q     Mr. Butler, you agree that you're still

4     under oath, sir?

5     A     Yes.

6     Q     We've been focusing, you know, up to now

7     for the entire year of 2006, and now I'd like to focus

8     from June 2006 through the last day of employment at

9     DCFHA, essentially from the time Mr. Sewell started.

10          You've already told me that you met with

11    Mr. Sewell shortly after he started, that you met with

12    him on a weekly basis at his direct report meetings,

13    and there were some other occasions where you walked

14    the building with him to discuss issues with him.

15          And I believe I understood your testimony

16    that about a week before he did the 90-day review --

17    and correct me on my timing if I'm incorrect here --

18    he indicated to his direct reports that he would be

19    doing a 90-day review; is that correct?

20    A     It was somewhere around that time, yeah.

21    Q     Do you recall that the 90-day review that

22    you had occurred on or about September 12, 2006?

a1c8a12b-7527-4a52-b027-ba053332992b

Page 120

```
 1        A      No.  I thought it was later than that.

 2        Q      When did you believe the 90-day review

 3   occurred?

 4        A      I don't have the date.

 5        Q      Well, he started in -- Mr. Sewell started

 6   in June, right?

 7        A      Uh-huh.

 8        Q      You need to answer orally, sir, just a

 9   reminder.

10        A      Yes.

11        Q      So if we're talking 90 days, that's going

12   to be sometime in September; is that correct?

13        A      Right.

14        Q      So do you agree that your 90-day review

15   occurred sometime in September --

16        A      Yes.

17        Q      -- 2006 --

18        A      Yes.

19        Q      -- even though you may not remember the

20   exact date?

21        A      Right.

22        Q      Where did the 90-day review occur?
```

a1c8a12b-7527-4a52-b027-ba053332992b

Page 123

1    during the entire review, then?

2        A    Right.

3        Q    How long did the review take?

4        A    Not much more than five minutes.

5        Q    Okay.  In that five-minute period, what did

6    Mr. Sewell tell you?

7        A    When I came in there, Mr. Sewell, he walked

8    over to the chest, ran his finger across there and

9    just showed it to me.

10       Q    Was it dirty?

11       A    It was dusty.

12       Q    Okay.

13       A    And he said basically that, you know, your

14   performance has been less than satisfactory --

15       Q    All right.

16       A    -- for this 90-day period.  And he cited

17   one -- he cited the fact that the remote control on

18   the TV downstairs didn't work.  And that was basically

19   it.

20       Q    Did he say anything else?

21       A    Not that I recall.  It wasn't much more

22   than that.  I was kind of shocked that he didn't say

a1c8a12b-7527-4a52-b027-ba053332992b

1    problems.

2              Do you recall that testimony?

3        A     Yeah.  Yeah.

4        Q     Did you have an understanding of whether he

5    was satisfied in the progress you were making in

6    resolving any of those problems?

7        A     He didn't indicate any dissatisfaction.

8    That certainly would have been the place to do it.

9        Q     Okay.  My question was different.  I didn't

10   ask you whether he indicated at that point in time.  I

11   asked you whether or not you had any understanding

12   whether he was concerned about any other issues.

13       A     There were still issues being worked on,

14   yes.

15       Q     All right.  One of the examples of issues

16   still being worked on as of September was that outside

17   gate, correct?

18       A     Yes.

19       Q     As you had indicated early on that the two

20   of you had talked about whether there was a way to do

21   something with that outside gate to make it easier to

22   get people in and out, right?

a1c8a12b-7527-4a52-b027-ba053332992b

Page 128

1      A      That was part of it.  The other part of

2   it -- yeah.  Yes.

3      Q      And the other part of it was that once that

4   gate was opened, anyone who wanted to could park in

5   that lot, right?

6      A      That's right.

7      Q      And that was a concern, people parking in

8   that lot who shouldn't be parking there, because the

9   building is only a block away from the metro, right?

10     A      Right.

11     Q      And the two of you had talked about trying

12  to do something about that, right?

13     A      Correct.

14     Q      Had you done anything about that at that

15  point in time?

16     A      Yeah.  I got the contractor who had

17  actually installed the fence to come out and we did a

18  walk-through and a schematic.

19     Q      When did you have that schematic completed?

20     A      It would have been -- I mean, this was --

21  this wasn't a professional schematic that somebody was

22  going to do construction off of.

a1c8a12b-7527-4a52-b027-ba053332992b

Page 136

1    conversation on those types of issues?

2         A    Building issues?

3         Q    Well, you're the one who said those types

4    of issues.  Whatever you meant by that, sir.

5         A    Well, I meant building issues.  Sure we

6    talked about the building at other times.

7         Q    What about your performance issues?  Was

8    there another point in time where you talked about

9    your performance issues between that September meeting

10   and October 12, 2006?

11        A    I don't recall such a discussion.

12        Q    All right.  Did you get anything in writing

13   relating to that September oral evaluation?

14        A    No.

15        Q    Excuse me?

16        A    No.

17        Q    Okay.  Do you know whether or not any of

18   Mr. Sewell's other direct reports got anything in

19   writing with respect to their 90-day evaluation?

20        A    I didn't ask any of them.  I don't know.

21        Q    So you don't know, right?

22        A    No.

a1c8a12b-7527-4a52-b027-ba053332992b

Page 137

1    Q    Okay.  Now, is it fair to say that the next

2    time you became aware of Mr. Sewell's displeasure with

3    respect to your performance was on October 13, 2006?

4    A    Yes, I believe so.

5    Q    All right.  Tell me what happened on that

6    date.

7    A    On that day, Mr. Ulmer was on leave.

8    Mr. Sewell arrived at the building, and the building

9    wasn't open, and he was upset that I had not opened

10   the building.

11   Q    Okay.  Now, you had testified earlier, I

12   believe, that it was Mr. Ulmer's responsibility to

13   open the building, correct?

14   A    Correct.

15   Q    As his supervisor, did you ever make

16   arrangements for a backup on what was supposed to

17   happen on days when Mr. Ulmer was not in?

18   A    Typical -- many days, Reuben would be on

19   backup.

20   Q    My question isn't what happened in general.

21   My question is about your plans, what -- as a

22   supervisor, what arrangements you made.  Okay?

a1c8a12b-7527-4a52-b027-ba053332992b

Page 138

1     A     On this day or generally?

2     Q     First, in general.  My question was -- and

3  I'll just go ahead and repeat it as best I can --

4  Mr. Ulmer wasn't in every day.  So as a supervisor, I

5  presume you had to make some arrangements for what

6  would happen on days when Mr. Ulmer wasn't in.  Is

7  that a correct presumption?

8     A     That's correct.

9     Q     Okay.  What arrangements, in general, did

10  you make for the building to be open on dates when

11  Mr. Ulmer wasn't going to be in?

12     A     Generally speaking, I would have another

13  employee who reported to me to open or I would open

14  myself.

15     Q     All right.

16     A     And there were occasions when I made

17  arrangements with other employees who indicated to me

18  that they wanted to come in early that they would open

19  the facility.

20     Q     And what did opening the facility entail?

21     A     Well, there were two different -- two parts

22  of opening of the facility.  One was opening the gate,

a1c8a12b-7527-4a52-b027-ba053332992b

Page 139

1    and the other was opening the building and disabling

2    the alarm, the security system.

3         Q    So how would someone open the gate?

4         A    They would use the key that was issued to

5    them and unlock it and swing it open.

6         Q    All right.  Once that was done, you

7    indicated they needed to open the building, right?

8         A    Correct.

9         Q    How would they do that?

10        A    Use their card, their access card.

11        Q    And that would be through the back, right?

12        A    Generally through the back, yes.

13        Q    And then once -- once they opened that, you

14   indicated they have to disarm the alarm or is that

15   before they use the proximity card?

16        A    After.

17        Q    After.  All right.  So they gain entrance

18   and they have to disarm the alarm.  How do they disarm

19   the alarm?

20        A    Go to the key pad and enter their security

21   code.

22        Q    All right.  After that, what's the next

a1c8a12b-7527-4a52-b027-ba053332992b

Page 140

1    step?

2        A    The next step would be, depending on who

3    the person was, Tony -- it typically would be Tony or

4    Reuben or myself, turn the lights on, open the

5    front -- make sure the front door was -- well, the

6    front door would be open.

7        Q    Well --

8        A    Open to -- that would turn off the security

9    thing, but the receptionist had to let people in the

10   front door.

11       Q    Unless, of course, Tony and/or Reuben were

12   actually using that second bolt to secure the second

13   door, right?  Then they would have to, as you started

14   to say, open that door, right?

15       A    If they -- if they secured the bolt.

16       Q    Right.

17       A    Or the person who left last the night

18   before.

19       Q    But on Friday, October 13th, who was

20   supposed to open the building?

21       A    I was.

22       Q    At what time?

a1c8a12b-7527-4a52-b027-ba053332992b

Page 141

1    A    The building is open for business at 8:00.

2    Q    I didn't ask you what time the building was

3    open for business.  I asked what time you were

4    supposed to open the building.

5    A    7:30 would have been the time.

6    Q    And did you arrive at 7:30?

7    A    No, I did not.

8    Q    What time did you arrive?

9    A    I'm not sure what time I arrived.

10   Q    After 8:00?

11   A    Probably.

12   Q    After 8:30?

13   A    I don't think so.

14   Q    But it could have been?

15   A    I don't think so.

16   Q    Well, I don't think so implies that you

17   don't know for sure.  So could it have been after

18   8:30?

19   A    I guess it's possible.

20   Q    After 9:00?

21   A    No.

22   Q    All right.

a1c8a12b-7527-4a52-b027-ba053332992b

Page 142

 1      A    Can we go back for a minute with regard

 2    to -- you had asked me some general questions --

 3    general question about how arrangements were typically

 4    made.  There were -- there was some level of

 5    redundancy as far as people who had the capability and

 6    the authorization to open the building.

 7            So what I'm saying in this instance is

 8    that, even though I did not make it there, there are

 9    other people -- and this was a part of our plan, that

10    more than one or two people could open the facility.

11    So that's just --

12      Q    I understand it's difficult to say you

13    screwed up, but Mr. Ulmer was generally responsible

14    for opening up, correct?  You've already said that.

15      A    Yes, I said that.

16      Q    Okay.  And I understand that there are

17    other people who can open up, but you also already

18    told me that you were the person who was responsible

19    for opening up that day with Mr. Ulmer out, correct?

20      A    Yes.

21      Q    All right.  And I understand that, you

22    know, there were other people who could have done it

a1c8a12b-7527-4a52-b027-ba053332992b

Page 143

1    and, in fact, in this instance, there was someone else

2    who opened up instead of you, correct?

3        A    Correct.

4        Q    And that happened to be Mr. Sewell,

5    correct?

6        A    I assume he opened it.

7        Q    You don't know for sure, because you

8    weren't there, right?

9        A    That's part of the reason.

10       Q    Okay.  And do you know how many people were

11   waiting to get in when Mr. Sewell arrived?

12       A    No, I don't.

13       Q    Okay.  Do you know whether the cleaning

14   crew had arrived and was waiting to get in?

15       A    They may very well have been.

16       Q    Do you know whether or not there were other

17   employees who had arrived who didn't have keys and

18   were waiting to get in?

19       A    There might have been.

20       Q    Do you know whether, when he drove his car

21   up to the gate, a line of cars lined up behind him

22   waiting to get in?

a1c8a12b-7527-4a52-b027-ba053332992b

Page 144

1 A There might have been.

2 Q All right.  Why didn't you show up at the

3 appropriate time to open up?

4 A I had planned to show up at the appropriate

5 time.  I didn't get out as early as I had expected.

6 Q Did you oversleep?

7 A No, I didn't oversleep.

8 Q Did you watch TV too long?

9 A No.

10 Q Why didn't you get out at the time you

11 expected?

12 A It just didn't work out, and I had more

13 traffic than I had anticipated.

14 Q What time do you typically have to leave

15 your house to get to the DCHFA in time to open it up

16 at an appropriate time?

17 A It varies widely.  At least --

18 Q Knowing that, isn't it appropriate to make

19 sure you leave on time to get it open?

20 A Sure.

21 Q But you didn't do that.

22 A I had enough time.  I would have had enough

Misty Klapper & Associates
703-780-9559

a1c8a12b-7527-4a52-b027-ba053332992b

Page 148

1   about possibility, yes, it's possible.

2        Q    Thank you.  What happened when you finally

3   came in that morning?

4        A    Mr. Sewell had sent somebody to give me a

5   message that he wanted to talk with me.

6        Q    Do you recall who that was?

7        A    No.

8        Q    Do you recall, you know, how that

9   communication came to you?

10       A    I believe it was by phone.

11       Q    Someone called you on your office phone or

12   your cell phone or your home phone?

13       A    My office phone.

14       Q    Was there a voice mail or had you arrived

15   by that time?

16       A    I believe I arrived at that time.

17       Q    And you were asked to go up and see

18   Mr. Sewell?

19       A    Yes.

20       Q    Okay.  And did you go up and see

21   Mr. Sewell?

22       A    Yes.

a1c8a12b-7527-4a52-b027-ba053332992b

Page 149

1    Q    Do you know about what time that was?

2    A    No.

3    Q    Do you recall whether it was morning or

4    afternoon?

5    A    It was morning.

6    Q    Was it shortly after you had arrived?

7    A    Yes.

8    Q    Within an hour of the time you arrived?

9    A    Yes.

10   Q    Immediately after you had arrived?

11   A    Immediately after I got the call.

12   Q    I want to know when you got the call.  Was

13   the call immediately after you arrived?

14   A    Yes.

15   Q    And you walked up to Mr. Sewell's office.

16   A    Yes.

17   Q    Was anyone else in there at the time?

18   A    I don't recall.

19   Q    Tell me what happened when you walked in.

20   A    I walked in.  He said he needed to talk

21   with me.  He didn't have time to talk right now, but,

22   you know, he had an issue with the gate, you know, the

Page 150

1    gate not being opened, that he would talk with me

2    later.

3        Q     Okay.  Was he seated or standing when he

4    said that?

5        A     I believe he was seated.

6        Q     And where were you?

7        A     I was standing.

8        Q     So you had just walked into his office?

9        A     I stopped at the reception there and told

10   them I needed to talk with him, and I walked in, yes.

11       Q     All right.  And so when he saw you walk in,

12   that's what he said to you, that he was busy?

13       A     Yes.

14       Q     Did you have a sense of whether or not he

15   was upset?

16       A     Yeah.  I mean, I thought he was upset.

17       Q     Would you classify it as being angry?

18       A     I wouldn't classify it.  He was upset.

19       Q     On what facts or observations do you base

20   your conclusion that he was upset?  The tone of his

21   voice, for example?  His appearance?  The way he

22   talked to you?  The way he looked at you?  What?

a1c8a12b-7527-4a52-b027-ba053332992b

1      A      The tone basically.

2      Q      Describe for me the tone.

3      A      A tone somewhat different from his normal

4 talking voice.

5      Q      Somewhat different in what way?  More

6 brusque?  Shorter?  Louder?  How?

7      A      More brusque.  Not necessarily louder.

8      Q      Okay.  And what did you do when he said he

9 wanted to talk to you later?

10     A      I said okay.  Well, you know, when you get

11 back -- he said he was going out to a meeting, I

12 believe.  When you get back, we'll -- you know, we'll

13 talk.  We'll talk at your convenience is basically

14 what I said.

15     Q      Okay.  And did you get a chance to talk to

16 him later that day?

17     A      No.

18     Q      All right.  So you come in.  You're asked

19 to come to his office.  He doesn't have time to talk

20 to you, tells you that he wants to talk to you about

21 the gate.  You understand he's upset and that you're

22 going to talk later.

a1c8a12b-7527-4a52-b027-ba053332992b

Page 152

1          Does that fairly summarize what happened?

2     A     Yeah.

3     Q     All right.  And this is essentially

4 two-and-a-half weeks after he had told you that your

5 performance was less than satisfactory, right?

6     A     Something like that.

7     Q     Now, you went out on leave after the 13th

8 for a period of time, correct?

9     A     Yes.

10    Q     Okay.  How long were you scheduled to go on

11 leave for at the time?

12    A     I believe my initial request was like four

13 days, I think.

14    Q     Four days was your initial request?

15    A     I believe so.

16          MR. PANAGOPOULOS:  Off the record for a

17 second.

18          (Discussion held off the record.)

19          BY MR. PANAGOPOULOS:

20    Q     How did you typically obtain approval for

21 leave?

22    A     The practice was generally to prepare a

a1c8a12b-7527-4a52-b027-ba053332992b

Page 153

1    leave slip, submit it to the HR person, who would then

2    take it to the director.

3        Q    All right.

4        A    There were occasions if the time frame were

5    short that it would go -- would take it directly to

6    the director and get him to sign it on the spot.

7        Q    All right.  Now, the 13th was a Friday.  So

8    your leave, the leave that you requested here was

9    scheduled to start on October 16th, is that correct,

10   which was a Monday, the following Monday?

11       A    I believe so.

12       Q    All right.  How did you request that leave?

13       A    Through Sam Thomas.

14       Q    So you provided your leave slip to Sam

15   Thomas?

16       A    Right.

17       Q    All right.  And from that point on, do you

18   know what happened to that leave slip?

19       A    I thought I had a -- I don't know for sure

20   what happened to it.  I did -- I did, however, call

21   Mr. Sewell to tell him about my leave request.  And I

22   also went to his office, and he was not there.  And I

a1c8a12b-7527-4a52-b027-ba053332992b

Page 155

1      A      Thirteenth.

2      Q      All right.  So after the incident with the

3  gate, obviously?

4      A      Yes.

5      Q      And you went out originally for four days,

6  you said?

7      A      I believe it was originally four days.

8      Q      Now, you had for some date in October also

9  scheduled some meeting with a vendor; is that correct?

10     A      That's correct.

11     Q      What vendor?

12     A      I can't remember the name.  It was a vendor

13  involved in working on a space study with the

14  organization.

15     Q      And do you recall what the specific topic

16  of the meeting was to be?

17     A      This particular vendor had been screened by

18  myself and two other staff people and was our

19  recommendation for selection to conduct a space study,

20  and they were coming in to meet Mr. Sewell and talk

21  about ground rules and so on and so forth.

22     Q      And who set that meeting up?

a1c8a12b-7527-4a52-b027-ba053332992b

Page 156

1       A       I set the meeting up.

2       Q       And you, what, then informed Mr. Sewell the

3   date the meeting would occur?

4       A       Yes.

5       Q       All right.  Did you tell Mr. Sewell who

6   would be at the meeting?

7       A       Yes.

8       Q       What did you tell him?

9       A       I told him the names of the party, the

10  contractor --

11      Q       All right.

12      A       -- who would be there.  And at the time, my

13  schedule was such that I would have been there.

14      Q       And it was an area that you were

15  responsible for, correct?

16      A       It was an area that I was working on, yes.

17      Q       Well, not only working on, but responsible

18  for.  It was one of your duties and responsibilities,

19  right?

20      A       It was an unusual duty that only happened

21  that one time.

22      Q       Well, was it within your duties and

a1c8a12b-7527-4a52-b027-ba053332992b

1    responsibilities?

2         A    It was assigned to me to lead the team that

3    issued the bids and evaluated the bids and presented

4    the recommendation.

5         Q    So the answer to my question is yes, it was

6    part of your duties, right?

7         A    Yes.

8         Q    Thank you.  When was the next time you

9    spoke to Mr. Sewell?

10        A    The next -- I called Mr. Sewell from out of

11   town.

12        Q    Did you speak to him?

13        A    I'm not sure I -- I don't think I spoke

14   with him directly.

15        Q    All right.  My question was when was the

16   next time you spoke to Mr. Sewell.

17        A    When I got back in town.

18        Q    All right.

19        A    I also sent e-mails to him from out of

20   town, but my direct speaking with him was when I got

21   back.

22        Q    Okay.  On what date did you return?

a1c8a12b-7527-4a52-b027-ba053332992b

Page 158

1      A      I believe it was the 23rd that I came back.

2      Q      Okay.  And tell me about your conversation

3   with Mr. Sewell on the 23rd when you returned.

4      A      I think the actual conversation -- I may

5   not have -- I'm trying to remember.  I may not have

6   talked to him until later on that topic.  I think I

7   came in late that afternoon.

8      Q      So when you came in on the 23rd, it wasn't

9   at the beginning of the day?

10     A      No.

11     Q      It was towards the end of the day?

12     A      It was toward the end of the day.  Yeah, it

13  would have been toward the end of the day.

14     Q      Okay.  And so tell me what happened when

15  you came in.

16     A      I went to -- I went to ask him about how --

17  what transpired at the meeting, and I think -- I don't

18  believe I really got the chance to talk to him that

19  day about it.  And it was -- it was the 24th or so

20  before I really got to talk with him, and I asked

21  him --

22     Q      Well, let's stick with the 23rd, because I

a1c8a12b-7527-4a52-b027-ba053332992b

Page 159

1    want to take this step by step.

2          A    Okay.

3          Q    Okay.  So you came in in the afternoon of

4    the 23rd to try to talk to Mr. Sewell, but you didn't

5    get a chance to?

6          A    I don't believe I did, no.

7          Q    Do you recall why you didn't get a chance

8    to?  Did you just get caught up in other things or he

9    wasn't available?

10          A    He wasn't available.

11          Q    So you came in, what, the next day, on the

12    24th?

13          A    Yeah, I came in on the 24th.

14          Q    Okay.  And did you speak to Mr. Sewell on

15    the 24th?

16          A    I don't believe I did, no.

17          Q    All right.  Do you know whether he was in

18    that day?

19          A    I have to -- well, I don't know for a fact,

20    but I do know that I tried to talk with him.

21          Q    How do you know that you tried to talk with

22    him?

a1c8a12b-7527-4a52-b027-ba053332992b

1    response on that day?

2        A    No.

3        Q    All right.  Were you beginning to get at

4    all worried at this point that Mr. Sewell was still

5    very upset with you for what had happened on the 13th?

6        A    I mean, I wasn't preoccupied with it.  I

7    thought about it.

8        Q    So it was something that crossed your mind?

9        A    Yeah.

10        Q    All right.  So you say you believe you

11    finally talked to him on the 25th?

12        A    I believe it was the 25th.

13        Q    Okay.  Morning or afternoon?

14        A    I'm not sure.

15        Q    What happened on that day?

16        A    I asked him about the meeting, what

17    happened, were there any follow-up items and he

18    wouldn't tell me anything about what happened and he

19    told me he would take care of it.  Meeting over.

20        Q    All right.  So at that point, it was pretty

21    clear to you, I assume, that he was pretty upset with

22    you?

a1c8a12b-7527-4a52-b027-ba053332992b

Page 172

1    A    I thought he was upset.

2    Q    All right.  This was a project that, as you

3    had indicated, you had been given responsibility for,

4    right?

5    A    Right.

6    Q    And it was a project that you had set up

7    the meeting for, right?

8    A    Right.

9    Q    And you didn't attend the meeting.  You

10   came back to find out what was going on and you're

11   essentially told don't worry about it any more, I'll

12   take care of it, right?

13   A    He said I'll take care of it.  That's what

14   he said.

15   Q    So you've basically lost a project that you

16   had been working on -- not only working on, but that

17   you had been responsible for.

18   A    Well, the project was at the culminating

19   point anyway where he had to sign on the dotted line

20   whether this was the company we were going to select.

21   Q    Yeah.  And you didn't know whether that

22   happened or not, right?

a1c8a12b-7527-4a52-b027-ba053332992b

Page 173

1    A    Right.  I didn't know.

2    Q    And you didn't know whether any follow up

3    would be needed or not, right?

4    A    Right.

5    Q    Because it had been taken away from you,

6    right?

7    A    Because he wouldn't tell me.

8    Q    Right.  Was he the one who assigned this

9    project to you to begin with?

10    A    I'm not sure whether it was a carryover or

11    not.  He assigned the latter part of it, yes.

12    Q    All right.  So at that point in time, did

13    you have any concerns about whether you were going to

14    lose your job?

15    A    I didn't have -- I didn't have any serious

16    concerns at that point.  I thought that my reasons for

17    leaving -- for not being able to make the meeting were

18    justified and that I had provided adequate notice and

19    I had provided and offered alternatives for dealing

20    with the meeting.  So --

21    Q    Well, what about what happened on the 13th,

22    the issue you guys hadn't talked about yet?  Had you

a1c8a12b-7527-4a52-b027-ba053332992b

Page 174

1    forgotten about that?

2        A    No, I hadn't forgotten about it.

3        Q    Did you think about whether, you know,

4    maybe that was the issue that was driving everything?

5        A    No.  I didn't think necessarily that was

6    the issue that was driving everything.  I thought

7    Mr. Sewell was quite capable of communicating what his

8    intentions were and what he meant.

9        Q    He told you he wanted to talk to you about

10   it on the 13th, right?

11       A    Right.

12       Q    And that he didn't have time that day,

13   right?

14       A    Right.

15       Q    You're gone for several days.  You come

16   back.  You want to talk about the meeting, but you

17   never bring up the incident on the 13th again, right?

18       A    I don't know that I ever brought it back

19   up.

20       Q    Were you just trying to avoid the issue?

21       A    No.

22       Q    Did you stop and consider whether or not

a1c8a12b-7527-4a52-b027-ba053332992b

1    that had been the straw that broke the camel's back

2    and he just decided he was going to terminate you

3    after that issue?

4        A    No.

5        Q    Do you know whether or not he had decided

6    to terminate you after that happened?

7        A    No.

8        Q    You don't know?

9        A    No.

10       Q    So for all you know, he could have, right?

11       A    He could have decided any number of things.

12       Q    Okay.  Now, on the 25th, he tells you not

13   to worry about it.

14       A    Right.

15       Q    And this project, in essence, is not in

16   your bailiwick any more, right?

17       A    He didn't say that.

18       Q    I didn't say he did.  I said in essence,

19   it's not --

20       A    I don't know.

21       Q    -- in your bailiwick.

22       A    I don't know.  Based on what he said, I

a1c8a12b-7527-4a52-b027-ba053332992b

Page 179

1    Q    Okay.  What did you say to him?

2    A    I didn't say anything other than my card is

3    not working.

4    Q    All right.  So he let you in.  You come in,

5    and what happens next?

6    A    I go park, go up to my office and get a

7    call from Sam Thomas --

8    Q    Okay.

9    A    -- saying that Sewell wants to see me.

10    Q    All right.  And what happens next?

11    A    Well, at the same time, I realize that my

12    computer had been locked out as well.  I generally

13    come in and turn it on.  I went up there to his office

14    and walked in.  He handed me a letter and said -- and

15    I read the letter.  And he said he was dissatisfied

16    with my performance, as he had stated at the

17    evaluation, and that one of his issues was -- I think

18    he -- one of the issues was the failure to open the

19    gate, and he asked me if I had anything to say.

20    Q    Your response?

21    A    I don't know that I said anything at that

22    point.  I told -- I did say to him that, you know, I

a1c8a12b-7527-4a52-b027-ba053332992b

Page 192

1            IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLUMBIA
2

3  - - - - - - - - - - - - - - - - - - x

4  REGINALD BUTLER                    :        COPY

             Plaintiff               :
5

   vs.                                :   No. 07-CV-2046
6

   DISTRICT OF COLUMBIA               :
7  HOUSING FINANCE AGENCY

8            Defendant                :

9  - - - - - - - - - - - - - - - - - - x

10                    June 23, 2008

11                 Washington, D.C.

12  CONTINUED DEPOSITION OF:

13                    REGINALD BUTLER

14       was called for examination by counsel for the

15  Defendant, pursuant to notice, taken at Ballard,

16  Spahr, Andrews & Ingersoll, 601 13th Street, N.W.,

17  Suite 1000 South, Washington, D.C., commencing at 8:34

18  a.m., before Misty Klapper, a Notary Public in and for

19  the District of Columbia, when were present on behalf

20  of the respective parties:

21

22

216d0f33-9675-453d-97b3-8307cd1f4364

```
 1                    P R O C E E D I N G S

 2    Whereupon:

 3                    REGINALD BUTLER,

 4               was called for examination, and, after

 5    being duly sworn, was examined and testified as

 6    follows:

 7                    FURTHER EXAMINATION BY COUNSEL FOR THE

 8                    DEFENDANT

 9                    BY MR. PANAGOPOULOS:

10         Q.    Mr. Butler, your counsel has indicated

11    that you have a series of documents in your home that

12    you have not yet produced to us.

13                    Would you please identify for me, as best

14    you can, what those documents are?

15         A.    Staff evaluations; draft of a memo, a

16    board memo, regarding the solicitation for bids for

17    re -- re-evaluation of the building, the physical

18    condition of the building.

19                    Let's see, a copy of a memo regarding the

20    space study, a list of the contractors who were

21    considered; some handwritten notes, some rough

22    handwritten items, on conversations that I had with --
```

216d0f33-9675-453d-97b3-8307cd1f4364

Page 219

1      A.      And so --

2      Q.      I think it's pretty clear from your

3    testimony already that you hadn't talked to him in

4    detail.  That's all I'm trying to confirm before we go

5    to the next document.

6      A.      No, I hadn't talked to him in detail that

7    I recall.

8      Q.      Okay.  And, in fact, the only

9    conversation you had was when you went in to discuss

10    the issue with him briefly and he didn't have time to

11    talk to you, correct?  Do you recall that testimony?

12      A.      Yes.

13      Q.      All right.

14          MR. PANAGOPOULOS:  Mark the next document

15    as Butler Number 1.

16          (Thereupon, Butler Deposition Exhibit

17          Number 1 was marked for identification.)

18          BY MR. PANAGOPOULOS:

19      Q.      Mr. Butler, you've been handed what's

20    been marked as Butler Exhibit Number 1.  It's a series

21    of two documents.

22          Would you take a look at those documents

216d0f33-9675-453d-97b3-8307cd1f4364

Page 220

1    and after you've looked at them, let me know when

2    you're ready to proceed.

3        A.    Okay.

4        Q.    What is the first document, sir?

5        A.    That's a memo from Mr. Sewell, asking a

6    question about responsibilities for opening -- for

7    securing the building in the evening.

8        Q.    Okay.  And did you understand -- let me

9    back up a step.

10       A.    In the evening and in the morning.

11       Q.    You identified this as a memo.

12             Do you recognize this as an E-mail, sir?

13       A.    It looks like it could be an E-mail, yes.

14       Q.    All right.  And in this E-mail Mr. Sewell

15   asked you who had the primary responsibility for

16   securing the building and when and who had the

17   responsibility for opening the building and when,

18   correct?

19       A.    Yes.

20       Q.    All right.  And did you understand that

21   this request related to the events of October 13th?

22       A.    I wasn't sure.

216d0f33-9675-453d-97b3-8307cd1f4364

Page 222

1    know it for a fact.

2        Q.    Okay.  I'd like you to turn to the second

3    page of this exhibit, sir.  What is this?  What is the

4    second page of this document?

5        A.    That's my response to him.

6        Q.    Okay.  And did you respond via E-mail or

7    in some other format?

8        A.    You know, I think I may have just typed

9    this up and handed it to him.

10       Q.    Okay.  Why didn't you respond by E-mail?

11       A.    I mean, no particular reason.  I mean, no

12   particular reason.  I wanted to make sure he got it

13   and if I had hand delivered it, we could talk about it

14   at the time.

15       Q.    Okay.  So how long did it take you to

16   draft this response?

17       A.    Not very long.

18       Q.    Okay.  And did you hand this document to

19   Mr. Sewell?

20       A.    I can't say that I put it in his hand.

21   It was either his -- his administrative assistant

22   or -- or I gave it to him.  I'm not sure.

216d0f33-9675-453d-97b3-8307cd1f4364

Page 224

1    Q.    Did you understand that you were an

2    at-will employee at the DCHFA?

3    A.    Yes.

4    Q.    Did you understand that corrective

5    action, a sequence of corrective actions listed in the

6    employee handbook, were optional and not required?

7    A.    No.

8    Q.    Did you read the --

9    A.    Yes.

10    Q.    Please let me finish my question.

11          Did you read the handbook?

12    A.    Yes.

13    Q.    When did you read the handbook?

14    A.    Shortly after the latest new issue came

15    out, which would have been, I don't know, June, July

16    of -- of 2006, I believe.

17          (Thereupon, Butler Deposition Exhibit

18          Number 2 was marked for identification.)

19          BY MR. PANAGOPOULOS:

20    Q.    You've been handed what's been marked as

21    Butler Exhibit Number 2.

22          Do you recognize that as the employee

216d0f33-9675-453d-97b3-8307cd1f4364

Page 226

1       A.      It would -- it would depend on what the

2   rest of the paragraph says.

3       Q.      All right.  Well, why don't we take a

4   look at a paragraph.  Turn to page 17 of the handbook,

5   if you would.  It says at the top employee conduct.

6               Let me know when you're there, sir.

7       A.      Yes, I'm there.

8       Q.      All right.  I'd like you to focus on the

9   paragraph entitled corrective action.  Let me know

10  when you're there.

11      A.      I'm there.

12      Q.      I'd like you to read the second sentence

13  out loud into the record, please.

14      A.      In the event of an infraction of an

15  established policy or procedure, a sequence of

16  corrective actions may take place, including oral

17  warning, written warning, suspension, dismissal.

18      Q.      Okay.  Now, did you see the word may in

19  there that you just read?

20      A.      Yes.

21      Q.      What does that mean in the context of

22  this sentence, sir?

216d0f33-9675-453d-97b3-8307cd1f4364

Page 227

1        A.    That these items can be taken.

2        Q.    And that the DCHFA is not required to go

3    through any of these steps or procedures, correct?

4        A.    I don't read it that way, they're not

5    required to do any of them.

6        Q.    Well, why don't we read the next sentence

7    into the record.  Please do that for me, sir.

8        A.    No particular procedure or sequence of

9    procedures need to be followed.

10       Q.    Okay.  So if you read the previous

11   sentence and this one together, then what that means

12   is the DCHFA doesn't have to take any of these steps,

13   correct?

14       A.    That's a possible interpretation, yes.

15       Q.    Can you think of another possible

16   interpretation?  I mean, we're talking plain English,

17   aren't we, sir?  It says the DCHFA may do these

18   things, but it doesn't have to do any of them.  It's

19   pretty simple, isn't it?

20       A.    What's your question?

21       Q.    Well, I guess the question, sir, is that

22   this paragraph, these two sentences that you've read,

216d0f33-9675-453d-97b3-8307cd1f4364

Page 228

1    establishes that the DCHFA is not required to take any

2    of the steps listed in this paragraph?

3          A.    It seems to read that way, yes.

4          Q.    Okay.  Have you ever had to discipline

5    anyone as a supervisor while at the DCHFA?

6          A.    Yes.

7          Q.    Have you ever had to terminate anyone as

8    a supervisor at the DCHFA?

9          A.    No, not on my own.

10         Q.    Not on your own.  Well, did you ever

11   participate in the termination of anyone at --

12         A.    Yes.

13         Q.    -- the DCHFA?

14               Let me finish my question.  It makes it

15   easier for the Court Reporter.

16               Did you ever participate in the

17   termination of anyone at the DCHFA?

18         A.    Yes.

19         Q.    Whose termination did you participate in?

20         A.    Don Thompson.

21         Q.    Anyone else?

22         A.    And another individual.  I'm having

216d0f33-9675-453d-97b3-8307cd1f4364

Page 240

1      Q.    And the date, is that your handwriting as

2  well?

3      A.    Yes.

4      Q.    Do you have any reason to doubt that you

5  signed this document on July 5, 2006?

6      A.    No.

7      Q.    Do you agree that you did sign this

8  document on July 5, 2006?

9      A.    I signed it, yes.  And I believe it was

10  that date.

11      Q.    Now, with respect to the leave you took

12  beginning -- well, I guess Friday was -- strike all

13  that.  Let me start over.

14            You worked on Friday, October 13th,

15  correct?

16      A.    Yes, at least part of the day.

17      Q.    Right.  You came in late, right?

18      A.    No.

19      Q.    Well, actually, you did, because you were

20  required to open the building.  You weren't there in

21  time to open.

22      A.    All right.  Okay.

216d0f33-9675-453d-97b3-8307cd1f4364

Page 241

1    Q.    So you came in late, right?

2    A.    Yes.

3    Q.    Okay.  Did you leave early?

4    A.    Yes.

5    Q.    Okay.  What time did you leave?

6    A.    I believe it was early afternoon.

7    Q.    Do you recall about what time?

8    A.    I'm not absolutely sure.

9    Q.    Do you recall if it was after 2:00 p.m.?

10   A.    I don't think it was that late.

11   Q.    Do you recall --

12   A.    I'm not sure.

13   Q.    Do you recall if it was after noon?

14   A.    I believe it was after noon.

15   Q.    Can you narrow it down any more

16   specifically than that?

17   A.    Noon to 1:00, somewhere in there would be

18   my best guess, but I'm not -- I'm not absolute -- I'm

19   not sure, absolutely sure.

20   Q.    And then you went on leave beginning the

21   following Monday, correct?

22   A.    Correct.

Misty Klapper & Associates
703-780-9559

216d0f33-9675-453d-97b3-8307cd1f4364

Page 242

1      Q.    Did you take any leave for leaving early

2  on the 13th?

3      A.    I'm not sure what my form said.

4      Q.    Okay.  Did you turn in a leave form on

5  the 13th?

6      A.    I believe so, yes.

7      Q.    Who did you turn that form into?

8      A.    I would have turned it in to Mr. Thomas

9  or -- or -- the way we would typically do these

10 things, it would be turned in to Thomas, it would be

11 turned in directly to Mr. Sewell or turned in to the

12 leave people who tracked the leave.

13     Q.    Who were the leave people who tracked the

14 leave?

15     A.    That would have been Valencia Andersen or

16 Kayode Adetayo.

17     Q.    And you don't recall who you turned the

18 leave request into?

19     A.    I thought I had turned it in -- I thought

20 I had turned it in to Mr. Thomas.

21     Q.    Okay.

22     A.    But I -- I can't swear to that.

216d0f33-9675-453d-97b3-8307cd1f4364

Page 245

1      Q.    Do you recall -- okay.  It was your

2  typical practice.

3            Do you specifically recall who you turned

4  in the form to?

5      A.    I can't say 100 percent, no.

6      Q.    Now, why did you leave early on the 13th?

7      A.    Because my mother was ill and she had a

8  turn for the worse.  And I went to Mr. Sewell's

9  office.  He wasn't there.  I left a message with Will

10  Willem, who was administrative assistant at that

11  point, to give Mr. Sewell the message that I needed to

12  leave.

13      Q.    Okay.  The message you left was that you

14  needed to leave?

15      A.    Yes.

16      Q.    Was that the full text of the message,

17  the full content of the message?

18      A.    I can't say it includes every word.

19  Well, I mentioned to him why I was leaving.

20      Q.    You mentioned to him.  He wasn't there?

21      A.    I mentioned it to Mr. Willem.

22      Q.    What did you say to Mr. Willem

216d0f33-9675-453d-97b3-8307cd1f4364

Page 246

1    specifically, sir?

2         A.    I was going to Cincinnati to help support

3    my mother in a serious illness she was experiencing.

4         Q.    Do you know what, if anything, Mr. Willem

5    said to Mr. Sewell?

6         A.    I wasn't there.

7         Q.    So the answer to my question is no, you

8    don't know what, if anything, he said to Mr. Sewell,

9    right?

10        A.    No.

11        Q.    Do you know whether anyone told

12   Mr. Sewell that you were leaving to take care of your

13   mother?

14        A.    I don't know if anyone else did.

15        Q.    Well, you don't know that anyone did,

16   then, right?

17        A.    No, I don't.

18             (Thereupon, Butler Deposition Exhibit

19             Number 4 was marked for identification.)

20             BY MR. PANAGOPOULOS:

21        Q.    Mr. Butler, you've been handed what's

22   been marked as Butler Exhibit Number 4.  It's a series

Page 252

1        BY MR. PANAGOPOULOS:

2            Q.    Okay.  Going back to the page we were

3    discussing, sir, is this the first reservation that

4    you made?

5            A.    You're on 366?

6            Q.    Yes.

7            A.    I don't know whether it is or not.

8            Q.    Well, when did you get a phone call

9    informing you that your mother had taken a turn for

10   the worse?

11           A.    I believe it would have been on Thursday.

12   I'm not absolutely sure.

13           Q.    Thursday, October 12th?

14           A.    I think so.

15           Q.    All right.

16           A.    I'm not sure.

17           Q.    But you made reservations the morning of

18   Friday, October 13th?

19           A.    This makes sense to me.

20           Q.    Well, I guess my question is did you or

21   didn't you?

22           A.    Well, based on the date and the time on

216d0f33-9675-453d-97b3-8307cd1f4364

Page 253

1    here, I don't have any -- I can't say I have any real

2    reason to doubt it.

3         Q.    Okay.

4         A.    I don't have any real basis for disputing

5    it.

6         Q.    Okay.  And it appears that the

7    reservations you made were for you to leave on

8    Saturday at 4:45 p.m.; is that correct?  It's right

9    there on the same page we were looking at, 366.

10        A.    Okay.  That is the departure time, yes.

11        Q.    And you were originally scheduled to

12   return on Wednesday, October 18th; is that correct?

13        A.    Yes, according to this.

14        Q.    And did you leave on Saturday at 4:45 to

15   go to Cincinnati?

16        A.    I believe I did.

17        Q.    Okay.  Then why did you leave work early

18   on Friday, the 13th of October?

19        A.    I mean, probably because I -- I believe

20   up to the last minute I was trying to get an earlier

21   flight.  And you can see through the course of this I

22   made several changes.  And I was talking back and

Page 254

1    forth with my sister through that time period and I

2    had some things to clear up at home before leaving.

3         Q.    Okay.  Now, did you -- as of Friday, did

4    you believe you were returning to the D.C. area on

5    Wednesday, October 18th?

6         A.    That, I believe, was my initial thought.

7         Q.    Why did you request leave through the

8    20th then?

9         A.    Well, what I'm saying to you, I believe

10   the -- that form is not my handwriting.

11        Q.    But I believe you told me you requested

12   leave through the 20th, whether that form is your

13   handwriting or not.  If you're telling me now you may

14   not have requested leave through the 20th, that's

15   fine.

16        A.    I mean, I have -- apparently, based on

17   this I didn't, but I know I made several changes

18   during the course of the time I was away.

19        Q.    Okay.  So when you left work on Friday,

20   October 13th you don't know how much leave you

21   requested, correct?

22        A.    If I made my reservation till the 18th, I

216d0f33-9675-453d-97b3-8307cd1f4364

Page 255

1    probably -- the leave request I probably submitted was

2    the 18th.

3         Q.    Have you seen in any documents produced

4    in this case at all any leave request form seeking

5    leave through the 18th of October?

6         A.    I don't recall having seen one, no.

7         Q.    Now, what was the first change you made

8    after making the reservations we were just discussing

9    in which you booked a flight to leave on the afternoon

10   of Saturday, the 14th, and returning on the afternoon

11   of Wednesday, the 18th?

12        A.    I believe the first change I made was to

13   leave -- return on Sunday.

14        Q.    All right.  And is that the change that's

15   reflected on the page that is Bates stamped -- pages,

16   rather -- that are Bates stamped 370 and 371, sir?

17        A.    I think -- I think so.  I believe so.

18        Q.    All right.  And so what you did was you

19   changed your departure date to Sunday, October 22; is

20   that correct?

21        A.    Correct.

22        Q.    And you did that on Tuesday, the 17th,

216d0f33-9675-453d-97b3-8307cd1f4364

Page 259

1    remember what I said.

2         Q.    Okay.  What did you say?

3         A.    I just said it.

4         Q.    I don't believe you did.  Tell me again.

5         A.    That -- didn't I just tell you what I --

6         Q.    Please answer my question, sir.

7         A.    Well, don't say I didn't answer you.  I

8    answered you.

9         Q.    Answer my question.

10        A.    I told -- told the person that I talked

11   to that I needed to extend my leave because my mother

12   was in -- still in pretty bad condition, and that to

13   update the leave slip that I already submitted and to

14   pass it on up the line to get approval.

15        Q.    Do you know what, if anything, that

16   person said to Mr. Thomas?

17        A.    I wasn't there.

18        Q.    Okay.  Do you know what, if anything,

19   that person said to Mr. Sewell?

20        A.    I wasn't there.

21        Q.    Do you know what, if anything, Mr. Thomas

22   said to Mr. Sewell regarding this leave?

216d0f33-9675-453d-97b3-8307cd1f4364

Page 260

1    A.    No.

2    Q.    When was the meeting with the space

3    planner scheduled to occur?

4    A.    I believe it was Monday at 11:00, I

5    think, or something like that, the 23rd.

6    Q.    Okay.  So the meeting with the space

7    planner was scheduled for Monday, the 23rd, at what

8    time, sir?

9    A.    I think it was 11:00.

10   Q.    And at least as set up on this particular

11   document, the Tuesday, October 17th 2006 E-mail, you

12   were planning to return on Sunday, October 22.

13         Do you see that?

14   A.    Yes.

15   Q.    All right.  So this would not have been

16   when you would have allegedly called Mr. Sewell to say

17   you wouldn't make the meeting on the 23rd, because at

18   least as of the 17th you were still planning on making

19   that meeting, weren't you, sir?

20   A.    I was planning on making that meeting.

21   Q.    Okay.  So you didn't call Mr. Sewell to

22   tell him you weren't going to make the meeting when

216d0f33-9675-453d-97b3-8307cd1f4364

Page 261

1    you made this particular change, did you?

2        A.    I wouldn't have called him then to say I

3    wouldn't make the meeting, but I --

4        Q.    All right.

5        A.    -- I --

6        Q.    That was all my question was.

7        A.    Okay.  But I would have communicated to

8    him --

9        Q.    We're going to get to that when we get

10   through these changes.  All right?  I just want to

11   take this step by step.

12       A.    Okay.

13       Q.    What's the next change you made on these

14   tickets, sir?

15       A.    Changing from Sunday to Monday.

16       Q.    When did you make that change?

17       A.    Based on the date on here, it looks like

18   it may have been Saturday, if this is a continuation.

19   I'm not absolutely sure, but I see a reservation

20   issued on the 21st.

21       Q.    Reservation issued on the 21st with a

22   confirming E-mail on Sunday, October 22nd at 2:01

216d0f33-9675-453d-97b3-8307cd1f4364

Page 270

1    Q.    Did there ever come a point in time when

2    you talked to Mr. Thomas about the leave you had

3    taken?

4    A.    I don't recall a conversation with him

5    about it.

6    Q.    Excuse me?

7    A.    I do not recall a conversation with him

8    about it.

9    Q.    Did you send an E-mail to him regarding

10   the leave you had taken?

11   A.    I don't recall sending an E-mail.

12   Q.    Excuse me?

13   A.    I don't recall sending an E-mail.

14   Q.    Okay.  You need to speak up a little bit,

15   sir.

16         Did there come a point in time where you

17   requested that family medical leave be applied for the

18   leave that you had already taken?

19   A.    I'm not sure whether I specifically said

20   that.

21   Q.    Did you ever submit a form requesting

22   family medical leave for the leave you had already

216d0f33-9675-453d-97b3-8307cd1f4364

Page 271

1    taken?

2        A.    I don't recall whether I included it in

3    the form I submitted.

4        Q.    Did you ever submit a form requesting

5    future leave?

6        A.    Yes.

7        Q.    Did you ever discuss future leave with

8    anyone at the DCHFA?

9        A.    Yes, I had extensive discussions with

10   Mr. Thomas.

11       Q.    Anyone other than Mr. Thomas?

12       A.    Mr. Adetayo.

13       Q.    Who is Mr. Adetayo?

14       A.    He's the T&A -- he oversees the T&A

15   group.

16       Q.    Anyone other than those two?

17       A.    My staff.

18       Q.    Identify your staff for me, please.

19       A.    Tony Ulmer, Mary Patton, Reuben Aboyewa

20   and there was a temporary employee in the other

21   position at that time.  I don't recall her name.

22       Q.    What did you say to the temporary

216d0f33-9675-453d-97b3-8307cd1f4364

Page 274

1      A.    Yes.

2      Q.    On what day did these conversations

3  occur?

4      A.    This would have been the 26th, I believe.

5  There was no one present with us, but a call was made

6  to Mr. Adetayo during the time that both of us were

7  there.

8      Q.    Who made the call to Mr. Adetayo?

9      A.    I believe Sam did.

10      Q.    And what did Sam say to Mr. Adetayo?

11      A.    Sam was unsure about how the act -- he

12  seemed to be unsure and he was trying to get some

13  clarification from Mr. Adetayo.

14      Q.    What act?

15      A.    The Family Medical Leave Act.

16      Q.    Okay.  All right.  You -- is it fair to

17  say, then, that you didn't talk to Mr. Thomas about

18  family medical leave on the afternoon of the 23rd when

19  you came into the office?

20      A.    I don't think I talked to him about it

21  then, no.

22      Q.    All right.  And you didn't talk to him

216d0f33-9675-453d-97b3-8307cd1f4364

Page 275

1    about leave on Tuesday, the 24th?

2        A.    No, I don't think so.

3        Q.    And you didn't talk to him about leave on

4    Wednesday, the 25th?

5        A.    I don't think so.

6        Q.    Why did you wait until the 26th to talk

7    to Mr. Thomas about leave?

8        A.    Because I hadn't formulated my plan.  I

9    had just gotten back.

10       Q.    So you weren't sure what days you were

11   going to need off?

12       A.    Right.  I was formulating my plan.  I was

13   awaiting -- I didn't have the forms.  I was

14   researching the Family Medical Leave Act and trying to

15   formulate my -- my required time based upon the

16   circumstances.

17       Q.    What type of research did you do into the

18   Family Medical Leave Act before speaking to

19   Mr. Thomas?

20       A.    I talked with my wife, who had used leave

21   the month before when her father passed.  He was ill

22   for an extended period and passed.  I -- I did some

216d0f33-9675-453d-97b3-8307cd1f4364

Page 280

1          (Thereupon, a brief recess was taken.)

2          BY MR. PANAGOPOULOS:

3     Q.    Mr. Butler, I'm handing you what's been

4  marked as Butler Exhibit Number 5.  You stated that

5  you had sent Mr. Thomas an E-mail.

6          Is that the E-mail you sent?

7     A.    Yes.

8     Q.    And you sent this to Mr. Thomas; is that

9  correct?

10    A.    Correct.

11    Q.    Your direct supervisor was Mr. Sewell,

12  right?

13    A.    Right.

14    Q.    Why didn't you cc Mr. Sewell on this

15  E-mail?

16    A.    I mean, it wasn't a calculation.  I just

17  didn't.

18    Q.    And as of Thursday, October 26th, you had

19  not talked to Mr. Sewell at all about needing leave in

20  order to take care of your mother, had you?

21    A.    I don't believe so, no.

22          (Thereupon, a discussion was had off the

216d0f33-9675-453d-97b3-8307cd1f4364

Page 287

1       A.      I suggested that he -- he go review

2   the -- review the act, the law, just like I had done.

3       Q.      Okay.  All right.  What happened next?

4       A.      He left for a while and I proceeded to

5   fill out the form.

6       Q.      Okay.  How long did it take you to fill

7   out the form?

8       A.      It took awhile.  I don't know exactly how

9   long, because I was trying to figure dates and, you

10  know, when I would go.  And I was anticipating going

11  out and coming back and going out and coming back,

12  that kind of thing.

13          So I would have had a calendar in front

14  of me and I was going through it that way.  And I

15  made -- I believe I made a couple of calls to my

16  sister, trying to gauge what the best timing was.

17          So it probably was at least an hour,

18  probably more than an hour, before I finished it and

19  got it to him.  I think he -- he came back -- he came

20  back down and I went through it with him.

21      Q.      All right.  Let's take this step by step.

22          It took you, you said, at least an hour

216d0f33-9675-453d-97b3-8307cd1f4364

Page 291

1    done, you know, the dates and everything I completed.

2    I went through the form with him.  And he said he

3    would file it and submit it through for approval.

4         Q.    Okay.  When he came to you the one time

5    before you had completed the form, what did he say?

6         A.    I don't recall, but I don't think he

7    added any real clarity to the situation, nor had he

8    changed his mind on what his posture was.

9         Q.    About his understanding of the act?

10        A.    Right.

11              (Thereupon, Butler Deposition Exhibit

12              Number 6 was marked for identification.)

13        BY MR. PANAGOPOULOS:

14        Q.    You've been handed what's been marked as

15   Butler Exhibit Number 6.  Take whatever time you need

16   to review that document and let me know when you're

17   ready to proceed.

18        A.    Okay.

19        Q.    Do you recognize this document, sir?

20        A.    Yeah, it looks like the document that I

21   completed.

22        Q.    Is that your handwriting on the first

216d0f33-9675-453d-97b3-8307cd1f4364

Page 298

1       Why don't you use the original.

2       MR. PANAGOPOULOS:  I think you just went

3   by it.

4       MR. GOULD:  Sorry.  Here.

5       BY MR. PANAGOPOULOS:

6       Q.    Okay.  So going back to Exhibit Number 1,

7   you received that request from Mr. Sewell before you

8   had completed the form, right, the FMLA form, that is?

9       A.    It was an E-mail.  It looks like it came

10  to my computer prior to the time I said that I thought

11  I had completed the form, yes.

12      Q.    Okay.  Now, did you speak to Mr. Sewell

13  at all on the 26th?

14      A.    I don't think I spoke with him on the

15  26th.

16      Q.    Okay.  The only thing you did was take

17  the memo you drafted in response to his request that's

18  set forth in Exhibit Number 1 and take it to the area

19  where his offices were, correct?

20      A.    Right, and I dropped it off there because

21  he wasn't -- he either wasn't there or wasn't

22  available to talk to me.

Misty Klapper & Associates
703-780-9559

216d0f33-9675-453d-97b3-8307cd1f4364

Page 299

1          Q.     Right.  Now, did you speak to Mr. Thomas

2     at all again on the 26th after submitting the form to

3     him, the FMLA form?

4          A.     I believe I -- I talked with him and

5     asked him if he needed anything else.

6          Q.     And when was that?

7          A.     That would have been later on in the day,

8     3:00 or so.

9          Q.     Okay.  What was his response?

10         A.     He didn't.  He didn't need anything else

11    from me.

12         Q.     Okay.  Did you speak to him again that

13    day?

14         A.     I don't recall.

15         Q.     All right.  Other than the conversations

16    you have described to me so far, did you have any

17    other conversations with anyone else at DCHFA about

18    your request for family medical leave?

19         A.     Other than the people who I've already

20    cited, I don't recall any additional ones.

21         Q.     Okay.  All right.  You've already said

22    that those are the only people you've talked to.

216d0f33-9675-453d-97b3-8307cd1f4364

Page 301

1    and you've told me everything you can think of

2    regarding what you said to them?

3              A.    Yes.

4                    (Thereupon, Butler Deposition Exhibit

5                    Number 7 was marked for identification.)

6                    BY MR. PANAGOPOULOS:

7              Q.    Mr. Butler, you've been handed what's

8    been marked as Butler Exhibit Number 7.

9                    Is that the termination letter that you

10   were handed on the morning of October 27th that we've

11   already discussed?

12             A.    It looks like it.

13             Q.    And during the course of your termination

14   meeting, did anyone ever mention family medical leave?

15             A.    I don't recall the term being used, no.

16             Q.    Excuse me?

17             A.    I don't recall the term being used.

18             Q.    Okay.  Did anyone talk about your leave?

19             A.    No, there was no discussion about leave.

20             Q.    Okay.

21                   (Thereupon, Butler Deposition Exhibit

22                   Number 8 was marked for identification.)

216d0f33-9675-453d-97b3-8307cd1f4364

Page 324

1    if you wanted to?

2         A.    After I received notice of cancellation.

3         Q.    All right.  But did you have an

4    understanding as to whether that participation would

5    be retroactive or not, sir?

6         A.    At the time I thought it -- I thought it

7    was -- it was over.

8         Q.    Well, did you wonder why you received the

9    COBRA information if it was over?

10        A.    They were trying to -- trying to comply.

11        Q.    And did you fill it out asking to

12   participate?

13        A.    No, I didn't.

14        Q.    Okay.  One of the items that we didn't

15   really touch on when we talked about your duties and

16   responsibilities the other day was your responsibility

17   for the vehicles and the maintenance of vehicles owned

18   by the DCHFA.

19             Did you have any responsibility with

20   respect to maintaining those vehicles?

21        A.    My division did, yes.

22        Q.    Okay.  And what were those

216d0f33-9675-453d-97b3-8307cd1f4364

Page 325

1    responsibilities?

2         A.    Basically to keep them in good working

3    order, to do periodic maintenance items, change the

4    oil, et cetera, and keep current the licensing

5    requirements.

6         Q.    All right.  And insurance requirements?

7         A.    Yes.

8         Q.    All right.  And do you have an

9    understanding as to whether or not registration

10   documents are supposed to be kept in vehicles in the

11   District of Columbia?

12        A.    I believe the District of Columbia is

13   like other jurisdictions.

14        Q.    And what does that mean?

15        A.    They generally are required.

16        Q.    Okay.  Do you know whether or not the

17   District of Columbia requires vehicles to have

18   insurance information, some type of proof of coverage,

19   in them?

20        A.    I believe they do.

21        Q.    And what did you do to ensure that the

22   appropriate documents were in the vehicles owned by

216d0f33-9675-453d-97b3-8307cd1f4364

Page 326

1    the DCHFA?

2        A.    Well, typically I -- when we purchased

3    vehicles, I would go to their finance department and,

4    actually, in some cases I may have talked to directly

5    with our insurance agent to request a vehicle be

6    added.  And upon completing that, we would get

7    documentation from them, indicating we had insurance,

8    and put them in the car.

9        Q.    Did Mr. Sewell tell you at any point in

10   time that he had discovered that the appropriate

11   documentation was not in the vehicles?

12       A.    It seems like I do remember some issue

13   relating to documentation in a vehicle.

14       Q.    Do you recall whether you ever followed

15   up on that?

16       A.    Yes, I -- I do.  As I remember, Tony

17   taking one vehicle -- actually, I may have gone with

18   him to take vehicles to, I believe it was, some kind

19   of state inspection update or something.  We did

20   follow up and we did take care of it.

21       Q.    Well, you're talking about an inspection

22   update.

216d0f33-9675-453d-97b3-8307cd1f4364

Page 327

1        Isn't it true that Mr. Sewell's concerns

2   were that there was no proof of insurance and no proof

3   of registration in the vehicles?

4        A.   I'm not sure what his issues were, but

5   with the -- I don't recall exactly what his issues

6   were.  Whatever they were, we took care of them.

7        Q.   Well, if you're not sure what the issues

8   were, how do you know you took care of it, sir?

9        A.   Well, if it was a documentation issue --

10  let me put it this way, I recall responding to an

11  issue raised about documentation, both Tony Ulmer and

12  I.   That's my recollection.

13       Q.   So all you recall is a discussion?

14       A.   I recall action on our part.

15       Q.   What action do you recall?

16       A.   I recall taking the cars into the

17  dealership where we -- and having -- my memory is an

18  inspection.

19       Q.   Okay.  So you don't recall doing anything

20  with respect to registration, right?

21       A.   I don't recall personally doing it.

22       Q.   Well, do you recall asking someone to do

216d0f33-9675-453d-97b3-8307cd1f4364

Page 328

1    anything regarding registration?

2         A.    I don't recall.

3         Q.    Okay.  Do you recall asking anyone to do

4    anything with respect to insurance?

5         A.    I can't say that I specifically recall.

6         Q.    You were terminated on October 27th 2006,

7    correct?

8         A.    Correct.

9         Q.    How often are fire extinguishers required

10   to be inspected?

11        A.    It's either a year or six months.  I'm

12   not sure at this point.

13        Q.    Okay.  Do you recall the last time that

14   the fire extinguishers at DCHFA were inspected before

15   you were terminated?

16        A.    No, I don't.

17              (Thereupon, Butler Deposition Exhibit

18              Number 9 was marked for identification.)

19              BY MR. PANAGOPOULOS:

20        Q.    You've been handed what's been marked as

21   Butler Deposition Exhibit Number 9.  It's a packet of

22   documents Bates stamped from page number 441 through

*Reginald L. Butler v. District of Columbia Housing Finance Agency*
Case No. 07-CV-2046 (HHK)

—Defendant's Motion for Summary Judgment—

# EXHIBIT 2

## Capital Reporting Company

```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - -x
REGINALD L. BUTLER,                :
                                   :
              Plaintiff            :
                                   :
     vs.                           : Civil Action
                                   : No. 07-CV-2046
DISTRICT OF COLUMBIA HOUSING       : (HHK)
FINANCE AGENCY,                    :
                                   :
                                   :
              Defendant            :
- - - - - - - - - - - - - - - -x
```

Washington, D.C.

Thursday, June 19, 2008

Deposition of:

HARRY DONALD SEWELL

called for oral examination by counsel for

Plaintiff, pursuant to notice, at 601 13th Street,

N.W., before Monica A. Voorhees, of Capital

Reporting, RPR/CSR, a Notary Public in and for the

District of Columbia, beginning at 8:50 a.m., when

were present on behalf of the respective parties:

Capital Reporting Company

Page 4

1                    P R O C E E D I N G S

2    WHEREUPON,

3                    HARRY DONALD SEWELL,

4    called as a witness, and having been first duly

5    sworn, was examined and testified as follows:

6                    EXAMINATION BY COUNSEL FOR PLAINTIFF

7    BY MR. GOULD:

8         Q.     Good morning, Mr. Sewell.  My name is

9    John Gould.  I represent Reginald Butler in a case

10   that he's brought against the D.C. Housing Finance

11   Agency.  I'll be asking you some questions today.

12               We are recording your testimony, so I

13   would appreciate it if you keep your answers audible

14   so that we can have the court reporter take them

15   down.

16               I think I should be a few hours this

17   morning.  You, we may need one short break, we might

18   not.  If you do need anything sooner than that, your

19   counsel is here or you can just request it through

20   me, that's fine.

21               Those are the ground rules.

22               MR. GOULD:  Dino, have you decided, I

Page 7

1   whether it was a civil case.

2        Q.       Okay.

3        A.       But it was, again, a bid protest.

4        Q.       Have you ever testified in Court before?

5        A.       No.

6        Q.       Are you taking any medications that

7   could interfere with your ability to testify today?

8        A.       No.

9        Q.       All right.  Can you tell us what your

10  present position is?

11       A.       I'm the executive director of the

12  District of Columbia Housing Finance Agency.

13       Q.       And how long have you been in that

14  position?

15       A.       Two years.

16       Q.       Can you tell me the circumstances under

17  which you obtained the position, the process?

18       A.       There was a national search conducted

19  through a firm out of Chicago.  I made application,

20  went through the process, became a finalist.  At

21  that point I was presented to the Board of Directors

22  for interviews and after whatever deliberations they

Capital Reporting Company

Page 8

1  made, I was selected.

2       Q.      All right.  And when, when were you

3  selected?

4       A.      June of 2006.

5       Q.      And when did you start as director?

6       A.      June of 2006.

7       Q.      Did you have the title of acting

8  director for a while?

9       A.      Until confirmation, yes.

10      Q.      Okay.  Tell me why that occurred, why

11  you needed to be acting director?

12      A.      Under the statute that organized the

13  Housing Finance Agency, the Board of Directors makes

14  an appointment and a referral to City Council and

15  that person has to be confirmed by the City Council.

16             So in the period between the appointment

17  by the Board and confirmation by City Council, the

18  person is, carries the title of acting and then upon

19  confirmation by City Council, they become -- they

20  lose the acting.

21      Q.      Okay, and is that what happened in your

22  case?

Capital Reporting Company

Page 24

1  would be at these meetings?

2          A.      Yes.

3          Q.      Including Mr. Butler?

4          A.      Yes.

5          Q.      How long would they generally last?

6          A.      90 minutes.

7          Q.      We're just talking about the time that

8  Mr. Butler was there?

9          A.      90 minutes.

10         Q.      Okay.  At what point in time was Ms.,

11  did you hire Ms. Makle?

12         A.      December 2006.

13         Q.      Okay.  So that was after Mr. Butler was

14  terminated, correct?

15         A.      Yes.

16         Q.      At some point in time you met with

17  Mr. Butler about an evaluation that you did on his

18  performance; do you recall that?

19         A.      Yes.

20         Q.      Okay.  Approximately when did that

21  meeting occur?

22         A.      90 days after my start of employment.

Capital Reporting Company

Page 25

1    Q.    Okay.  Was there anyone besides you and

2    Mr. Butler at this meeting?

3    A.    No.

4    Q.    And so we're talking about sometime in

5    late September 2006; is that fair to say?

6    A.    That's correct.

7    Q.    And where did the meeting take place?

8    A.    In my office.

9    Q.    Okay.  Did you announce before either to

10   Mr. Butler or to the staff that you were conducting

11   this 90-day evaluation of everybody?

12   A.    For all direct reports, yes.

13   Q.    Okay.  When did you announce that?

14   A.    Probably a couple weeks ahead of time,

15   it took time to arrange each of the meetings.

16   Q.    All right.  What did you do to evaluate,

17   prior to meeting with Mr. Butler, what did you do to

18   evaluate his performance?

19   MR. PANAGOPOULOS:  Objection, vague and

20   ambiguous.  You can answer it.

21   THE WITNESS:  Basically went over notes

22   that I had made along the way and/or thoughts about

Page 32

1    split hairs here, but, fine, let's continue.

2              And you're not, as I understand it,

3    reserving objections to questions until the time of

4    trial?

5              MR. PANAGOPOULOS:  We're reserving

6    objections, but I also reserve the right to make

7    appropriate objections to the, you know, to the

8    extent I need to today.

9              BY MR. GOULD:

10   Q.       How did you, what process did you use to

11   conduct your evaluation of other employees at the

12   DCHFA, besides Mr. Butler?

13   A.       For all direct reports I had a similar

14   discussion as to whether their performance was

15   acceptable or not acceptable.

16   Q.       What did you do before you had this

17   discussion with these employees, that's what I'm

18   trying to get at?

19   A.       Again, similar process, would go through

20   recollections, thoughts, any random notes that I had

21   made about their performance and/or specific

22   incidents if there were any that I wanted to point

Page 33

1    out either positive or negative.

2         Q.    Let's go back to Mr. Butler.

3               My understanding is that you said you

4    took notes about his performance, correct, prior to

5    his evaluation?

6         A.    Along the way.

7         Q.    Let's just speak about him, between that

8    three-month period?

9         A.    Correct.

10        Q.    There was information obviously gathered

11   in those notes, correct?

12        A.    Or thoughts or --

13        Q.    Or thoughts?

14        A.    -- or a notation of something that was

15   done or not done, that's correct.

16        Q.    And where did you get that information

17   from other than your thoughts?

18        A.    Direct observation.

19        Q.    Did you speak with anyone about

20   Mr. Butler or his performance other than Mr. Butler

21   at the time?

22        A.    No.

Capital Reporting Company

Page 34

1      Q.      Okay.  What did you do to observe

2  Mr. Butler's performance in that three-month period?

3      A.      Conditions in the building, attendance

4  at meetings, completion of assignments and those

5  types of things.

6      Q.      Did you review his personnel file?

7      A.      No.

8      Q.      So attendance at meetings, condition of

9  the building and, I'm sorry, what was the third one?

10     A.      Conditions in the building, completion

11  of assignments.

12     Q.      Completion of assignments, okay.

13     A.      Et cetera.

14     Q.      All right, well let's just go with the

15  specific ones.

16             How was his attend -- you said at

17  meetings, now are you talking about staff meetings?

18     A.      Staff meetings, meetings with vendors

19  and so forth.

20     Q.      Well how would you know when he met with

21  vendors?

22     A.      If I was present.

Capital Reporting Company

Page 43

1      Q.      Okay.  Then you said that you also

2  evaluated the condition of the building?

3      A.      Correct.

4      Q.      Okay.  What do you mean by, can you be

5  more specific about what you mean by the condition

6  of the building?

7      A.      Cleanliness, in particular, insect

8  infestation, things of that nature.

9      Q.      Okay.  Now it had, you said the garage

10  had some structural problems, right?

11      A.      Correct.

12      Q.      Okay.  And that had, that engineering

13  firm was dealing with that?

14      A.      Doing studies of that, correct.

15      Q.      Doing studies, to fix them?

16      A.      Correct.

17      Q.      All right.  Did the building, itself,

18  have any structural problems, serious structural

19  problems like the garage?

20      A.      Roof, roof leak, yes.

21      Q.      Okay, so there was a roof problem?

22      A.      Yes.

Page 44

1    Q.    There was also a cleanliness and insect

2    problem in the building?

3    A.    Correct.

4    Q.    All right.  Did Mr. Butler personally

5    clean the building?

6    A.    He oversaw the firm that cleaned the

7    building, yes.

8    Q.    Was that, that was a vendor?

9    A.    Correct.

10    Q.    Do you remember who that vendor was?

11    A.    I don't recall the name.

12    Q.    Was it the same vendor that's there now?

13    A.    No, they were terminated.

14    Q.    When did -- did you play any role in

15    their termination?

16    A.    Ms. Makle did that.

17    Q.    And so that happens sometime after

18    December of 2006?

19    A.    Correct.

20    Q.    What about the building did you think

21    was unclean?

22    A.    Surfaces of desks and cabinets, floor

Capital Reporting Company

Page 45

1    areas.

2        Q.        And what was on these surfaces, was it

3    dust?

4        A.        Dust and dirt.

5        Q.        And when did you first notice these, the

6    dust and dirt on these surfaces?

7        A.        Shortly after my arrival.

8        Q.        Did you say anything to Mr. Butler?

9        A.        Yes.

10       Q.        Right away?

11       A.        Would you classify right away.

12       Q.        Well I mean within the first few days

13   that you noticed these cleanliness problems?

14       A.        Within the first few days that I noticed

15   it.  Probably.

16       Q.        You did.  What did you tell him to do

17   about it?

18       A.        Get it cleaned up.

19       Q.        Anything more specific?

20       A.        That's pretty specific.

21       Q.        Well did you want him to clean it up

22   personally?

Capital Reporting Company

Page 48

1    across, yes.

2        Q.    And you ran your finger across it in

3    front of him, right?

4        A.    Yes.

5        Q.    And then you mentioned that you also

6    evaluated his performance on completion of

7    assignments during this 90-day period; isn't that

8    right?

9        A.    Yes.

10        Q.    Okay.  How did he do with regard to that

11    part of your own personal evaluation?

12        A.    Repeat the question, please.

13        Q.    How did Mr. Butler do in your personal

14    evaluation of him that was completed in December on

15    the category of completion of assignments?

16        A.    December?

17        Q.    September, I'm sorry if I misspoke,

18    September of 2006.

19        A.    Some things remained incomplete.

20        Q.    Pardon?

21        A.    Some things remained incomplete.

22        Q.    Well was there a deadline that he missed

Capital Reporting Company

Page 49

1    with regard to a completion, were they incomplete in

2    that way?

3         A.    Yes.

4         Q.    What, what assignment in which he had a

5    deadline was incomplete?

6         A.    Again, we were working on several

7    different things around the building and in my view,

8    sufficient progress had not been made.

9         Q.    Can you be any more specific about these

10   assignments?

11        A.    I cannot.

12        Q.    You cannot.

13             So you can't tell me whether it was the

14   roof, the floor, the gate?

15        A.    It was probably all of them.  I never

16   mentioned the gate.  You mentioned the gate, I never

17   mentioned the gate.

18        Q.    What is, did he complete any of his

19   assignments?

20        A.    None of the things were fixed while he

21   was there.

22        Q.    None of the things were fixed while he

Page 51

1   not make sufficient progress on was the cleanliness

2   of the building; is that what you're telling me?

3          A.     That's the one I recall most clearly,

4   yes.

5          Q.     And you don't recall any other one, do

6   you?

7          A.     Again, discussions about what to do with

8   various building components and we did not make

9   sufficient progress.

10         Q.     But you --

11         MR. PANAGOPOULOS:  Counsel, are you

12   still limiting this to the initial 90-day period?

13         MR. GOULD:  Yes.

14         BY MR. GOULD:

15         Q.     But you cannot name me today anything,

16   any other one of these assignments other than the

17   cleanliness assignment or to get the building

18   cleaned assignment, you can't name me with

19   specificity any other assignment that he hadn't made

20   sufficient progress on?

21         MR. PANAGOPOULOS:  Objection,

22   mischaracterizes his testimony.

Capital Reporting Company

Page 52

1          MR. GOULD:  I'm trying to get this down.

2          BY MR. GOULD:

3     Q.      So you can answer.

4          That's the only one that I hear you

5     naming; isn't that right?

6     A.      Counsel --

7          MR. PANAGOPOULOS:  You can answer if

8     there's something else.

9          THE WITNESS:  Progress around about what

10    to do about the garage, progress about what to do

11    about the roof, progress about what to do about the

12    elevator.  I mean there were several other things

13    going on that needed to be corrected in the

14    building.

15         BY MR. GOULD:

16    Q.      And it was Mr. Butler's fault that these

17    things were not being corrected?

18    A.      It was his responsibility to see that

19    progress was made to having them corrected.

20    Q.      Okay.  Well at the meeting in September,

21    did you give him a list of these other assignments

22    that he had failed to make sufficient progress on?

Capital Reporting Company

Page 53

1      A.      I believe I spoke with him principally

2  again about the conditions in the building, the

3  cleanliness issue as an example of my discontent

4  with his performance.

5      Q.      Right.  So other than that specific

6  issue, you didn't tell him that you were

7  dissatisfied with his lack of progress with regard

8  to the garage, the roof or, and/or the elevator at

9  the September meeting, did you?

10     A.      I don't believe I ran specifically

11 through all of those, but I told him of my general

12 dissatisfaction with his performance.

13     Q.      Right.  Didn't the DCHFA have a

14 performance evaluation program or practice at the

15 time that you took over?

16     A.      It was extant.

17     Q.      Okay.  Wasn't there a policy to give

18 written evaluations every, at the end of every

19 fiscal year to employees?

20     A.      It was extant.

21     Q.      Okay.  And my understanding is you

22 didn't partake of that policy?

Capital Reporting Company

Page 55

1      Q.      When did you start doing written

2   performance reviews?

3      A.      This fiscal year.

4      Q.      Meaning starting October 1, 2007?

5      A.      Correct.

6      Q.      Okay.  So no one received a written

7   performance, no employee as far as you understand at

8   the DCHFA received a written performance review for

9   fiscal year 2006?

10      A.      None of my direct reports.

11      Q.      Did people below your direct reports

12   receive written performance reviews during that

13   period, if you know?

14              MR. PANAGOPOULOS:  Objection,

15   foundation, you can answer.

16              BY MR. GOULD:

17      Q.      Did people --

18      A.      I do not know.

19      Q.      You do not know, okay.

20              Did you have a policy or practice of

21   reviewing, signing off on performance evaluations

22   for people who were not your written reports -- I'm

Capital Reporting Company

Page 64

1    as you understood?

2        A.      To oversee the maintenance, operations,

3    functions of the building.

4        Q.      And he supervised these I guess four

5    employees we're talking about total?

6        A.      Correct.

7        Q.      Okay.  Did he do written evaluations of

8    them, do you know?

9        A.      I don't know.

10       Q.      Okay.  Did Mr. Butler have some

11   responsibilities over technology issues?

12       A.      Telephone.

13       Q.      Telephone only?

14       A.      Yes.

15       Q.      Okay.  Not computer?

16       A.      Not when I was there, no.

17       Q.      All right.  Now after, during, let's go

18   back to this evaluation that you held with

19   Mr. Butler at the end of September of 2006, did you

20   make any specific suggestions for, to him for him to

21   improve his performance?

22       A.      I don't recall.

Capital Reporting Company

Page 67

1    previously and I believe that was the vendor that we

2    met with.

3        Q.    I see, okay, and Mr. Butler, did he

4    attend all of those meetings?

5        A.    No.

6        Q.    Which one did he miss?

7        MR. PANAGOPOULOS:  Objection,

8    foundation.  Go ahead.

9        THE WITNESS:  There was a meeting, I'm

10   not certain of the vendor, but I believe it was

11   dealing with a space study that we were going to

12   conduct.

13       BY MR. GOULD:

14       Q.    So that's a different vendor?

15       A.    Different vendor.

16       Q.    And where was Mr. Butler?

17       A.    Out of the office.  He, he called the

18   meeting.

19       Q.    When did he call the meeting?

20       A.    I don't know, he arranged the meeting.

21   I don't know specifically when he arranged it.

22       Q.    When did that, did you eventually attend

6315422a-d5b1-4d80-8929-e074c4876af9

Capital Reporting Company

Page 68

1    that meeting without him?

2        A.    I did.

3        Q.    And when did that meeting take place?

4        A.    I don't recall the specific date.

5        Q.    Mr. Butler was out of the office you

6    say?

7        A.    He was out of the office.

8        Q.    Okay, do you know why he was out of the

9    office?

10       A.    I do not.

11       Q.    He never told you?

12       A.    He had requested leave.

13       Q.    So you knew that?

14       A.    I knew that.

15       Q.    Who did you get that information from?

16       A.    Via a leave slip.

17       Q.    You saw the leave slip?

18       A.    Yes.  I signed the leave slip.

19       Q.    Who handed it to you?

20       A.    I don't recall that.

21       Q.    They just give it to you?

22       A.    Things are put in my office for

Page 72

1    this period, do you know what the leave was for?

2         A.    It says on the form --

3              MR. PANAGOPOULOS:  Well let's get a

4    clarification, are you asking him what the form says

5    or are you asking him his understanding at the time

6    or are you asking him his understanding at a later

7    time, I think it's --

8              MR. GOULD:  I'm not trying to trick him.

9              BY MR. GOULD:

10        Q.    Let's try to go with just the questions,

11   there's no trick here.

12             You can either answer from what you see

13   on the form, your own recollection or anything else

14   that forms the basis of your testimony, that's fine.

15        A.    What I see on the form, it says sick.

16        Q.    Right.  Did he have any discussion,

17   Mr. Butler have any discussion with you about why he

18   was going to take this leave?

19        A.    Not that I recall.

20        Q.    Did anyone else have a discussion with

21   you about why Mr. Butler was going to take the

22   leave?

Capital Reporting Company

Page 73

1      A.      Not that I recall.

2      Q.      When you say not that you recall, do you

3  mean no?

4      A.      I mean no.

5      Q.      Okay.  And did Mr. Butler talk to you at

6  any point during the time he was out on this leave?

7      A.      Not that I recall.

8      Q.      Okay.  Do you remember talking to

9  Mr. Butler when he returned, between the time he

10  returned from this leave and the time that he was

11  terminated?

12      A.      Yes.

13      Q.      Okay.  When do you think was the, I mean

14  we can, I think we can agree he was terminated on

15  October 27th, 2006, so just between the time when he

16  took this particular leave, either the one that's

17  set forth on this slip or, you know, the number of

18  days he was actually out that leave and the time

19  that he was terminated, do you recall how many times

20  you talked to Mr. Butler?

21      A.      How many times?

22      Q.      Yes.

Capital Reporting Company

Page 74

1        A.        Not specifically, no.

2        Q.        Do you recall any discussions with

3    him --

4        A.        Yes.

5        Q.        -- during that time?  Okay.

6              What's, can you tell me what happened

7    during the discussion that you recall?

8        A.        The discussion --

9              MR. PANAGOPOULOS:  I'm sorry, I don't

10   think you've established how many times he recalls,

11   you just asked him if he remembers discussions.

12             BY MR. GOULD:

13       Q.        Any discussion that you recall during

14   that period.  Just start with the first one that you

15   recall?

16       A.        The discussion I recall was about the

17   meeting that Mr. Butler missed.

18       Q.        Okay.  About, do you have a specific

19   date when that happened?

20       A.        I do not.

21       Q.        Well was it during the week that he was

22   terminated?

Page 75

1        A.        I think it was after he returned from

2    leave.

3        Q.        But you can't say whether it was during

4    the, between the Monday, he was terminated on a

5    Friday, October 27th; do you remember that?

6        A.        I remember the termination, yes.

7        Q.        Okay.  You don't remember the day of the

8    week it occurred?

9        A.        No.

10       Q.        All right.  So tell me what you

11   discussed with him about the meeting.

12                 MR. PANAGOPOULOS:  That he missed?

13                 BY MR. GOULD:

14       Q.        The meeting that he missed, yes.

15       A.        I think Mr. Butler asked me what had

16   happened at the meeting and I said to him don't

17   worry about it, I will take care of it.

18       Q.        That's the full extent of the

19   discussion?

20       A.        More or less.

21       Q.        What did happen at the meeting?

22       A.        Again, it was a discussion about, I

Capital Reporting Company

Page 81

1           was marked for identification)

2           BY MR. GOULD:

3           Q.       This is an E-mail that you sent to

4    Mr. Butler on October 26th, is it not?

5           A.       It appears to be, yes.

6           Q.       Okay, do you recall out of all of the

7    things that were going on at that period of time why

8    you sent Mr. Butler, why you wanted to discuss with

9    Mr. Butler the issues set forth in the E-mail?

10          A.       Yes.

11          Q.       Okay.  What do you recall about the

12   reasons why you wanted to discuss these issues with

13   him?

14          A.       There was an occasion where the building

15   was, failed to be opened at the appropriate time.

16          Q.       Wasn't that a couple of weeks before the

17   date of the E-mail?

18          A.       Yes.

19          Q.       All right.  Did you discuss, had you

20   discussed that incident with Mr. Butler prior to you

21   sending this E-mail to him?

22          A.       He was out.

Page 82

1      Q.      All right, so the answer is no, you

2   hadn't?

3      A.      I had not.

4      Q.      Okay.  What happened with regard to this

5   failure to -- what happened with regard to this

6   incident that you, occasioned you to write

7   Mr. Butler this E-mail?

8      A.      There was an occasion when I arrived at

9   the building and the exterior gate had not been

10  opened, which then prevented several people,

11  including the building maintenance services and some

12  employees from entering the building.

13     Q.      About what time of the, do you remember

14  the day, approximately?

15     A.      I don't remember the day.

16     Q.      All right.  It was in October, though,

17  was it not?

18     A.      It was in October.

19     Q.      All right.  Do you remember the time of

20  the day that you discovered that this had occurred?

21     A.      Approximately 7:15 a.m. to 7:30 a.m.

22     Q.      And tell me what you observed to come to

Capital Reporting Company

Page 83

1    the conclusions that you just gave us in your

2    response?

3        A.    I drove up to the gate, the gate was

4    secured.  A line of vehicles formed behind my

5    vehicle of people who were waiting to gain entrance

6    to the building.

7        Q.    And this was about 7:15 a.m?

8        A.    7:15 to 7:30 a.m., yes.

9        Q.    Okay.  What time did the workday start

10   at DCHFA around this time period?

11       A.    The building is to be opened at 7 -- at

12   that point when it had to be manually opened, the,

13   Tony Ulmer arrived at 6 a.m. and the building was to

14   be prepared and opened from that point forward.

15       Q.    Were any other employees required to

16   report at 6 a.m.?

17       A.    Not at 6 a.m., no.

18       Q.    Okay.  When was the, as best as you can

19   remember in October of 2006, when was the next

20   employee scheduled -- what was the time in which --

21       A.    7.

22       Q.    -- some employees started at?

Page 88

1      Q.      How do you know that, did you ask her?

2      A.      Keys were, the distribution of keys was

3   controlled.

4      Q.      Who else had a key besides yourself and

5   Mr. Ulmer, obviously?

6      A.      There were perhaps two or three others

7   who had keys to the gate.

8      Q.      So as I understand it, you pulled up to

9   the gate, you got out of your car, you turn the key

10  in the pad lock and you opened the gate?

11     A.      You had to reach through the bars, the

12  pad lock was on the inside of the gate, reach

13  through the bars, unlock the pad lock, take it off,

14  swing the gate open, yes.

15     Q.      And how long did that take you?

16     A.      On any given day?

17     Q.      That particular day?

18     A.      It depends, on that day, I was, I had

19  done it several times before, so, I don't know, five

20  minutes.

21     Q.      It couldn't have even taken that long,

22  could it?

6315422a-d5b1-4d80-8929-e074c4876af9

Capital Reporting Company

Page 89

1      A.      You're reaching behind, you can't see

2      the, you can't see what you're doing, you do it the

3      Ray Charles method.

4      Q.      All right, couldn't you go in the front

5      entrance --

6      A.      No.

7      Q.      -- open the front entrance and go around

8      and open up the gate?

9      A.      No, there's a bolt that has the front

10     door bolted so that cannot be opened until you come

11     in the building, unlatch the bolt and then the front

12     door can be opened.

13     Q.      So the front door is secured from the

14     inside?

15     A.      Yes, in the evenings.

16     Q.      All right.  And every morning Mr. Ulmer

17     had to do the same thing you did?

18     A.      Correct.

19     Q.      Now, did Mr., was Mr. Butler at work

20     that day later, the day that you had to open the

21     gate that you spoke about?

22     A.      Yes.

Capital Reporting Company

Page 91

1    when you arrived?

2         A.    Correct.

3         Q.    All right.  Now you just told me that

4    Mr. Ulmer had the responsibilities, so I'm looking

5    at Sewell 2.

6               Did you not understand that at the time

7    that you wrote this E-mail to Mr. Butler?

8         A.    I understood that, yes.

9         Q.    But you still felt the need to write the

10   E-mail to Mr. Butler?

11        A.    Yes.

12        Q.    All right.

13              MR. GOULD:  Let me show you this.

14              (Sewell Deposition Exhibit No. 3

15              was marked for identification)

16        BY MR. GOULD:

17        Q.    Have you seen a copy of this before?

18        A.    I have.

19        Q.    Is this Mr. Butler's response to your

20   E-mail?

21        A.    It is.

22        Q.    Okay.  Did you read this at the time

Capital Reporting Company

Page 93

1    clear.

2              BY MR. GOULD:

3    Q.    Well let's take the first one.

4              Was it a complete response to what you

5    requested in your E-mail, first of all?

6    A.    It was an inadequate response.

7    Q.    Well, let me try to see what you mean by

8    that.  You didn't think that the arrangements that

9    Mr. Butler had made for opening and closing the

10   building were proper; is that a fair

11   characterization of why it was inadequate?

12   A.    I wouldn't use the term proper.  It was

13   not adequate as evidenced by it didn't, it resulted

14   in the building not being opened.

15   Q.    Well what was inadequate was what

16   happened that day you're saying, I think; is that

17   fair, is that a fair summary?

18   A.    And the response showed that as well, to

19   me.

20   Q.    All right.  So didn't Mr. Butler explain

21   to you that Tony was going to be out that day and he

22   had planned to get there early to open the building,

Page 94

1    he, being Mr. Butler, at some point before he was

2    fired?

3        A.    I knew that Mr. Ulmer was on leave, yes.

4        Q.    Okay.  And how did you know that?

5        A.    Mr. Butler informed me of that.

6        Q.    And didn't he tell you also at some

7    point that he was going to get there early to open

8    the building?

9        A.    I don't recall that.

10        Q.    All right.  Were you dissatisfied with,

11    I know you're dissatisfied with what happened that

12    day, that the building wasn't open, but were you

13    dissatisfied with the general arrangements that

14    Mr. Butler had made to open and close the building?

15        A.    Yes.

16        Q.    Can you tell me what specifically he did

17    wrong with regard to that?

18        A.    Just a lack of accountability, a lack of

19    specificity, an I before E except after C type of

20    arrangement.

21        Q.    Well it sounds like to me you're talking

22    about what happened that day as opposed to in

Capital Reporting Company

Page 105

1    he had had discussions with Mr. Butler?

2        A.        No, not that I recall.

3        Q.        All right.  Now you got this memo which

4    I think is Sewell 3 -- well the memo is 4, you sent

5    the E-mail out first.

6            MR. PANAGOPOULOS:  Exhibit 4 is not a

7    memo, it's a salary authorization reflecting a cost

8    of living.

9            MR. GOULD:  I'm sorry, Exhibit 3 and 2

10   was the memo that you sent out to Mr. Butler, I

11   believe.

12           MR. PANAGOPOULOS:  It's an E-mail

13   request.

14           MR. GOULD:  Right, an E-mail request.

15           BY MR. GOULD:

16       Q.        You sent that out on the 26th and on the

17   27th you fired Mr. Butler; isn't that right?

18       A.        Yes.

19       Q.        Can you tell me all the reasons you

20   fired Mr. Butler on the 27th?

21       A.        The failure to open the building was the

22   determinative, the failure to have the building open

Page 106

1    on time was the determinative event where I decided

2    to terminate Mr. Butler.

3         Q.     So that was the reason?

4              MR. PANAGOPOULOS:  Objection,

5    mischaracterizes his testimony.

6              THE WITNESS:  I said the determinative

7    event.  It had been an accumulation of failures and

8    that was the straw that broke the camel's back, if

9    you will.

10             BY MR. GOULD:

11        Q.     Okay, what other, did you take into

12   account any other issues with regard to Mr. Butler

13   other than his failure to have the building opened

14   that morning in deciding to fire him?

15        A.     Well the previous discussion about the

16   unsatisfactory nature of his performance in

17   September.

18        Q.     But you didn't fire him in September,

19   did you?

20        A.     No, I don't.

21        Q.     In fact, you didn't even warn him that

22   he needed to improve his performance on pain of

Capital Reporting Company

Page 108

1    you told, you were the person who told Mr. Butler

2    that he was fired, right?

3         A.       That is correct.

4         Q.       Okay.  I forget, actually let me go back

5    to something.

6              You mentioned the determining factor was

7    the failure to secure the building and you

8    mentioned --

9         A.       To open the building.

10        Q.       -- to open the building, sorry, and you

11   mentioned the discussion that you had or the results

12   of his verbal evaluation in September?

13        A.       And intervening lapses.

14        Q.       Well that's what I forgot to ask you,

15   were there any other factors?  You told me the

16   determining factor and you told me about the

17   evaluation and things that happened that were in the

18   evaluation, were there any other factors that caused

19   you to decide to fire Mr. Butler?

20        A.       No improvement in the condition of the

21   building.

22        Q.       Well what conditions of the building had

6315422a-d5b1-4d80-8929-e074c4876af9

Page 109

1    not improved?

2         A.        Cleanliness.

3         Q.        Any other condition?

4         A.        There were things that were being worked

5    on again where very little or no progress had been

6    made.

7         Q.        And what are we talking about in

8    particular?

9         A.        The things I have mentioned previously.

10        Q.        Okay.  But there was no discussion with

11   Mr. Butler between September, the September

12   evaluation and the October 27th meeting, was there?

13        A.        I don't recall any, no.

14        Q.        Okay, did you consult any documents

15   before firing Mr. Butler?

16        A.        No.

17        Q.        Did you look at the personnel policies?

18        A.        No.  Before firing him?

19        Q.        Yes.

20        A.        Or before making the decision to fire

21   him?

22        Q.        Either, at any time.

Page 117

1      Q.      Answer it.

2      A.      Again, I didn't skip.  It says may, not

3  must, so at the discretion of the executive director

4  and in that all employees of the Agency are at will

5  employees, I can take whatever actions I deem

6  appropriate.  This was a guideline, not a

7  prescriptive procedure.

8      Q.      Well I understand that, that's, okay.

9              So are those the reasons why you decided

10  not to give Mr. Butler a written warning and a

11  suspension prior to the dismissal?

12     A.      I felt that the cumulative effect of his

13  failure to perform over the course of my tenure,

14  things I previously mentioned, things like having

15  the vehicles undocumented, we're driving vehicles

16  with no documentation as to ownership or insurance,

17  and other failures that I had pointed out over the

18  course of my tenure I felt had constituted

19  sufficient grounds for him to be terminated.

20     Q.      And terminated immediately without a

21  written warning and a suspension?

22     A.      Correct.

Capital Reporting Company

Page 118

1    Q.    What, I heard something about driving

2    vehicles without insurance, did I --

3    A.    Without documentation of insurance.  The

4    Agency --

5    Q.    Who was driving these vehicles without

6    documentation of insurance?

7    A.    Any employee that is a -- that holds a

8    valid driver's license is able to request to drive

9    one of the vehicles.  Principally the driver of the

10   vehicles would be Mr. Butler, Mr. Ulmer or myself.

11   Q.    Well these vehicles were insured, were

12   they not?

13   A.    But they did not have -- the

14   documentation in the vehicle which is required.

15   Q.    Oh, they didn't have the proof of

16   insurance wasn't actually in the cars?

17   A.    Correct.

18   Q.    Okay.

19   A.    Or proof of ownership.

20   Q.    Or --

21   A.    The registration.

22   Q.    The registration?

6315422a-d5b1-4d80-8929-e074c4876af9

Capital Reporting Company

Page 119

1      A.      Correct.

2      Q.      Was this one of the cars that you drove?

3      A.      One, well there are two vehicles, one

4   was the car I drive, yes.

5      Q.      Well when did you notice that this, that

6   they weren't in there?

7      A.      Sometime over the course of the Summer I

8   went to read the manual so that I would know how to,

9   what the proper operation of the vehicle would be, I

10  did not see proof of insurance or ownership with the

11  owner's manual and I inquired where is, where are

12  the insurance card and the registration for the

13  vehicle.

14          Subsequent I inquired the same about the

15  vehicle that I did not principally drive.  We have a

16  sedan and a van and the documentation for that

17  vehicle was not in that vehicle as well.

18     Q.      So you were given a car to use, a sedan

19  to use as part of your compensation package?

20     A.      Correct.

21     Q.      And you could use it for personal

22  purposes?

Capital Reporting Company

Page 120

1      A.      It was assigned to me for 24-hour use,

2   yes.

3      Q.      Okay.  And there was also a van?

4      A.      There is a van that the Agency owns as

5   well, yes.

6      Q.      And who used the van?

7      A.      Various staff or, again, principally

8   driven at the time of Mr. Butler's tenure either by

9   himself or Mr. Ulmer.

10     Q.      And when, you discovered this sometime

11  in the Summer you said of 2006?

12     A.      Correct.

13     Q.      And you talked to Mr. Butler immediately

14  about that, did you not?

15     A.      Correct.

16     Q.      And he corrected the situation, didn't

17  he?

18     A.      No, not immediately, no.

19     Q.      How long did it take him to correct

20  that?

21     A.      I believe it wasn't corrected until

22  after he left.

Page 127

1    about insect infestation, we've talked about just

2    the overall unsatisfactory appearance of the

3    building, yes.

4        Q.    Yeah, I forgot to ask you about the

5    insect in specific, specifically so let me go over

6    that now.

7            Was the building, are you saying the

8    building was, at the time that Mr. Butler was fired

9    still had an insect problem?

10       A.    Bugs and mice, actually.

11       Q.    What kind of bugs were in the building?

12       A.    I am not an expert in that area, sir.

13       Q.    Well how did you know the bugs were

14   there?

15       A.    The kind that crawl, I saw them

16   crawling.  It could have been a roach, it could have

17   been -- I mean I'm not, I don't know the specific

18   genus of the bug, but they were bugs.

19       Q.    And there were bugs on October 26th and

20   27th?

21       A.    On that specific day?

22       Q.    Yeah.

6315422a-d5b1-4d80-8929-e074c4876af9

Page 128

1    A.    I don't know that, but on or about those

2    days, yes.

3    Q.    Well, was it the responsibility of the

4    cleaning company to exterminate pests?

5    A.    It was a separate extermination.

6    Q.    Okay.  So that would have been

7    extermination?

8    A.    Another vendor?

9    Q.    Another vendor --

10    A.    Yes.

11    Q.    -- that Mr. Butler supervised that day?

12    A.    And would administer the kind of -- all

13    building services, yes.

14    Q.    Do you know when the last time the

15    building just prior to his firing, when it had, the

16    exterminator had been out there to do --

17    A.    I do not.

18    Q.    -- to do whatever exterminators do?

19    A.    I do not.

20    Q.    And you can't tell us today when the

21    last, the time just previous to Mr. Butler's

22    termination was that you saw mice in the building?

Capital Reporting Company

Page 129

1    A.    Again, on or about that time, other

2    employees were also reporting the presence of mice

3    in their office.  I personally saw dead bug

4    carcasses in the stairwells that remained there for

5    days on end, so, yes.

6    Q.    Okay.  So let's continue with the

7    handbook here.

8    A.    Okay.

9    Q.    By the way, before we do that, let me

10   just ask you about the exterminator vendor.  Did you

11   terminate the exterminator vendor at the same time

12   you terminated Mr. Butler?

13   A.    At the same time, no.

14   Q.    Did you terminate the cleaning service

15   vendor at the same time you terminated Mr. Butler?

16   A.    No.

17   Q.    I think we talked about the cleaning

18   vendor was terminated by Ms. Makle sometime

19   thereafter?

20   A.    Correct.

21   Q.    What about the exterminators, did you

22   use the same ones?

Page 130

1      A.      No, I believe we changed vendors there

2   as well.

3      Q.      Also Ms. Makle --

4      A.      Yes.

5      Q.      -- decided that, she's the one who

6   changed the vendors?

7      A.      It was under her, the building was one

8   of the responsibilities that fell within the office

9   of administration, yes.

10      Q.      Was Mr. Ulmer also involved in that

11   decision?

12          MR. PANAGOPOULOS:  Which decision?

13          BY MR. GOULD:

14      Q.      The decision to change vendor

15   exterminating, exterminating vendors?

16      A.      I don't know that.

17      Q.      Well we talked a little bit about

18   Ms. Makle earlier and I think you told me that she

19   was on a higher level?

20      A.      Correct, in that -- the building.

21      Q.      Mr. Ulmer also took over some of

22   Mr. Butler's responsibilities, did he not?

6315422a-d5b1-4d80-8929-e074c4876af9

Capital Reporting Company

Page 131

1      A.      Correct.

2      Q.      So wouldn't this be part of the

3   responsibilities that Mr. Ulmer took over?

4              MR. PANAGOPOULOS:  Objection,

5   foundation.

6              THE WITNESS:  Again, when I had

7   mentioned higher level, I was saying Ms. Makle as

8   the head of the office of administration is the

9   chief operating officer of the Agency, so she's at a

10  higher level meaning she had many more duties other

11  than the building, itself.

12             BY MR. GOULD:

13     Q.      Well it sounds like she had duties that

14  involved making decisions on cleaning vendors and

15  exterminators?

16     A.      Correct.

17     Q.      Which were also the duties of

18  Mr. Butler?

19     A.      Correct.

20     Q.      All right.  And she took on these duties

21  all by herself, my understanding of her testimony,

22  she didn't consult with Mr. Ulmer?

Capital Reporting Company

Page 143

1          BY MR. GOULD:

2      Q.      Regarding the family and medical leave

3   section?

4          MR. PANAGOPOULOS:  You can answer.  You

5   already have.

6          THE WITNESS:  Yeah, again, I wasn't

7   aware that there was a request so, therefore, I

8   wasn't aware that anything in this handbook would

9   apply, that is correct.

10         BY MR. GOULD:

11     Q.      Including the Family and Medical Leave

12  Act section?

13     A.      Correct, I wasn't aware that there was a

14  request for Family and Medical Leave Act.

15     Q.      And you think that still today?

16     A.      Yes.

17     Q.      Okay.  Did you ever ask Mr. Butler about

18  his family?

19     A.      No.

20     Q.      Did you know anything about the fact

21  that his mother was ill?

22     A.      When?

Capital Reporting Company

Page 144

1      Q.      Between June of 2006 and when you fired

2  him on October 27th, 2006?

3      A.      No.

4      Q.      Did you even know he had a living

5  mother?

6      A.      No.

7      Q.      Did you know whether he had any

8  siblings?

9      A.      No.

10      Q.      Never asked him?

11      A.      No.

12      Q.      Do you know when his birth date was?

13      A.      No.

14      Q.      Never asked him?

15      A.      No.

16      Q.      Do you know where he lived?

17      A.      Address?

18      Q.      Yeah.

19      A.      No.

20      Q.      Do you know what town he lived in?

21      A.      No.

22      Q.      Do you know whether he was married?

Capital Reporting Company

Page 147

1          MR. PANAGOPOULOS:  Unbelievable.

2          MR. GOULD:  Well it happened, didn't it.

3          So your understanding is, just for the

4    future questions, is that you can say more than

5    objection as to form?

6          MR. PANAGOPOULOS:  Ask your questions

7    and you'll see what my understanding is based on how

8    I object.

9          MR. GOULD:  All right.

10          BY MR. GOULD:

11     Q.     Was anyone at the meeting on

12    October 22nd, 2006, that you had with Mr. Butler?

13     A.     October 22nd?

14     Q.     27th, I'm sorry, October 27th that you

15    had with Mr. Butler?

16     A.     Yes.

17     Q.     Who else was there?

18     A.     Mr. Thomas and Mr. Alexander.

19     Q.     Okay.  What happened at the meeting?

20     A.     I had asked for Mr. Butler to be brought

21    to my office when I arrived at the building with the

22    intention of terminating his employment.

Capital Reporting Company

Page 148

1      Q.      What happened at the meeting,

2  Mr. Sewell?

3      A.      Mr. Butler was given a letter that

4  explained that he was being separated from the

5  organization that day, briefly --

6      Q.      Go -- I'm sorry, go ahead.

7      A.      Briefly went over the reasons why and as

8  I recall, that was pretty much it.

9      Q.      Who handed him the letter?

10     A.      I did.

11     Q.      Who went over the reasons why he was

12  being fired?

13     A.      I did.

14     Q.      And what did you tell him?

15     A.      What I just said.

16     Q.      Well describe the reasons that you

17  described to him, if you recall?

18     A.      That he had been told that his

19  satisfactory was -- that his performance was

20  unsatisfactory previously, that his performance had

21  continued to be unsatisfactory and that he was being

22  terminated.

Capital Reporting Company

Page 149

1      Q.      And you didn't go over the details --

2      A.      No.

3      Q.      -- of what was unsatisfactory?  Okay.

4              Did Mr. Thomas say anything?

5      A.      No.

6      Q.      Did Mr. Alexander say anything?

7      A.      No.

8      Q.      Why did you decide to have them there?

9      A.      I thought it was appropriate to have the

10  H.R. person and Counsel.

11     Q.      But you hadn't discussed this decision

12  with them prior to that, had you?

13             MR. PANAGOPOULOS:  Objection.

14             THE WITNESS:  No, I --

15             MR. PANAGOPOULOS:  Go ahead.

16             THE WITNESS:  I had, yes.

17             BY MR. GOULD:

18     Q.      You discussed this with Mr. Thomas?

19     A.      Yes.

20     Q.      When did you tell Mr. Thomas you were

21  going to fire Mr. Butler?

22     A.      I don't recall the exact date, but

Capital Reporting Company

Page 150

1    shortly, if not the day of, shortly after the

2    failure to open the building.  As I said previously,

3    that was the determinative incident in my estimation

4    and I spoke with both Mr. Thomas and Mr. Alexander

5    about looking through the handbook and all

6    appropriate materials in preparation and to prepare

7    a termination letter in preparation for the

8    termination of Mr. Butler.

9         Q.    How many times had you spoken with

10   Mr. Thomas?

11        A.    I don't recall.

12        Q.    More than once?

13        A.    Yes.

14        Q.    Did Mr. Thomas prepare the letter?

15        A.    No.

16        Q.    Did you?

17        A.    No.

18        Q.    Who did?

19        A.    I believe Mr. Alexander prepared the

20   letter.

21        Q.    But you're the one who made the

22   decision?

## Capital Reporting Company

Page 151

1      A.      Correct.

2      Q.      When do you think the letter was, I know

3   it was given to him on the 27th, when do you think

4   it was prepared?

5      A.      I have no idea.

6      Q.      Well it was sometime in October, right?

7      A.      Yes.

8      Q.      You have some idea, right, you don't

9   know the exact date?

10     A.      I do not.

11     Q.      Was there any E-mail correspondence or

12  any kind of written correspondence between you and

13  Mr. Thomas about this?

14     A.      No.

15     Q.      Did Mr. Thomas give you an opinion as to

16  what he thought should be done with Mr. Butler?

17     A.      No, I didn't request one.

18     Q.      So Mr. Thomas didn't say whether he

19  agreed or disagreed with the decision?

20     A.      I didn't request one.

21     Q.      So the answer is no, he did not because

22  you didn't request one?

Capital Reporting Company

Page 153

1      Q.      Okay.  And what time was the meeting, at

2  the beginning of the day?

3      A.      The meeting was at the beginning of the

4  day.

5      Q.      Okay, and so your understanding was

6  Mr. Butler was then going to go collect his personal

7  belongings and leave?

8      A.      Correct.

9      Q.      All right.  I forgot to copy the

10  termination letter so I'm going to go look for it,

11  so I need a break.  I think after we go over that we

12  should be just about done.

13                (Short recess taken)

14                (Sewell Deposition Exhibit No. 7

15                was marked for identification)

16              BY MR. GOULD:

17      Q.      Okay, Mr. Sewell, this is the actual

18  termination letter that you handed Mr. Butler,

19  correct, on October 27th?

20      A.      That is correct.

21      Q.      All right.  Now how many times did you,

22  you mentioned you spoke with Mr. Alexander about

Capital Reporting Company

Page 154

1    Mr. Butler prior to his, to Mr. Butler's

2    termination, about how many times did you speak to

3    Mr. Alexander on that subject?

4         A.    I don't recall the specific number of

5    times.

6         Q.    Was it more than once?

7         A.    Yes.

8         Q.    Okay.  And this mentions, the letter

9    mentions the failure to have the building open and

10   ready for business on Friday, October 13th, 2006; do

11   you see that?

12        A.    Yes, I do.

13        Q.    So do you think you talked to

14   Mr. Alexander between, about Mr. Butler's situation

15   between October 13th and October 27th?

16        A.    Yes.

17        Q.    Okay.  Did you talk to him before that

18   about Mr. Butler's performance?

19        A.    No.

20        Q.    Okay.  And that was also the period of

21   time that you talked with Mr. Thomas, right?

22        A.    Yes.

6315422a-d5b1-4d80-8929-e074c4876af9

Capital Reporting Company

Page 155

1      Q.      All right.  And you think you told

2  Mr. Thomas at some point between that October 13th

3  and October 27th of your decision to terminate

4  Mr. Butler?

5      A.      Yes.

6      Q.      All right.  But you can't pinpoint it

7  exactly the dates of those conversations?

8      A.      I cannot.

9      Q.      Mr. -- do you recall the circumstances

10  under which Mr. Thomas left?

11      A.      I cannot.

12      Q.      Was he terminated, do you know?

13      A.      I believe he was.

14      Q.      And he was your direct report, was he

15  not?

16      A.      He was not.

17      Q.      At that point he was reporting to

18  Ms. Makle?

19      A.      That is correct.

20      Q.      So she made the decision to terminate

21  him?

22      A.      That is, if he, in fact, was terminated,

Page 156

1    it would have been her decision; that's correct.

2        Q.    She didn't discuss that with you?

3        A.    No.

4        Q.    You found out after he was terminated

5    that it had occurred?

6        A.    Correct, she informed me.

7        Q.    And she never told you why?

8        A.    She informed me that he had -- again, I

9    recall she informed me that he had left.  I don't

10   recall specifically whether she had terminated him.

11       Q.    I see, okay, so he also could have left,

12   he also could have resigned?

13       A.    He could have, yes.

14       Q.    All right.  Did you, have you been

15   involved in terminating any other of your direct

16   reports?

17       A.    Yes.

18       Q.    Okay.  Who else have you terminated

19   besides Mr. Butler on your, that you -- who else did

20   you make the decision to terminate besides

21   Mr. Butler?

22       A.    At the, as part of the 90-day review

Capital Reporting Company

Page 157

1    process, there were two employees that I informed

2    that their performance was less than satisfactory,

3    Mr. Butler and Francis Dyson, who at that point was

4    my executive assistant and because of her continued

5    poor performance, I subsequently terminated her as

6    well, yes.

7        Q.    Do you remember when that happened?

8        A.    I don't recall the specific date.

9        Q.    Was it after Mr. Butler or before?

10       A.    I believe it was before.

11       Q.    Did you provide her with the, some kind

12   of notice as set forth in the bullet points in the

13   handbook that we reviewed prior to terminating her?

14       A.    No.

15       Q.    Did she even get an oral warning?

16       A.    She got the same warning as Mr. Butler,

17   that her performance was unsatisfactory and that it

18   needed to be improved.

19       Q.    Do you remember why her performance was

20   unsatisfactory leading to her termination?

21       A.    Yes.

22       Q.    What, what did she do wrong?

Capital Reporting Company

Page 158

1    A.    The specific thing that caused her

2    termination was a, I'll use the technical term

3    screw-up in traveling arrangements for me to travel

4    to the west coast and back.

5          Prior to that, it was just a general,

6    again, lack of the skills required of a person who

7    would function as an executive assistant.

8    Q.    Okay.

9    A.    Filing, typing, accurate recordation of

10   messages, those types of things.

11   Q.    And you hired a replacement?

12   A.    Yes.

13   Q.    And who is that, again?

14   A.    Sandy Whitehorn.

15   Q.    Uh-huh, I think you mentioned her.

16         Anyone else besides Mr. Butler and your

17   executive assistant?

18   A.    Those were the only two.

19   Q.    Did you have any conversations

20   subsequent to Mr. Butler's termination with

21   Mr. Thomas about Mr. Butler?

22   A.    Yes.

Capital Reporting Company

Page 162

1    you've filled them up or you're done with them?

2        A.    Yes.

3        Q.    And with respect to the pad that may

4    have had notes regarding Mr. Butler, is that what

5    happened to it, when you were done with it, you

6    threw it out?

7        A.    Yes.

8        Q.    You had mentioned I believe some issue

9    regarding an elevator?

10       A.    Yes.

11       Q.    What was the issue with respect to the

12   elevator?

13       A.    The elevator, elevators as having

14   mechanical equipment has to be inspected on a

15   periodic basis.  The elevator in our, in our

16   building had malfunctioned and it came to my

17   attention that it had not been inspected, so we

18   sought about, A, having the elevator inspected, B,

19   when it was, it was found that there were certain

20   safety deficiencies with that elevator that needed

21   to be corrected.

22            Subsequent I believe to Mr. Butler's

Capital Reporting Company

Page 163

1   tenure we finally had those deficiencies corrected

2   with the elevator.

3       Q.      Okay, was it Mr. Butler's responsibility

4   to maintain the maintenance on the elevator?

5       A.      It would have been his responsibility,

6   yes, to have made sure that the elevator was

7   inspected and if any deficiencies were found, to

8   have those deficiencies corrected.

9       Q.      Do you have an understanding as to

10  whether or not the issues with respect to the

11  elevator posed any type of safety issue?

12      A.      To my knowledge there was one serious

13  issue that posed a serious issue.  Elevators are

14  supposed to have, and I'll term it an emergency

15  release function where if the door is closing and

16  you stick your hand in the door or some other thing

17  gets caught in the pathway of the door, the door is

18  to return to open.

19          Our elevator, that, that safety function

20  was inoperable, which would cause the elevator to

21  continue to close even if someone stuck an arm, leg,

22  briefcase in the door and it was something that had

6315422a-d5b1-4d80-8929-e074c4876af9

Capital Reporting Company

Page 164

1    to be corrected.  There were other things that were

2    of a less serious nature, hydraulic fluid found in

3    the elevator bed that had to be removed and things

4    of that nature.

5              MR. PANAGOPOULOS:  Okay, no further

6    questions.

7              EXAMINATION BY COUNSEL FOR PLAINTIFF

8    BY MR. GOULD:

9         Q.    When was the elevator repaired?

10        A.    Sometime subsequent to Mr. Butler's

11   departure.

12        Q.    How long after?

13        A.    I'm not sure.

14        Q.    Not immediately, though?

15        A.    How would you classify immediately?

16        Q.    Well, Monday?

17        A.    No.

18        Q.    Was it a matter of weeks until it was

19   repaired, days, months?

20        A.    I don't recall.

21        Q.    You don't recall that?

22        A.    No.

6315422a-d5b1-4d80-8929-e074c4876af9

*Reginald L. Butler v. District of Columbia Housing Finance Agency*
Case No. 07-CV-2046 (HHK)

—Defendant's Motion for Summary Judgment—

# EXHIBIT 3

Page 1

1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2

3      - - - - - - - - - - - - - - -x

4      REGINALD L. BUTLER,                    :         COPY
                                             :
5                    Plaintiff,              :
                                             :
6          vs.                               : Civil Action No.
                                             : 07-cv-2046 (HHK)
7      DISTRICT OF COLUMBIA                   :
       HOUSING FINANCE AGENCY,               :
8                                            :
                     Defendant.              :
9      - - - - - - - - - - - - - - -x

10

11                                      Washington, D.C.

12                                      Friday, July 25, 2008

13          Deposition of

14              HARRY T. ALEXANDER, JR.

15          a witness, taken on behalf of counsel for

16     the Plaintiff in the above-entitled matter, before

17     Denise M. Brunet, RPR and Notary Public in and for the

18     District of Columbia, taken at the offices of Ballard,

19     Spahr, Andrews & Ingersoll, 601 13th Street,

20     Northwest, Suite 1000, Washington, D.C., commencing at

21     12:07 p.m., when were present on behalf of the

22     respective parties:

c0683b94-3c4e-4c7f-80a8-cc08174424fc

Page 4

1                    P R O C E E D I N G S

2          Thereupon,

3                    HARRY T. ALEXANDER, JR.

4    was called for examination by counsel for the

5    Plaintiff and, after having been sworn by the Notary

6    Public, was examined and testified as follows:

7          EXAMINATION BY COUNSEL FOR THE PLAINTIFF

8             BY MR. GOULD:

9       Q     Good afternoon, Mr. Alexander.  I'm Jon

10   Gould, as you know, and with me is my client Reginald

11   Butler, and I'll be asking you some questions in the

12   case of -- that Mr. Butler has brought against the

13   District of Columbia Housing Finance Agency.

14             Have you attended depositions before other

15   than the one of Mr. Thomas yesterday?

16      A     Yes.

17      Q     Okay.  So do you think you understand the

18   way things go at a deposition?

19      A     Yes.

20      Q     Okay.  Well, I'll dispense with any of the

21   ground rules, then.  Before coming here today, did you

22   review any documents related to the case of Mr. Butler

c0683b94-3c4e-4c7f-80a8-cc08174424fc

Page 22

1    in court?

2         A      Could you repeat that, please?

3         Q      Had you seen a copy of these three pages of

4    this document, being DCHFA 106 through 108, between

5    the time that we began to correspond in this case and

6    the time that this litigation was filed in court?

7         A      I'm not sure.

8         Q      Okay.  Have you seen a copy of those three

9    pages after this litigation was filed in court?

10        A      Yes.

11        Q      Did you have discussions with Mr. Sewell

12   regarding Mr. Butler's performance prior to the time

13   that Mr. Butler was terminated?

14        A      Yes.

15        Q      When's the first time that you remember

16   discussing those issues with Mr. Sewell?

17        A      The first time I remember is my 90-day

18   review.

19        Q      At your own 90-day review?

20        A      My own 90-day review.

21        Q      Do you remember approximately when your

22   90-day review was conducted by Mr. Sewell?

c0683b94-3c4e-4c7f-80a8-cc08174424fc

1    A    I honestly can't.  I honestly can't.  It

2  was probably in September.

3    Q    Okay.  Did Mr. Sewell present you with

4  anything in writing at the conclusion of that review?

5    A    No.

6    Q    Do you remember the substance of the

7  review, what Mr. Sewell told you about your review?

8    A    That I was doing good.

9    Q    And it was at that meeting he mentioned

10  something about Mr. Butler?

11    A    Yes.

12    Q    Okay.  Do you remember what he said about

13  Mr. Butler, what Mr. Sewell said about Mr. Butler?

14    A    He was concerned with his performance.

15    Q    Did Mr. Sewell indicate whether he,

16  Mr. Sewell, had already met with Mr. Butler about

17  these concerns?

18    A    I'm not positive.

19    Q    Okay.  Did Mr. Sewell indicate any intent

20  to take any discipline against Mr. Butler as a result

21  of the concerns that Mr. Sewell had that you say

22  Mr. Sewell had about Mr. Butler's performance?

c0683b94-3c4e-4c7f-80a8-cc08174424fc

Page 24

1          MR. PANAGOPOULOS:  Same meeting?

2          MR. GOULD:  At the same meeting, yes.

3          THE WITNESS:  Was he going to take

4    discipline?

5          BY MR. GOULD:

6      Q     Yes.

7      A     He either said he was or did tell

8    Mr. Butler the concerns that he had about the

9    building, and that he had to make improvement.

10     Q     Okay.  Did Mr. Sewell go into any more

11   detail at this meeting about Mr. Sewell's concerns

12   about the building?

13     A     The specific concerns?

14     Q     Yes.

15     A     The cleanliness and bugs.

16     Q     Did you have any discussions with

17   Mr. Butler about Mr. Sewell's concerns prior to

18   Mr. Butler's termination, concerns that Mr. Sewell

19   expressed to you at this meeting?

20     A     No.

21     Q     Did you have discussions with Mr. Sewell

22   about Mr. Sewell's decision to terminate Mr. Butler

c0683b94-3c4e-4c7f-80a8-cc08174424fc

Page 25

1    prior to Mr. Butler's termination?

2        A    Yes.

3        Q    All right.  When's the first time that you

4    had a discussion with Mr. Sewell in which he brought

5    up the subject of terminating Mr. Butler?

6        A    I can't remember when, but maybe it was

7    sometime after my 90-day review.

8        Q    Okay.  Now, had Mr. Sewell indicated that

9    he had already made a decision to terminate Mr. Butler

10   at that time?

11       A    He was going down that path.

12       Q    Did he ask you to assist him at all in any

13   of these decisions regarding Mr. Butler?

14       A    He asked me for legal advice.

15       Q    And this is at the -- this is during the

16   discussion that you just mentioned?

17       A    The second, yes.

18       Q    It wasn't until the second discussion you

19   had on this issue that he asked for legal advice from

20   you?

21       A    He may have in the first, but he had asked

22   what our handbook said with respect to terminating an

c0683b94-3c4e-4c7f-80a8-cc08174424fc

Page 26

1    employee.

2        Q      What your handbook said?

3        A      Yes.

4        Q      Okay.  And he asked you that at the first

5    meeting?

6        A      I don't recall if he did.

7        Q      Could have been the first or the second?

8        A      Well, it was the second for sure.  The

9    first one --

10       Q      I see.  Okay.

11       A      -- I'm not sure.

12       Q      Do you have any better recollection of the

13   date of the second meeting on the issues that we just

14   went over?

15       A      No.

16       Q      All right.  Do you remember what you told

17   him with regard to what the handbook said regarding

18   termination of employees, told Mr. Sewell?

19       A      That Mr. Butler was an at-will employee and

20   he could be discharged for cause or without cause.

21       Q      Okay.  Did you consult the handbook before

22   you told Mr. Sewell that?

c0683b94-3c4e-4c7f-80a8-cc08174424fc

Page 27

1    A    Well, I knew what it said.

2    Q    Right.  Okay.  You had consulted it in the

3    past?

4    A    Yes, sir.

5    Q    Okay.

6         (Thereupon, the document was marked as

7         Alexander Deposition Exhibit No. 3 for

8         identification.)

9         BY MR. GOULD:

10   Q    Now, you've seen a copy of that letter

11   before, haven't you?

12   A    Yes, I have.

13   Q    Okay.  And did you play any role in

14   drafting that letter?

15   A    Yes.

16   Q    Okay.  What role did you play in drafting

17   the letter?

18   A    I drafted the letter.

19   Q    All right.  At whose instruction?

20   A    The executive director.

21   Q    Did you show it to Mr. Sewell?

22   A    Yes, sir.

c0683b94-3c4e-4c7f-80a8-cc08174424fc

Page 35

1    Did Mr. Butler ever have any problems dealing with an

2    IT consultant at DCHFA prior to Mr. Butler's

3    termination by the name of Lesly Elvard?

4              MR. PANAGOPOULOS:  Objection, foundation.

5    You can answer.

6              THE WITNESS:  I don't think he was a

7    consultant.  I think he was an employee.

8              BY MR. GOULD:

9         Q    Did he have any trouble with Mr. Elvard

10   with regard to IT issues -- he being Mr. Butler --

11   prior to Mr. Butler's termination?

12             MR. PANAGOPOULOS:  Objection, foundation.

13             THE WITNESS:  I'm not sure.

14             BY MR. GOULD:

15        Q    Did Mr. Sewell -- prior to you drafting

16   Alexander Exhibit 3, did Mr. Sewell describe to you

17   all the reasons -- let me withdraw that and I'll ask

18   that -- let me ask a preliminary question.

19             Did Mr. Sewell make the final decision to

20   terminate Mr. Butler?

21        A    As far as I know.

22        Q    Okay.  And your role with regard to that

c0683b94-3c4e-4c7f-80a8-cc08174424fc

*Reginald L. Butler v. District of Columbia Housing Finance Agency*
Case No. 07-CV-2046 (HHK)

—Defendant's Motion for Summary Judgment—

# EXHIBIT 4

## Harry D. Sewell

**From:**     Harry D. Sewell
**Sent:**     Thursday, October 26, 2006 11:09 AM
**To:**       Reginald Butler
**Subject:** Building Security

Reggie:

Who has primary responsibility for securing the building in the evening and what time does that occur.  Who has primary responsibility for opening the building in the morning and what time does that occur.  Who are the designated alternates in the absence of the above people.

Please respond by COB today.

H

DCHFA
00291

*Reginald L. Butler v. District of Columbia Housing Finance Agency*
Case No. 07-CV-2046 (HHK)

—Defendant's Motion for Summary Judgment—

# <u>EXHIBIT 5</u>

Tony has responsibility for opening up in the morning by 7:30am. Reuben and I are alternates.

I have the primary responsibility for securing the building in the evening and this typically occurs between 6:00pm and 7:00pm.  If no one remains, I secure the building. If staff members remain I determine that there is responsible person prepared to secure the facility or require that the staff member(s) leave with me.  Harry Alexander and Tony Ulmer are alternates.

Historically, in order to accommodate staff members wishing to work late, we have left the final lockup to the last person to leave. Implicit in the ability to stay is the willingness and ability to secure the building. Before leaving after hours remaining staff members are required to determine that there is someone available and willing to secure the building. Kayode and Solomon are also frequently late to depart.

DCHFA
00292

*Reginald L. Butler v. District of Columbia Housing Finance Agency*
Case No. 07-CV-2046 (HHK)

—Defendant's Motion for Summary Judgment—

# <u>EXHIBIT 6</u>

## Samuel Thomas

| | |
|---|---|
| **From:** | Reginald Butler |
| **Sent:** | Thursday, October 26, 2006 9:32 AM |
| **To:** | Samuel Thomas |
| **Subject:** | Request Re: Application for Family and Medical Leave Act Coverage |

As we discussed, please provide all documents and required certifications for my application for coverage under the Family and Medical leave Act in order to accommodate care of a close relative with a serious health condition. If you could provide these documents today as we agreed, it will be greatly appreciated.

**HFA** District of Columbia
Housing Finance Agency

Reginald Butler | Director, Business Services |
815 Florida Avenue, NW | Washington, DC 20001 |
Phone: 202-777-1607 | Fax: 202-986-6705 | www.dchfa.org |

DCHFA
00105

11/17/2006

*Reginald L. Butler v. District of Columbia Housing Finance Agency*
Case No. 07-CV-2046 (HHK)

—Defendant's Motion for Summary Judgment—

# EXHIBIT 7

# Family and Medical Leave Request Form

Employee: *Reginald L. Butler* Date: *10/26/06*

Job Title: *Director, Business Services* Supervisor: *Harry D. Sewell*

Under Federal Law Family/Medical Leave is twelve (12) weeks of unpaid leave in a twelve (12) month period for family or medical reasons or, under D.C. law, sixteen (16) weeks of unpaid leave during any consecutive twenty-four (24) month period. Submit this request form to your Human Resources at least 30 days before the leave is to commence, when practicable. When submission of the request 30 days in advance is not practicable, submit the request as early as is practicable.

## ELIGIBILITY

1. ☑ Yes ☐ No
   Counting any periods of time that you worked for the agency (whether they were consecutive or not) have you worked for the agency for a total of 12 months of more? (If "yes," continue to next question. If "no," stop here.)

2. ☑ Yes ☐ No
   During the past 12 months, have you worked at least 1,250 hours? (Approximately eight months of 40-hour weeks or one year of 25-hour weeks)? (If "yes," continue to next question. If "no," stop here.)
   Have you previously received medical or family leave? If yes, provide information below:

   Dates of leave: From_____ To_____

   Purpose of leave_____

   _____

3. ☑ Yes ☐ No
   Have you taken any intermittent leave?

4. ☑ Yes ☐ No
   Have you taken time off from scheduled hours?

   If "yes," provide details: *October 16 – 20, 2006*

   _____

## REASONS FOR REQUESTING LEAVE:

Leave must be granted for any of the following reasons:

- For a serious health condition that makes it unable for you to perform your job;

- To care for a family member of the employee who has a serious health condition.

- To care for your child, spouse, or parent who has a serious health condition; or

- To care for your child after birth, or for placement after adoption or foster care.

1

I am requesting leave for the following reason:

❏ **Personal serious health condition**

☑ **Serious health condition of:**

Spouse Name: _____

Child Name: _____

Parent Name: *Betty J. Butler* _____

Family member: _____

❏ **Birth of a child**

Expected delivery date is: _____

❏ **Adoption or placement of a child for foster care**

Child's name: _____

Scheduled date of adoption or placement: _____

**DATES OF LEAVE REQUESTED:**

I request leave from _____ to _____

I request intermittent leave according to the following schedule: *10/16-20)* *10/30/06, 10/31/06* **\*\***
*11/6/06, 11/7/06, 11/13-17, 11/27-28, 12/4-5,*
*12/11-12, 12/18-22*

I request a reduced schedule leave according to the following schedule:

_____

_____

The total number of days of leave that I request is *25* .

How will your duties and responsibilities in your unit be handled during your leave of absence?

*Business Services division staff will help with duties, other duties will be handled by phone, email and computer by me while away*

**\*\*** *This leave request is for paid leave.*

2

DCHFA
00294

**EMPLOYEE STATEMENT:**

I agree to return to work on _Scheduled return dates after intermittent leave_. If circumstances change such that I will not be able to return to work on that date, I agree to inform my supervisor by submitting a NOTICE TO EMPLOYER OF CHANGES IN APPROVED MEDICAL OR FAMILY LEAVE form. I understand that my benefits will continue during my leave and that I will arrange to pay my share of applicable premiums if any.

Signature: _Reginald L. Butler_ Date: _10/26/06_

11/1
4/8
11/20
11/29
12/6
12/13
12/20

DCHFA
00295

**TO BE COMPLETED BY SUPERVISOR**

Staff member was hired on ___Oct 1, 1981.___

Staff member is ☑Full-time    ☐Part-time

Regular hours are __40__ hrs __5__ days of the week.

Employee has previously requested family or medical leave on _____

Leave taken from _____ to _____ Total time taken _____

Supervisor: __Harry D. Sewell__    Title: __Executive Director-__

Date: __10 - 26 - 06__    Telephone #: _____601._____


Leave is    ☐ Approved

              ☐ Denied for the following reason(s): _____

_____


Request approved by: _____ Date: _____


Request denied by: _____ Date: _____

4

*Reginald L. Butler v. District of Columbia Housing Finance Agency*
Case No. 07-CV-2046 (HHK)

—Defendant's Motion for Summary Judgment—

# EXHIBIT 8

# District of Columbia Housing Finance Agency

815 Florida Avenue, NW   Washington, DC  20001-3017

October 27, 2006

Mr. Reginald Butler
Director of Business Services
District of Columbia Housing Finance Agency
815 Florida Avenue, NW
Washington, DC 20001

Subject: Termination

Dear Mr. Butler:

During the review of your performance on Thursday September 27, 2006 covering the first 90 days of my tenure, I informed you that your performance was "less than satisfactory" and cited several specific examples.  Owing to your continued poor performance, including your failure to have the building open and ready for business on Friday October 13, 2006, you are hereby terminated effective immediately.

Please immediately return to Sam Thomas all DCHFA property in your possession including equipment, keys, pagers, cellular telephones, security passes, logs etc.  You will receive your regular pay for this pay period and compensation for any unused and accrued annual leave pursuant to the DCHFA Employee Handbook.  A proposed severance agreement will be mailed to your home address.

Sincerely,

Harry D. Sewell
Acting Executive Director

DCHFA
00290

*Reginald L. Butler v. District of Columbia Housing Finance Agency*
Case No. 07-CV-2046 (HHK)

——Defendant's Motion for Summary Judgment——

# **<u>EXHIBIT 9</u>**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REGINALD L. BUTLER,

     *Plaintiff,*

*v.*

DISTRICT OF COLUMBIA HOUSING
FINANCE AGENCY,

     *Defendant.*

Case No.: 07-CV-2046 (HHK)

## DISTRICT OF COLUMBIA HOUSING FINANCE AGENCY'S
## ANSWERS TO PLAINTIFF'S AMENDED FIRST SET OF INTERROGATORIES

Defendant District of Columbia Housing Finance Agency ("DCHFA"), pursuant to Rule 33 of the Federal Rules of Civil Procedure, objects to and answers Plaintiff Reginald L. Butler's Amended First Set of Interrogatories as follows:

## I.  GENERAL OBJECTIONS

1.  DCHFA objects to plaintiff's interrogatories insofar as they seek information that is irrelevant and/or unlikely to lead to the discovery of admissible evidence.

2.  DCHFA objects to plaintiff's interrogatories, definitions, and instructions insofar as they are overly broad, unduly burdensome, oppressive, harassing, and otherwise seek to impose obligations upon DCHFA that are broader than, or inconsistent with, the Federal Rules of Civil Procedure Rule.

3.  DCHFA objects to plaintiff's interrogatories insofar as they seek information protected by the attorney-client privilege, work-product privilege, and/or any other applicable privilege or immunity recognized by law.

4.    DCHFA objects to plaintiff's interrogatories insofar as they do not specify a relevant time period covered by the interrogatory.   Such interrogatories are not reasonably limited in scope.

5.    DCHFA reserves the right, pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, to supplement its answers to the extent needed if additional responsive information is discovered.

## II.    **INTERROGATORIES**

1.    Please identify all persons answering these interrogatories and indicate which person answered which interrogatory.

> ANSWER:    DCHFA states that the following persons answered these interrogatories with the assistance of counsel:

> > Harry D. Sewell
> > Executive Director
> > District of Columbia Housing Finance Agency
> > 815 Florida Avenue, N.W.
> > Washington, D.C. 20001-3017
> > Telephone: (202) 777-1600
> > * Mr. Sewell may be contacted through undersigned counsel

> Mr. Sewell provided information related to Interrogatory Nos. 1-8.

2.    Please identify all the reasons why the defendant terminated the plaintiff in October 2006.

> ANSWER:    DCHFA renews and incorporates by reference its General Objections. Subject to DCHFA's General Objections, DCHFA states that Mr. Butler was terminated for overall unsatisfactory job performance.  Examples of this include, but are not limited to, Mr. Butler's failure to supervise the janitorial crew as evidenced by the filthy condition of the building and his failure to have the building open and ready for business at the scheduled time.

2

3.     Please identify all the persons who participated in the decision to terminate the

plaintiff in October 2006.

ANSWER:     DCHFA renews and incorporates by reference its General Objections.
Subject to DCHFA's General Objections, DCHFA states that the decision to terminate
Mr. Butler in October 2006 was made by the Executive Director, Harry D. Sewell, to
whom Mr. Butler reported.

4.     Provide the names, addresses, and telephone numbers of all persons whom you

know or believe to have knowledge or information concerning (a) the claims asserted in the

Amended Complaint, including the decision to remove the plaintiff, and/or (b) the defenses you

intend to prove, and separately, with respect to each person, state in summary fashion, any and

all facts, knowledge and information you know or believe such person to have.

ANSWER:     DCHFA renews and incorporates by reference its General Objections.
Subject to DCHFA's General Objections, DCHFA states that the following individuals
have knowledge or information concerning the claims asserted by Mr. Butler in his
second amended complaint and/or the defenses DCHFA intends to prove:

     Harry D. Sewell
     District of Columbia Housing Finance Agency

Mr. Sewell has knowledge regarding the operations and structure of DCHFA, Mr.
Butler's performance as an employee with DCHFA, as well as the reasons for Mr.
Butler's termination in October 2006.

     Samuel Thomas
     215 Painters Crossing
     Chaddsfield, PA  19317
     * Mr. Thomas may be contacted through undersigned counsel

Mr. Thomas has knowledge regarding the personnel policies and procedures of the
DCHFA and the actions taken against Mr. Butler.

     Reginald L. Butler
     8622 Blackpool Drive
     Annandale, VA

Mr. Butler has knowledge regarding his performance as an employee of DCHFA and the
circumstances surrounding the leave he sought to take in Fall 2006.

5.    Please identify all the employees or other persons who performed work the plaintiff previously performed after the defendant terminated him.

> ANSWER:    DCHFA renews and incorporates by reference its General Objections. Subject to DCHFA's General Objections, DCHFA states that Fran D. Makle (Deputy Executive Director of DCHFA, 815 Florida Avenue, N.W., Washington, D.C. 20001-3017, Telephone: (202) 777-1600 (Ms. Makle may be contacted through undersigned counsel)) took over the responsibilities associated with Mr. Butler's job after his termination. Specifically, Mr. Butler's duties involving facilities maintenance were incorporated into Ms. Makle's position as Deputy Executive Director.

6.    Please identify the dates of any family or medical leave taken by (a) the plaintiff during calendar year 2006 and (b) the employees identified in response to interrogatory no. 5 after the date of the plaintiff's termination. Identify all experts you have retained or specially employed to provide expert testimony in this case.

> ANSWER:    DCHFA renews and incorporates by reference its General Objections. DCHFA further objects to Interrogatory No. 6 to the extent it seeks to discover attorney work-product related to experts who may be utilized in this case. Subject to DCHFA's objections, DCHFA states that (a) Mr. Butler did not take any family or medical leave during calendar year 2006, and (b) Ms. Makle has not taken any family or medical leave since Mr. Butler's termination in October 2006. Furthermore, DCHFA states that discovery in this matter has just begun and, at this time, DCHFA has not decided whether an expert witness will be utilized at the trial of this matter. DCHFA will identify any expert it retains pursuant to the Court's Scheduling Order and the Federal Rules of Civil Procedure.

7.    State the subject matter on which an expert whom you propose to call as a witness at trial will testify, including the substance of all facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

> ANSWER:    DCHFA renews and incorporates by reference its General Objections. DCHFA further objects to Request No. 7 to the extent it seeks to discover attorney work-product. Subject to DCHFA's objections, DCHFA states that discovery in this matter has just begun and, at this time, DCHFA has not decided whether an expert witness will be utilized at the trial of this matter. DCHFA will identify any expert it retains and provide the information requested pursuant to the Court's Scheduling Order and the Federal Rules of Civil Procedure.

8.    Identify the number of the defendant's employees during all the calendar workweeks in the calendar year of 2006.

ANSWER:    DCHFA renews and incorporates by reference its General Objections. Subject to DCHFA's General Objections, DCHFA states that for the calendar workweeks in the calendar year of 2006, DCHFA had the following number of employees on its payroll:

| Calendar Workweek (Saturday through Friday) | Number of Employees |
| --- | --- |
| Dec. 31, 2005 to Jan. 6, 2006 | 46 |
| Jan. 7, 2006 to Jan. 13, 2006 | 43 |
| Jan. 14, 2006 to Jan. 20, 2006 | 43 |
| Jan. 21, 2006 to Jan. 27, 2006 | 42 |
| Jan. 28, 2006 to Feb. 3, 2006 | 42 |
| Feb. 4, 2006 to Feb. 10, 2006 | 42 |
| Feb. 11, 2006 to Feb. 17, 2006 | 42 |
| Feb. 18, 2006 to Feb. 24, 2006 | 40 |
| Feb. 25, 2006 to Mar. 3, 2006 | 40 |
| Mar. 4, 2006 to Mar. 10, 2006 | 40 |
| Mar. 11, 2006 to Mar. 17, 2006 | 40 |
| Mar. 18, 2006 to Mar. 24, 2006 | 40 |
| Mar. 25, 2006 to Mar. 31, 2006 | 40 |
| Apr. 1, 2006 to Apr. 7, 2006 | 42 |
| Apr. 8, 2006 to Apr. 14, 2006 | 42 |
| Apr. 15, 2006 to Apr. 21, 2006 | 44 |
| Apr. 22, 2006 to Apr. 28, 2006 | 44 |
| Apr. 29, 2006 to May 5, 2006 | 44 |
| May 6, 2006 to May 12, 2006 | 44 |
| May 13, 2006 to May 19, 2006 | 46 |
| May 20, 2006 to May 26, 2006 | 46 |
| May 27, 2006 to June 2, 2006 | 48 |
| June 3, 2006 to June 9, 2006 | 48 |
| June 10, 2006 to June 16, 2006 | 48 |
| June 17, 2006 to June 23, 2006 | 48 |
| June 24, 2006 to June 30, 2006 | 47 |

| July 1, 2006 to July 7, 2006 | 47 |
| July 8, 2006 to July 14, 2006 | 46 |
| July 15, 2006 to July 21, 2006 | 46 |
| July 22, 2006 to July 28, 2006 | 46 |
| July 29, 2006 to Aug. 4, 2006 | 46 |
| Aug. 5, 2006 to Aug. 11, 2006 | 46 |
| Aug. 12, 2006 to Aug. 18, 2006 | 46 |
| Aug. 19, 2006 to Aug. 25, 2006 | 46 |
| Aug. 26, 2006 to Sept. 1, 2006 | 46 |
| Sept. 2, 2006 to Sept. 8, 2006 | 46 |
| Sept. 9, 2006 to Sept. 15, 2006 | 46 |
| Sept. 16, 2006 to Sept. 22, 2006 | 45 |
| Sept. 23, 2006 to Sept. 29, 2006 | 45 |
| Sept. 30, 2006 to Oct. 6, 2006 | 45 |
| Oct. 7, 2006 to Oct. 13, 2006 | 45 |
| Oct. 14, 2006 to Oct. 20, 2006 | 44 |
| Oct. 21, 2006 to Oct. 27, 2006 | 44 |
| Oct. 28, 2006 to Nov. 3, 2006 | 44 |
| Nov. 4, 2006 to Nov. 10, 2006 | 44 |
| Nov. 11, 2006 to Nov. 17, 2006 | 46 |
| Nov. 18, 2006 to Nov. 24, 2006 | 46 |
| Nov. 25, 2006 to Dec. 1, 2006 | 46 |
| Dec. 2, 2006 to Dec. 8, 2006 | 46 |
| Dec. 9, 2006 to Dec. 15, 2006 | 46 |
| Dec. 16, 2006 to Dec. 22, 2006 | 46 |
| Dec. 23, 2006 to Jan. 5, 2007 | 45 |

Respectfully submitted,

Jeffrey W. Larroca #453718
Charles W. Chotvacs #484155
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
601 13th Street, N.W.
Suite 1000 South
Washington, D.C.  20005-3807
Telephone: (202) 661-2200
Facsimile: (202) 661-2299
E-mail:  larroca@ballardspahr.com
         chotvacsc@ballardspahr.com

March 10, 2008

*Counsel for Defendant*
*District of Columbia Housing Finance Agency*

## DECLARATION

I, HARRY D. SEWELL, declare, under the penalty of perjury, that the foregoing Answers to Plaintiff's Amended First Set of Interrogatories are true and correct to the best of my knowledge, information, and belief.

DATED: _10 March 2008_

_(signature)_

Harry D. Sewell
Executive Director
DISTRICT OF COLUMBIA
HOUSING FINANCE AGENCY

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of March, 2008, a true and correct copy of the

District of Columbia Housing Finance Agency's Answers to Plaintiff's Amended First Set of

Interrogatories was hand-delivered to the following counsel for plaintiff:

Jonathan L. Gould
KESTELL AND ASSOCIATES
1012 14th Street, N.W.
Suite 630
Washington, D.C. 20005
E-mail: jgould@igc.org
*Counsel for Plaintiff*
*Reginald L. Butler*

Charles W. Chotvacs

*Reginald L. Butler v. District of Columbia Housing Finance Agency*
Case No. 07-CV-2046 (HHK)

—Defendant's Motion for Summary Judgment—

# EXHIBIT 10

# District of Columbia Housing Finance Agency

Employee Handbook

DCHFA
00456



## District of Columbia Housing Finance Agency

### Mission

The District of Columbia Housing Finance Agency was established in 1979 to stimulate and expand home ownership and rental housing opportunities in Washington, D.C. We accomplish our mission by issuing mortgage revenue bonds that lower the homebuyer's costs of purchasing and rehabilitating homes and the developer's costs of acquiring, constructing and rehabilitating rental housing. We embrace our responsibility with conviction and pledge our best efforts to serve as the City's champion for homeowners and renters and to act as the City's principal catalyst for neighborhood investment.

DCHFA
00457

# Contents

INTRODUCTION ........................................ 1

*Welcome to the District of Columbia Housing Finance Agency* ........................ 1

*Notice to all employees* ........................ 2

*About this Handbook* ........................ 3

EMPLOYMENT POLICIES ........................................ 4

*Equal Employment Opportunity* ........................ 4

*Nondiscrimination* ........................ 4

*Complaints Regarding Sexual or Discriminatory Harassment and otherForms of Discrimination* ........................ 5

*Personnel Files* ........................ 9

*Secondary Employment* ........................ 9

*Resignations* ........................ 9

*Terminations* ........................ 9

*Suspensions* ........................ 10

*Layoffs* ........................ 10

*Reassignment* ........................ 10

*Re-employment* ........................ 11

*Non-Fraternization/Employment of Relatives* ........................ 11

COMPENSATION POLICIES ........................................ 13

*Employee Status* ........................ 13

*Full-timeRegular Employee* ........................ 13

*Part-time Regular Employee* ........................ 13

*Temporary Employee* ........................ 13

*Non-exempt Employee* ........................ 13

*Exempt Employee* ........................ 14

*Working Hours* ........................ 14

*Time Records and Overtime Compensation* ........................ 15

*Paydays* ........................ 15

*Voluntary Benefit Payroll Deductions* ........................................................... *15*
*Performance Evaluation* ........................................................... *16*

**EMPLOYEE CONDUCT** ........................................................... **17**
*Corrective Action* ........................................................... *17*
*Confidentiality* ........................................................... *18*
*Personal Appearance and Demeanor* ........................................................... *18*
*Attendance* ........................................................... *19*
*Smoking in the Workplace* ........................................................... *19*
*Personal Telephone Calls* ........................................................... *19*
*Informal Complaint Resolution* ........................................................... *19*
*Formal Complaint Policy* ........................................................... *19*

**EMPLOYEE BENEFIT PROGRAMS** ........................................................... **21**
*Educational Assistance* ........................................................... *21*
*Professional Memberships* ........................................................... *21*
*Educational Leave* ........................................................... *22*
*Annual Leave* ........................................................... *24*
*Jury Duty* ........................................................... *22*
*Sick Leave* ........................................................... *23*
*Bereavement Leave* ........................................................... *23*
*Part-time Employee Leave* ........................................................... *23*
*Domestic Partners* ........................................................... *23*
*Family and Medical Leave* ........................................................... *24*
*Parental Leave* ........................................................... *27*
*MilitaryLleave* ........................................................... *28*

**INSURANCE** ........................................................... **29**
*Agency Paid Life and Accidental Death and Dismemberment insurance* ............... *29*
*Disability Insurance* ........................................................... *30*
*Employee Group Medical Benefits* ........................................................... *30*
*Dental Insurance* ........................................................... *31*

DCHFA
00459

*125 Cafeteria Plan* ........................................................................ *31*

*Retirement 457 plan* ...................................................................... *32*

**WORKPLACE SAFETY** ............................................................... **33**

*Workers' Compensation Insurance* .................................................. *33*

*EmployeeReturn to Work Policy* .................................................... *33*

*Drug free Workplace* ..................................................................... *34*

*Employee Safety Program Responsibilities* ..................................... *34*

*Returning Agency Property and Documents* .................................... *35*

*Electronic Communication Systems* ................................................. *35*

**HOLIDAY LEAVE** ....................................................................... **37**

**EMPLOYEE ACKNOWLEDGEMENT** ........................................ **38**

DCHFA
00460

# Introduction

## Welcome to the District of Columbia Housing Finance Agency

On behalf of the Board of Directors and staff, I welcome you to the District of Columbia Housing Finance Agency. You are joining an organization with over $1.126 billion in assets as of September 30 2005, and a stellar reputation for financing quality affordable housing in the Nation's Capital. Furthermore, you are joining a team of dedicated professionals who, with conviction and certainty, are committed to our mission of financing decent, safe and affordable housing. I extend to you my best wishes for your success and growth within our Agency and our industry.

Welcome to the team.


Harry P. Sewell
Acting Executive Director
June 2006

## Notice to all employees

Employees must recognize the importance of retaining a copy of this Employee Handbook (the "Handbook") for reference throughout your employment with the District of Columbia Housing Finance Agency (the "Agency" and "HFA"). The Handbook provides you with some basic information concerning the rights and responsibilities of an employee, describes some prohibited conduct for which an employee will be disciplined and informs employees about the Agency's compensation and benefits package. It also describes how an employee may seek assistance if the employee believes that he/she has been subjected to sexual harassment, discrimination, or other conduct that the employee considers unfair.

Employment with the Agency is at will. An employee may voluntarily leave the Agency at any time. Similarly, an employee may be terminated at any time without cause or prior notice. In addition, the Agency has the right to alter, amend, modify, or nullify any portion of this Employee Handbook with or without notice to employees.

Employees have not entered into a contract of employment with the Agency, either express or implied. This Employee Handbook and the Agency's policies do not create a contract between employees and the Agency.

Employees are asked to please contact the Human Resource Officer if this Employee Handbook is ever lost and a replacement copy will be provided.

DCHFA
00462

## About this Handbook

The information in this Employee Handbook is intended to provide basic information about the Agency's policies, benefits, and other matters in order to guide and assist employees. Every employee is responsible for reviewing the Employee Handbook.

All provisions in the handbook are subject to applicable laws. Due to government regulations and the changing demands of Agency operations, from time to time the Agency may modify, change or delete these policies and benefits. The Agency will attempt to keep employees up to date regarding changes that affect them.

**Should employees have any questions, they are encouraged to seek clarification from the Human Resource Officer:**

Human Resource Officer
815 Florida Avenue, NW
Washington, DC 20001
(202) 777-1657

**Information in the Employee Handbook is not intended to imply, directly or indirectly, the existence of a contract of employment. This version, which is effective as of June 2006, supersedes all previous employee handbooks.**

DCHFA
00463

## Employment Policies

### Equal Employment Opportunity

The Agency provides equal employment opportunity (EEO) to all employees and applicants for employment without regard to race, color, religion, gender, gender expression, national origin, age, disability, marital status, veteran status, personal appearance, sexual orientation, family responsibilities, matriculation, political affiliation, or any other status protected by applicable law. This policy applies to all terms and conditions of employment including, but not limited to, hiring, placement, promotion, termination, layoff, recall, and transfer, leave of absence, compensation, and training.

### Nondiscrimination

The Agency expressly prohibits any form of discrimination based on race, color, religion, gender, gender expression, national origin, age, disability, marital status, veteran status, personal appearance, sexual orientation, family responsibilities, matriculation, political affiliation or any other status protected by applicable law, and the policy of nondiscrimination applies to all personnel and employment practices, including:

- Hiring,
- Upgrading,
- Transfer,
- Recruitment or recruitment advertising,
- Layoff or termination,
- Compensation of any kind,
- Selection for training,
- Educational programs, and
- Agency-sponsored recreational and social activities.

If you believe that you have been subjected to discrimination because of your race, color, religion, gender, gender expression, national origin, age, disability, marital status, veteran status, personal appearance, sexual orientation, family responsibilities, matriculation,

DCHFA
00464

political affiliation or any other status protected by applicable law, you should notify your supervisor or the Human Resource Officer, Deputy Executive Director or the Executive Director.

The Agency will not tolerate any retaliation against any employee for lodging a discrimination complaint or for participating in the investigation of a discrimination complaint.

## Complaints Regarding Sexual or Discriminatory Harassment and other Forms of Discrimination

The Agency is dedicated to providing a work environment that is free of sexual and discriminatory harassment and other forms of discrimination.

## Harassment

It is the policy of the Agency that equal employment opportunity exists for every employee without regard to age, race, gender, gender expression, color, religion, national origin, marital status, veteran status, personal appearance, sexual orientation, family responsibilities, disability, matriculation, political affiliation, or any other basis protected by applicable law ("Protected Categories"). It is the Agency's policy to maintain a work environment free from sexual harassment or harassment based on any Protected Category. Sexual or discriminatory harassment will not be tolerated. Any alleged incidents of harassment will be thoroughly investigated and may result in immediate disciplinary action up to and including termination.

### a. Sexual Harassment

Sexual harassment consists of unwelcome sexual advances, requests for sexual favors, verbal or physical conduct of a sexual nature, or other verbal or physical conduct of a non-sexual but gender-based nature, whether by a male or female under the following circumstances:

1. When submitting to such conduct is made a term or condition of an individual's employment, either explicitly or implicitly; or

2. When submitting to or rejecting such conduct is used as a basis for employment decisions affecting the individual; or

3. When such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

Examples of conduct which, if unwelcome, can amount to sexual harassment include but are not limited to the following: requests for sexual favors; uninvited physical contact; sexual bantering; off-color language or jokes; sexual flirtations; advances or propositions; verbal abuse of a sexual nature; commentaries about an individual's body; use of sexually degrading words to describe individuals; displays of sexually suggestive objects or pictures; gender-based insults or derogatory references, and use of sexually-oriented or degrading gestures or other non-verbal communications.

Employees will conduct themselves in ways that ensure others are able to work in an atmosphere free from sexual harassment. Employees who feel that they are being or have been sexually harassed should bring the situation to the attention of their supervisor, the Human Resource Officer, Deputy Executive Director or to the Executive Director. If the sexual harassment allegation is against the Executive Director, the employee should bring the situation to the attention of Chairperson of the Board of Directors. Complaints will be investigated promptly, fairly and impartially. The Agency will demonstrate by example full support of the policy and communicate that it considers sexual harassment to be a serious matter. The Agency will also endeavor to keep work areas free from conduct which could cause an uncomfortable or offensive work environment.

The Agency:

1. Will impose disciplinary action, up to and including termination, when allegations of sexual harassment are found to be valid;

2. Will ensure that no retaliation occurs against any employee who has reported sexual harassment or any employee who has come forward as a witness in the investigation of a harassment claim; and

DCHFA
00466

3.  Will follow-up with the employee who has been harassed to ensure that the harassment has ended.

The Agency also attempts to maintain the confidentiality of harassment complaints. The Agency, however, cannot guarantee such confidentiality due to its commitment to remedial action.

**b.  Discriminatory Harassment**

Discriminatory harassment is harassment directed to an employee because of their race, color, religion, national origin, age, disability, marital status, veteran status, personal appearance, sexual orientation, gender, gender expression, family responsibilities, matriculation, political affiliation or any other basis protected by applicable law ("Protected Categories").

Examples of conduct which may, if unwelcome, amount to discriminatory harassment include but are not limited to the following: off-color language or jokes; verbal abuse of a discriminatory nature; commentaries regarding an individual's Protected Categories; use of degrading words regarding the Protected Categories of individuals; displays of discriminatory objects or pictures; insults or derogatory references regarding an individual's Protected Categories, and use of degrading gestures or other non-verbal communications based on one's Protected Categories.

Employees will conduct themselves in ways that ensure others are able to work in an atmosphere free from discriminatory harassment. Employees who feel that they are being or have been discriminatorily harassed should bring the situation to the attention to their supervisor, the Human Resource Officer, the Deputy Executive Director or to the Executive Director. If the harassment allegation is against the Executive Director, the employee should bring the situation to the attention of the Chairperson of the Board of Directors. Complaints will be investigated promptly, fairly and impartially. The Agency will demonstrate by example full support of the policy and communicate that it considers discriminatory harassment to be a serious matter.

The Agency:

1. Will impose disciplinary action, up to and including termination, when allegations of discriminatory harassment are found to be valid;

2. Will ensure that no retaliation occurs against any employee who has reported discriminatory harassment or any employee who has come forward as a witness in the investigation of a harassment claim; and

3. Will follow-up with the employee who has been harassed to ensure that the harassment has ended.

The Agency attempts to maintain the confidentiality of harassment complaints. The Agency, however, cannot guarantee such confidentiality due to its commitment to remedial action.

"Disabilities Policy"

The Agency complies with the Americans with Disabilities Act of 1990 (ADA) and related local law. The Agency does not discriminate against qualified individuals with disabilities, and will provide such persons with a reasonable accommodation where it does not cause undue hardship on the Agency. A qualified individual with a disability is a person who, with or without reasonable accommodation, can perform the essential functions of the job that the individual holds or desires. The Agency may reject an employee for a position or remove that employee from a position if the Agency determines that the employee cannot perform the essential functions of the job without creating a direct threat to the safety or health of the employee or of other individuals and that there is no reasonable accommodation that would eliminate that threat. Any determination as to whether a direct threat exists as to the safety or health of an employee or other individual will be made only after an individualized assessment is undertaken of the employee's specific limitations and the essential functions of the particular position. Any qualified individual with a disability requiring a reasonable accommodation should notify the Human Resource Officer. The Agency will also maintain all medical documentation regarding employees confidentially, in separate medical files.

DCHFA
00468

8

## Personnel Files

The Agency maintains a personnel file for each employee. This file contains documentation regarding certain aspects of the employee's tenure with the Agency, such as references, performance appraisals, beneficiary forms, and disciplinary actions. Employees may review their personnel files by scheduling appointments with the Human Resource Officer. This review will comply with applicable laws and may be confined to the premises of the Agency. To ensure that personnel files are up to date, employees should notify the Human Resource Officer of any changes in name, telephone number, home address, beneficiary designations, contacts, or any other pertinent information.

## Secondary Employment

Employees may not take an outside job, either for pay or as a donation of their personal time, with a client or competitor of the Agency nor work on their own if it competes in any way with the mission of the Agency. If an employee's financial situation requires that they engage in outside part-time or full-time employment, or if they intend to engage in a business enterprise of their own, they are required to discuss such employment with their supervisor who will then discuss the matter with the Human Resource Officer and, if appropriate, the Executive Director.

## Resignations

To resign in good standing, an employee must provide a letter of resignation to the Executive Director at least two weeks prior to the effective date of resignation. Unless otherwise stated in the employee's letter of engagement , an employee who resigns will be paid any accrued but unused vacation time up to a maximum of two hundred and forty (240) hours as of the effective date of the resignation.

## Terminations

Employment by the Agency is employment "at will." This means that neither you nor the Agency has entered into a contract regarding the duration of your employment. Furthermore, the Agency reserves the right to terminate an employee at any time, with or without cause, reason, or prior notice.

DCHFA
00469

9

In general, the Agency will attempt to utilize the process of progressive discipline in its termination of employees. However, in some circumstances, immediate dismissal of an employee is appropriate.

## Suspensions

Under certain circumstances that involve accusations of serious misconduct, an employee may be suspended without pay, pending a thorough investigation of the incident. After the investigation is completed, a final decision will be made whether to return the employee to work with pay or to terminate the employee effective as of the date of the suspension.

### Layoffs

Severance pay may be paid to employees affected by a Reduction-in-Force (RIF). Severance pay will be based upon length of service as follows:

| Severance | Payment |
|---|---|
| One year | One week |
| Two years | Two weeks |
| Three years | Three weeks |
| Four or more years | Four Weeks |

## Reassignment

DCHFA employees may be reassigned during their employment at the discretion of management. When an employee is reassigned, DCHFA considers the transferee's first ninety (90) days in the new position to be an introductory period during which time his/her supervisor will have the opportunity to evaluate his/her performance to determine if the employee will be able to perform the job at a satisfactory level. If it is determined that the employee will not be able to satisfactorily perform the job, where feasible, DCHFA will attempt to place him/her in a position more suitable to his/her skills and abilities. If unable to do so, the employee may be terminated.

DCHFA
00470

**Re-employment**

There are two types of re-employment: "Reinstatement" and "Rehire."

### a. Reinstatement

Former employees who return to the Agency within thirty (30) days of leaving the Agency will receive reinstatement of benefits and retain their original anniversary date for the purposes of group benefit administration and leave. Eligibility to earn and use annual leave or sick leave will commence upon reinstatement.

If an employee is terminated due to a RIF and is called back to work within four months of their RIF date, they will be reinstated with full benefits commencing upon their reinstatement date.

### b. Rehire

Former employees who are re-employed after a thirty (30) day break in service are considered rehires. The date of rehire becomes the new anniversary date. Eligibility for participation in group benefit plans is determined by the date of rehire.

**Non-Fraternization/Employment of Relatives**

In order to avoid potential conflicts of interest, the Agency prohibits the employment of individuals who are related. For purposes of this policy, the term "related" refers to individuals related by blood or marriage and/or individuals who have a personal relationship with another employee which, in the opinion of the Executive Director, creates a conflict of interest in the work environment. If an individual who is related to a current employee applies for a position within the Agency, the applicant will not be hired unless the current employee related to the new hire chooses to resign. In the case of a change in the relationship of two or more employees which creates a conflict of interest in the work environment, one or the other (or more) of the employees involved must agree in writing to resign. In such cases, the involved employees will make the decision

as to which one(s) will resign. If the affected employees do not resign within ninety (90) days of the change in relationship, all related employees will be terminated.

DCHFA
00472

# Compensation Policies

## Employee Status

Agency employees are classified as full-time or part-time, based on the number of scheduled work hours. Eligibility for benefits is determined by these classifications. *See* Employee Benefit Programs for more information regarding benefits. Employees will be informed of their initial employment classification and of their status as an exempt or nonexempt employee.

The Agency has a ninety (90) day probationary period. During the probationary period, employees are not eligible for benefits described in the Employee Handbook. At the end of the probationary period, an employee's supervisor will discuss the with the employee his/her job performance.

## Full-time Regular Employee

An employee who is regularly scheduled to work thirty (30) hours or more per week and who is not considered to be hired on a temporary basis is a full-time regular employee.

## Part-time Regular Employee

An employee who is scheduled to work less than thirty (30) hours per week and is not hired on a temporary basis is considered a part-time regular employee.

## Temporary Employee

A temporary employee is engaged to work full-time or part-time on the Agency's payroll with the understanding that his/her employment will be terminated no later than upon completion of a specific assignment or time frame.

## Non-exempt Employee

A non-exempt employee is an employee who, because of the type of duties performed, the usual level of decision-making authority, and the method of compensation, is subject to all Federal Fair Labor Standards Act provisions. (Examples of non-exempt positions include office coordinators and clerical workers.) Non-exempt employees are required to account for hours and fractional hours worked and must be compensated for all hours

worked including overtime hours.   Overtime hours are compensated at the rate of one-and-one half times the employee's regular hourly rate of pay for all hours worked beyond a consecutive forty (40) hour workweek in accordance with applicable laws.   To be eligible for overtime, the employee must have first worked forty (40) hours in the applicable workweek and such overtime must be pre-approved by the employee's supervisor and the Executive Director.

The Agency sets a work schedule for its non-exempt employees. Non-exempt employees must not work more than the hours scheduled without the prior approval of their supervisor. If a non-exempt employee works more than their scheduled hours without first obtaining permission from their supervisor, the non-exempt employee must note the time worked on their timesheet so that they can be paid for that time. However, the employee may be disciplined for working more than their scheduled hours without first obtaining permission to do so.

Telling a non-exempt employee to continue working, without recording the hours that they worked on their timesheet is against the Agency's policy and illegal. If anyone does so, the non-exempt employee must contact the Human Resource Officer as soon as possible.

## Exempt Employee

Exempt employees are paid on a salary basis and do not receive additional compensation for working more than forty (40) hours during a workweek.

## Working Hours

The Agency's working hours are from 9:00 A.M to 5:30 P.M. with an hour for lunch, generally to be taken between the hours of 12:00 P.M to 2:00 P.M. Absences from the office beyond the normal lunch hours, which are not approved by the employee's supervisor, are to be recorded by the supervisor. Any employee absent without approval may be charged for vacation time as well as be subject to disciplinary action.

DCHFA
00474

14

## Time Records and Overtime Compensation

All non-exempt employees are required to record on a form designated by the Agency their hours worked on a daily basis. Non-exempt employees should include any fractions of hours worked down to fifteen (15) minute intervals. If a non-exempt employee works ten (10) minutes before or past a full hour, they will be paid for fifteen (15) minutes. Non-exempt employees may not voluntarily donate time spent working during their time off. All work, regardless of where or when it is performed, should be recorded on their daily timesheet. Nonexempt employees are also required to record their starting time, time-off for lunch, time-in and time-off at the end of each workday.

Exempt employees are required to record on the form designated by the Agency on each day when they reported to work. No one is authorized to alter or change the entries that employees place on their time sheet without permission and employees must initial any such alterations or changes.

## Paydays

All employees are paid bi-weekly, every other Friday, for all work performed through the end of the previous payroll period. If any such day falls on a holiday, the employees will be paid on the preceding business day. Employees may elect to sign up for automatic deposit into a bank or other financial institution of their choice, by obtaining an "Authorization for Automatic Deposit" form from the Human Resource Officer. The Agency may modify or change the bi-weekly pay periods.

## Voluntary Benefit Payroll Deductions

Under certain circumstances, employees may elect voluntary payroll deductions for the following:

- Medical Insurance, which includes
  - Dental Insurance
  - Vision
  - Mail in prescription
  - Short-term disability
  - Long-term disability

- Retirement plan
  - 125 Cafeteria Plan
  - 457 Plan

## Performance Evaluation

All Agency employees will receive a performance evaluation on an annual basis. The Agency reserves the right to review your performance at any time, or on an interim basis, should your performance warrant it.

DCHFA
00476

16

# Employee Conduct

Employees are expected to carry out their responsibilities, adhere to acceptable business ethics, and exhibit a high degree of personal integrity and professionalism at all times. Employees are also expected to refrain from any behavior that might be harmful to themselves, co-workers, or the Agency, or that might be viewed unfavorably by current or potential clients or by the public.

## Corrective Action

In order to maintain professionalism in dealing with clients, the general public and fellow employees, certain rules have been established. In the event of an infraction of an established policy or procedure, a sequence of corrective actions may take place, including:

- Oral warning
- Written warning
- Suspension
- Dismissal

No particular procedure or sequence of procedures need be followed. Each situation is evaluated on its own facts by management. However, an employee's undesirable action or behavior may result in immediate suspension or termination of employment. Types of behavior and conduct that the Agency deems undesirable and an infraction include, but are not limited to, the following:

1. Falsifying employment or other Agency records.
2. Violating the Agency's nondiscrimination and/or harassment policy.
3. Excessive pattern of absenteeism, tardiness, or leaving the Agency during working hours without permission.
4. Excessive, unnecessary, or unauthorized use of Agency's supplies, equipment, or vehicles, particularly for personal purposes.
5. Reporting to work while under the influence of or exhibiting the effects of alcohol or illegal drugs.

DCHFA
00477

17

6. Carrying or using alcoholic beverages or illegal drugs on the Agency's property or while working off the Agency's premises, except, with respect to alcoholic beverages when authorized.

7. Fighting or using obscene, abusive, or threatening language or gestures.

8. Theft.

9. Violation of the Hatch Act. (i.e., "engaging in certain prohibited political activity").

10. Possession of firearms.

11. Disregarding safety or security regulations.

12. Insubordination.

13. Conducting a lottery or gambling on the Agency's premises.

14. Sleeping during working hours.

15. Excessive use of the Agency's telephones for personal calls.

16. Posting, removing or altering notices on any Agency bulletin boards without the permission of the Executive Director.

17. Creating or contributing to unsafe and unsanitary conditions.

18. Smoking in an unauthorized area.

19. Speeding or careless driving of Agency vehicles.

## Confidentiality

The Agency operates under strict rules of confidentiality. In accepting employment with the Agency, employees are required to sign a confidentiality agreement. As such, employees agree to comply with the rules, procedures and policies of the Agency regarding confidentiality both during and after their employment. In addition, no employee is permitted to remove or make copies of any Agency records, reports or documents without prior approval from his/her supervisor. Disclosure of confidential information could lead to termination as well as other legal action.

## Personal Appearance and Demeanor

Employees are expected to be dressed neatly, cleanly, to be well groomed, and to act professionally at all times. Professionalism is paramount to the Agency as a professional image increases the Agency's credibility and enhances the Agency's business potential.

DCHFA
00478

## Attendance

Prompt arrival at work on each scheduled workday is important for the successful operation of the Agency. Employees are responsible for providing proper advance notice for absences as required by Agency policy. In the event an employee fails to call to report an absence and does not report for work, the Agency's policy is that the employee may be disciplined up to and including termination.

## Smoking in the Workplace

The Agency intends to provide a safe and comfortable working environment, to promote the wellness of our employees, and to comply with applicable laws. Smoking and/or the use of tobacco products in Agency offices and work sites are strictly prohibited.

## Personal Telephone Calls

Agency telephones are intended for business use only. Employees must not charge long distance personal calls to the Agency. All personal long distance telephone calls must be reimbursed to the Agency. Any misuse of phone privileges may result in the employee being disciplined up to and including termination.

## Informal Complaint Resolution

The Human Resource Officer and supervisors have an "Open Door Policy." Whenever possible, employees are encouraged to discuss problems and issues with either their supervisor or the Human Resource Officer. The Agency does not tolerate any form of retaliation by co-workers or supervisors against employees for discussing problems with appropriate management staff and the Human Resource Officer.

## Formal Complaint Policy

The informal presentation by employees of concerns is encouraged pursuant to the Informal Complaint Resolution Policy. The provisions of this section do not control informal complaints. This policy applies to job-related concerns regarding any aspect of Agency employment, except disagreements with establish Agency policy. If an employee has a complaint or concern about discrimination, harassment or retaliation, the

employee should utilize the procedures set for in the Equal Employment Opportunity, Discrimination and/or Harassment Policies.

A formal complaint ("Formal Complaint") should be utilized only after an employee has attempted to utilize the Informal Complaint Resolution Policy. A Formal Complaint shall be in writing and shall contain sufficient detail to communicate the basis for the complaint.

A Formal Complaint must be presented to an employee's direct Supervisor. However, in the event a formal complaint is made regarding an action by the employee's direct Supervisor, the Formal Complaint should be presented to the Human Resource Officer. In the event a Formal Complaint is made regarding an action by the Executive Director, it should be submitted to the Chair of the Agency's Board of Directors who will make a final determination.

Depending on the subject of the Formal Complaint, the direct Supervisor, Human Resource Officer or Board Chair will investigate and make a determination. The employee who lodged the Formal Complaint will be informed of the determination. In the case of a Formal Complaint lodged against any employee except the Executive Director, if the employee is dissatisfied with the decision, he or she may appeal the determination to the Executive Director. The Executive Director will then make a final determination and communicate the determination to the employee.

DCHFA
00480

## Employee Benefit Programs

The Agency has established a variety of employee benefit programs. These include time off benefits, group health and related benefits, and retirement plan benefits. Retirement plan benefits are provided through the 457 Plan.

This Employee Handbook only highlights some features of the group health and retirement plan benefit programs. The group health programs are described more fully in Summary Plan Description (SPD) booklets, which can be accessed individually by logging on to www.carefirst.com.

The Agency reserves the right to amend or terminate any of its employee benefit programs. For more complete information regarding any of our benefit programs, please contact the Human Resource Officer.

### Educational Assistance

Educational assistance is provided at the discretion of the Executive Director subject to the following conditions. An employee must be employed with the Agency for one (1) year before he/she is eligible to participate in this program. In addition, the educational program must be relevant to the employee's job and development within the Agency.

Employees will be reimbursed based on tuition only. This reimbursement shall not include books, transportation, parking, meals, etc. or any other course work material. Employees should consult the Human Resources Officer for procedures.

### Professional Memberships

The Agency may pay an employee's professional membership dues for activities relevant to the employee's duties and responsibilities. Approval of such memberships is at the sole discretion of the Executive Director. Employees should consult the Human Resources Officer for procedures.

## Educational Leave

Full-time employees may be granted educational leave without pay at the discretion of the Executive Director. Full time employees may be granted leave of absence without pay at the discretion of the Executive Director for a period not to exceed six (6) months after completing one year of service with the Agency.

## Annual Leave

Employees begin to accrue annual leave as indicated below upon commencement of employment and provided the employee has satisfactorily completed the ninety (90) days probationary period with the Agency.

No leave may be taken without prior written approval from the employee's supervisor. Employees anticipating leave for at least three (3) consecutive working days must obtain approval prior to commencement of the leave.

| Years of service | Full-time Rate | Part-time Rate |
|------------------|----------------|----------------|
| Up to 4 years | 4 hours per pay period | 2.5 hours per pay period |
| Over 4 years | 6 hours per pay period | 3.5 hours per pay period |

Annual leave may be carried over up to a maximum of two hundred and forty (240) hours. Upon resignation or retirement, employees may be paid in a lump sum for accumulated annual leave up to two hundred and forty (240) hours.

## Jury Duty

Employees must notify their supervisor in writing within forty eight (48) hours of receipt of a summons or subpoena, requiring their appearance at a court or administrative proceeding. The employee must provide a copy of the summons or subpoena to his/her supervisor, which establishes the date of the court appearance. Employees on jury duty will continue to receive full payment in addition to any compensation received for jury duty for a period of ten (10) days.

DCHFA
00482

## Sick Leave

### a. Paid sick leave

Employees may use sick leave after satisfactory completion of the probationary period with the Agency. Sick leave is accrued for full-time employees at the rate of four (4) hours per pay period and for part-time employees at the rate of two and one half (2.5) hours per pay period. Supervisors have discretion to request a letter from the employee's physician in order to verify a claim of illness.

If an employee is approved for Family Medical Leave, he/she may elect at his/ her option to use any paid medical or sick leave.

### b. Unpaid sick leave

Regular employees may be granted sick leave without pay for up to three (3) months or a period determined by the Executive Director, or as is consistent with the applicable law.

## Bereavement Leave

In the event of the death of an employee's spouse, Domestic Partner, as defined below, child, parent, sibling or grandparent, the employee will be paid at their regular rate of pay for up to three (3) consecutive working days' absence. Should the employee wish to take extra time, it may be taken as annual leave or leave without pay.

## Part-time Employee Leave

Part-time employees are scheduled to work less than thirty (30) hours per week and accrue annual and sick leave as provided in this Handbook.

## Domestic Partners

The Agency is extending its employee benefits package to each Agency employee who has a familiar relationship with another individual characterized by mutual caring and the sharing of a mutual residence ("Domestic Partners"). Each Agency employee who wishes to be eligible for Agency benefits as a Domestic Partner must register with either the Vital Records Division of the District of Columbia government, which is located at 825 North Capitol Street, N.E., Washington, D.C. 20002 by executing a declaration of

domestic partnership or, in the event the employee's home jurisdiction recognizes domestic partnerships, by completing the registration requirements of such jurisdiction. Upon submitting proof of registration of domestic partnership to the Agency's Human Resources Officer, each such employee requesting benefits as a Domestic Partner will be entitled to any and all benefits offered by the Agency to the same extent as if such employee's Domestic Partner were his/her spouse. The Agency shall recognize an employee's registration of domestic partnership so long as the domestic partnership remains in effect and is not otherwise terminated.

## Family and Medical Leave

### a. Eligibility

To be eligible for Family/Medical Leave ("Family/Medical Leave"), an employee must have worked for the Agency for twelve (12) months (not necessarily twelve 12 consecutive months) and for at least one thousand (1,000) hours (excluding any vacation, holiday, or sick leave taken) during the year preceding the start of leave.

*What is Family/Medical Leave?*

Under Federal Law Family/Medical Leave is twelve (12) weeks of leave in a twelve (12) month period for family or medical reasons or, under D.C. law, sixteen (16) weeks of leave during any consecutive twenty-four (24) month period. Family leave may be granted to an employee for the following reasons:

1. Birth of a child, the placement of a child with the employee for adoption or foster care, or the placement of a child with the employee for whom the employee permanently assumes and discharges parental responsibility; or

2. To care for a family member of the employee who has a serious health condition.

Medical leave may be granted to an employee for For an employee's own serious health condition, if the condition prevents the employee from performing the functions of his or her position.

A "family member" is a person to whom the employee is related by blood, legal custody or marriage; a child living with the employee for whom he or she permanently assumes responsibility; and a person with whom the employee shares or

DCHFA
00484

has shared a residence within the last year, and with whom the employee has maintained a committed relationship for at least one year.

**b. Length of Leave**

The leave may be taken in any twelve (12) month period. A twelve (12) month period will be computed retroactively from every date an employee requests to use family/medical leave. An employee may take the family/medical leave in continuous periods of time or, in some cases, intermittently. An employee may take Family/Medical leave (1) in continuous periods of time, (2) in some cases, intermittently, (3) in a portion of his/her regular hours resulting in a "part-time" schedule, or (4) in less than the number of hours the employee normally works. For example, if a full-time employee worked part-time for 24 weeks at 20 hours per week, that would be considered the equivalent of a 12 week period.

If the Agency agrees, intermittent leave may be taken for the placement of a child due to adoption or foster care and because of the birth of a child. Intermittent leave may be taken for an employee's or a family member's serious health condition when medically necessary. The Agency may require an employee to transfer to a different job for intermittent leave purposes.

**c. Request for Leave**

An employee who requests leave and indicates it qualifies, as Family/Medical Leave must explain the reason for needing the leave on the Leave Request Form so that the Agency can determine if the leave qualifies. If the leave qualifies, an employee will be given a continuous or intermittent notice by the Human Resource Officer.

This leave will require a doctor to complete a Certification of Health Care Provider form ("Certification form") for either an employee's own serious health condition or for that of a family member. A copy of the Certification form may be obtained from the Human Resource Officer. Documentation for reasons such as the placement of a child due to adoption or foster care may also be required.

DCHFA
00485

25

An employee must submit all medical documentation, including the Certification form, directly to the Human Resource Officer. The Agency can classify any leave request as family/medical leave if the reason for such leave meets the criteria, even if an employee does not classify such leave as Family/Medical Leave.

An employee must provide the Agency with at least thirty (30) calendar days advance notice, if the need for leave is foreseeable based on an expected birth, placement due to adoption or foster care, or planned medical treatment for himself/herself or a family member's serious health condition. An employee who fails to give thirty (30) calendar days notice for foreseeable leave may be denied such leave until thirty (30) calendar days after the day he provides notice.

If thirty (30) calendar days notice is not feasible, because of lack of knowledge, change in circumstances, or a medical emergency, notice must be given as soon as practical. If completing a Leave Request Form in advance is not possible, an employee shall provide verbal notice as soon as possible. This verbal notice shall be sufficient to make the supervisor aware that the employee needs Family/Medical Leave. An employee should consult with the Agency and make reasonable efforts to schedule the leave so as not to disrupt Agency's operations.

In a request for intermittent leave, an employee shall advise the Agency, upon the Agency's request, as to why the intermittent leave schedule is necessary. The employee will be required to submit a schedule of treatment, if applicable, and a Work Schedule form. The Agency may require an employee to attempt to reschedule treatment subject to the availability and approval of the health care provider.

If an employee requests leave to care for a seriously ill family member, the employee will be required to provide a completed Certification form stating that he is personally providing the care. If an employee requests leave because he/she feels unable to perform the essential functions of the job, a copy of his/her job description will be given to him/her to give to the health care provider along with the Certification form. The health

26

care provider may then review the job description to make the determination as to whether the employee is able to perform the essential functions of the job.

A copy of the Leave Request Form and the continuous or intermittent notice must be submitted to the Human Resource Officer. The Certification form must be submitted to the Human Resource Officer within fifteen (15) calendar days after the initial request but no later than two days after the employee returns to work. If medical documentation is not provided within fifteen (15) calendar days after the initial request and still not provided two days after the employee returns to work, the Agency reserves the right to deny the leave or take other action as necessary. This may include not classifying the leave as family/medical leave.

### d.  Health Insurance Premiums and Other Payments

While an employee is on Family/Medical Leave, he/she will be required to pay his/her share of health insurance premiums. If an employee is on unpaid leave, the payment would be due at the same time as if it were being made via payroll deduction. If an employee's premium payment is more than thirty (30) calendar days late, the insurance coverage may be terminated. The Agency may require an employee to repay the Agency's portion of the premiums if the employee does not return to work.

### e.  Returning or Not Returning to Work

If an employee returns to work after family/medical leave, the employee will either be given the same job or an equivalent position with benefits as if the employee had not been on leave. Subject to applicable laws, an employee who does not return to work at the end of Family/Medical Leave will not be guaranteed a job and may be terminated. While on Family/Medical Leave, employees may elect to use paid sick leave, paid annual leave, and, to the extent available, other family leave, and personal or compensatory leave.

## Parental Leave

The Agency has a policy to grant employees who are parents a total of twenty-four (24) hours of flexible or vacation leave during any twelve (12) month period to attend or participate in school-related events for their children. Pursuant to District of Columbia

law, the Agency may deny such leave if the granting of the leave would disrupt business and make the achievement of production or service delivery unusually difficult. Employees are required to notify the Human Resource Officer of the desire for parental leave to attend a school-related event at least ten (10) calendar days prior to the event, unless the need to attend the school-related event cannot be reasonably foreseen.

## Military Leave

The Agency adheres to the Uniformed Services Employment and Reemployment Rights Act (USERRA). Your rights under USERRA are set forth in the "Your Rights under USERRA" notice in the lunchroom/break room.

DCHFA
00488

## Insurance

The Agency provides the following insurance coverage programs at no cost to employees. Employees may elect to provide coverage for eligible dependents. Dependent premiums are the responsibility of the employee. Full-time employees are eligibility for coverage after satisfactory completion of the probationary period:

- Health
- Dental
- Vision
- Prescription benefit program
- Flex Spending Accounts

## Agency Paid Life and Accidental Death and Dismemberment Insurance

All active, full-time, regular employees who are working at least thirty (30) hours per week are eligible to participate in Agency's group life and accidental death and dismemberment insurance program. Part-time and temporary employees are not eligible. The accidental death and dismemberment insurance policy is two times the employee's annual salary up to $ 250,000 and is currently completely paid by the Agency. The life insurance policy is two times the employee's annual salary up to $250,000. The cost of the life and accidental death and dismemberment insurances are currently paid completely by the Agency.

Coverage for life and accidental death and dismemberment insurance programs for an eligible employee will automatically take effect on the completion of the employee's probationary period. If an employee is not actively at work on his/her eligibility date, coverage will become effective on the first day of the month following the employee's return to active full-time employment. Although enrollment is automatic, employees should complete an enrollment form for purposes of identifying a beneficiary.

Life and accidental death and dismemberment coverage terminates at the end of the month in which your work hours are reduced below thirty (30) hours per week, or you

DCHFA
00489

29

resign or are otherwise terminated from the Agency employment. Employees may, at the employee's own expense, convert his/her life insurance coverage to an individual policy.

## Disability Insurance

The Agency provides short-term and long-term disability to employees. For details, please refer to the insurance carrier booklet or contact the Human Resource Officer.

## Employee Group Medical Benefits

The Agency provides health insurance through CareFirst BlueCross BlueShield. All active full-time employees who are working at least thirty (30) hours per week are eligible to participate in the Agency's medical benefits program. Part-time and temporary employees are not eligible. Full-time employees are eligible for health insurance after satisfactory completion of the probationary period.

The insurance covers employees of the Agency only. At the employee's expense, the employee may cover his/her dependents, including his/her spouse, Domestic Partner, and unmarried children who are under nineteen (19) years of age. Any unmarried child under age twenty five (25) who attends school on a full-time basis and depends solely on you for financial support may be covered as a dependent. An employee's eligible children include the employee's natural children and adopted children, children of a Domestic Partner, or the employee's stepchildren.

The employee's coverage will take effect on the employee's eligibility date if the employee has signed and returned his/her enrollment form and the employee is actively at work on that date. If the employee does not enroll in the group health plan within thirty one (31) days from the time the employee is first eligible, the employee will be considered a late entrant unless the employee otherwise becomes eligible under the "special enrollment rules."

Medical benefits are offered under a "PPO Plan," a "HMO Plan," and a "POS Plan." Benefits for covered medical services under the "PPO Plan" are generally paid at 100%. Benefits for covered medical services under the "HMO Plan" are generally paid at 20%

30

DCHFA
00490

after deductible. Benefits for covered medical services under the "POS Plan" are generally paid at 60% after deductible.

## Dental Insurance

Dental insurance is a PPO plan provided by CareFirst BlueCross BlueShield. All active, full-time, regular employees who are working at least thirty (30) hours per week are eligible to participate in the Agency's dental plans. Part-time and temporary employees are not eligible.

## 125 Cafeteria Plan

The 125 Cafeteria Plan (125 Plan) allows you to pay for health care premiums, out-of-pocket health care expenses, and dependent care expenses on a pre-tax basis. By doing so, the Internal Revenue Service allows you to avoid paying federal income and Social Security taxes on the amount of your wages/salary used to pay for these expenses. Assuming a twenty percent (20%) income tax and an eight percent (8%) (Rounded) Social Security tax, every dollar of wage/salary reduction saves you 28 cents, as illustrated below.

|  | Without 125 Election | Without 125 Election |
|---|---|---|
| $1.00 of gross Wages/salary | $1.00 | $1.00 |
| Less: Federal Income and Social Security Taxes | $ .28 | $ .00 |
| Net available to pay Health & Dependent care expenses | $ .72 | $1.00 |

Enrollment for this benefit is on any November 1. Once the employee elects to participate in the 125 Plan, the employee may only revoke his/her election to participate on November 1. The 125 Plan is comprised of the following two parts:

a. **Flexible Medical Savings Account**

The Flexible Medical Savings Account portion of 125 Plan allows employees to reduce their salaries by a uniform amount to pay medical expenses not covered by employer

plans. Reimbursement from the account is tax free, which saves employees federal, D.C., state, and social security taxes.

### b. Dependent Care Assistance Program

The Dependent Care Assistance portion of the 125 Plan allows employees to reduce their salaries by a uniform amount (determined by the IRS) over a twelve (12) month period to pay for dependent care services necessary to permit the employee (and the spouse, or if allowed by law, the Domestic partner of the employee) to be employed. Reimbursement from the account is tax free, saving the employee federal, D.C., state and Social Security taxes. For further details, contact the Human Resource Officer.

## Retirement 457 Plan

The Agency may offer its employees participation in a 457 Plan ("457 Plan"). The 457 Plan is a tax-deferred, employee-directed investment plan. In 2006, the 457 Plan allows, on a pre-tax basis: (i) Agency employees to contribute up to fifteen thousand dollars ($15,000) per year; and; (ii) Agency employees over the age of fifty (50) up to twenty thousand dollars ($20,000) per year. The amounts that may be contributed under the 457 Plan are adjusted annually. Please contact the Human Resource Officer for pertinent updates in the plan.

Employees participating in this 457 Plan will have sole discretion and responsibility for directing their investments as they choose. This is not a plan in which the Agency makes contributions, matching or otherwise. The Agency will not give investment advice to employees. However, 457 Plan representatives are available to provide employees with guidance in accordance with their investment goals. An employee is not eligible for participation in the 457 Plan until satisfactorily completing his/her probationary period.

DCHFA
00492

## Workplace Safety

### Workers' Compensation Insurance

If an employee is injured as a result of a work-related activity, within the scope of his/her job duties, the employee must immediately report such injury to the employee's supervisor. This ensures that the Agency can assist the employee in obtaining appropriate medical treatment. An employee's failure to follow this procedure may result in the appropriate workers' compensation report not being filed in accordance with the law, which may consequently jeopardize the employee's right to benefits in connection with the injury. Upon the employee's release by his/her doctor, the employee must report back to work on the date indicated. Failure to do so may lead to disciplinary action up to and including termination. Questions regarding Workers' Compensation insurance should be directed to the Human Resource Officer.

### Employee Return to Work Policy

The Agency's employee early return to work program may provide temporary modified work for an employee who is unable to immediately return to his/her regular job duties as a result of a work-related injury. If an employee is injured, the employee is to report the injury to the employee's supervisor immediately. If the employee is treated by a physician for work-related injury, the employee must obtain a written release from the physician, each time the employee receives medical treatment. This release should state that the employee is:

- fully released to work with no restrictions, or
- released to work with specific restrictions, or
- not released until the physician sees you again and the date of the next appointment.

The employee should tell the physician that the Agency may provide a temporary modified job until he/she is fully released to work. The employee must report the physician's findings immediately to the Human Resource Officer. If the physician signs a release for work with specific restrictions, the employee must report to work on the date indicated. Until the employee is released for temporary or regular work, the employee

must report the status of his/her condition once a week to the Human Resource Officer. An employee's failure to report to work when released or to report weekly on the progress of his/her condition is a violation of employee return to work policy and may result in termination of employment.

## Drug-free Workplace

The Agency maintains a drug-free workplace. Employees suspected of exhibiting the effects of drugs or alcohol may be removed from the workplace, referred to a certified assistance program at the employee's expense, or disciplined up to and including termination, depending on the circumstances. An employee who uses a prescription drug that causes adverse side effects that may impact safety should inform the Human Resource Officer, that he/she is taking such medication on the advice of a physician. The Agency may request written documentation from a physician substantiating the need to use the drug. The sale, distribution, or transportation of controlled substances is prohibited. The use of controlled substances is prohibited unless prescribed by a licensed physician.

## Employee Safety Program Responsibilities

An employee has the responsibility to perform his/her duties in a safe manner and to maintain his/her work area in a safe condition.

**Employees are expected to:**

1. Follow all instructions and perform job functions in accordance with safety guidelines.
2. Utilize proper judgment in personal work habits and report to work in a condition to meet job obligations.
3. Work at a speed consistent with safety.
4. Be familiar with any apparent hazards of specific jobs and job sites and exercise due caution.
5. Report all accidents to supervisor.
6. Immediately report any unsafe conditions to their supervisor.
7. Be familiar with emergency procedures and participate in all emergency drills.
8. Maintain an active interest in the Agency's safety program.

DCHFA
00494

9. Never act in a manner that endangers yourself and others. Violations may result in discipline or termination.

## Returning Agency Property and Documents

When an employee's employment with the Agency ends the employee will deliver to the Agency any and all computers, devices, records, data, notes, reports, proposals, manuals, lists, correspondence, videotapes, photographs, specifications, drawings, blueprints, sketches, software programs, materials, equipment, and other documents or property that the employee used, possessed, developed or acquired in connection with your employment by the Agency. Each employee also agrees to turn over all reproductions of any of the aforementioned items that are in the employee's possession. In addition, employees will not provide any such reproductions to any third parties without first obtaining written authorization from the Agency's Executive Director.

## Electronic Communication Systems

Electronic communication systems include telephone, voice mail, computers, websites, e-mail, and all electronically stored information. All messages generated on or handled by the electronic communication systems, including back-up copies, are the property of the Agency and will be protected from misuse, misappropriation, and infringement.

Electronic communication systems are to be used only for Agency business purposes. Incidental personal use is permissible if it does not consume more than a trivial amount of resources, interfere with the productivity of employees, or adversely impact any business activity. Incidental personal use does not include the following prohibited activities: charitable endeavors, private business activities, chat rooms, or amusement and entertainment.

Any information prepared or developed by an employee of the Agency and stored in its electronic communication systems is owned solely by the Agency and may not be reproduced, copied, removed, or transferred to another storage base. Unauthorized accessing, copying, or disclosing of any such information for either personal use or to third parties may be reported to law enforcement authorities.

Employees who are authorized to access the Agency's electronic communication systems must utilize passwords in order to prevent access by unauthorized persons. Employees are prohibited from disclosing passwords except when directed to do so by a supervisor. Misrepresenting, obscuring, suppressing, or replacing a user's identity on an electronic communication is forbidden. The user name, electronic mail address, organizational affiliation, and related information included with electronic messages or postings must reflect the actual originator of the messages or postings. Employees must immediately notify the Information Technology Officer, when it is (a) suspected that information in the electronic communications system has been lost or disclosed to unauthorized persons; (b) suspected that there has been unauthorized use of Agency's computer systems, or (c) suspected that passwords or other system access control mechanisms are being lost, stolen, or disclosed.

The Agency monitors the use of its electronic communication systems. Employees are not entitled to an expectation of privacy regarding any information that passes through the system. Persons placing personal information on the Agency's computer systems have no rights regarding the use, distribution, retrieval, or disposal of such information.

Licensing agreements are applicable to software that the Agency utilizes. Using, copying, or distributing such software in a manner that is inconsistent with the software license is strictly forbidden. Employees are prohibited from selling, transferring, sharing, or loaning any software or other products used as part of the system. Employees are also prohibited from adding software or other products to the system.

Employees are prohibited from altering information stored in the communications systems unless specifically authorized to do so within the course of their employment. Unauthorized employees are also prohibited from altering the Agency's web pages.

DCHFA
00496

# Holiday Leave

The Agency observes the following holidays each year.

New Year's Day

Martin Luther King Day

President's Day

Emancipation Day

Memorial Day

Independence Day

Labor Day

Columbus Day

Veterans Day

Thanksgiving

Christmas

The Executive Director may close the Agency due to severe weather conditions. Under such circumstances, if the Agency is closed, employees with previously approved annual or sick leave will not be charged with leave.

# D.C. HOUSING FINANCE AGENCY
## REQUEST FOR LEAVE FORM

Employee Name _____    Date _____

Signature _____    Division _____

Reason for Leave: _____

_____

(Must be completed for Sick and LWOP)

## CATAGORY CHARGED:

[ ] Sick          [ ] Annual or Vacation      [ ] Compensatory
[ ] Administrative   [ ] Leave Without Pay      [ ] Conference/Semnar

## I AM REQUESTING LEAVE FOR THE FOLLOWING PERIOD(S):

| PERIOD | | | HOURS | | TOTAL |
|--------|------|------|------|------|-------|
| Month | Date | Year | From | To | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Total Hours Requested | | | | | |

*(All information above this line must be completed by employee)*

Supervisor Signature (sign and return to Personnel)

[ ] Approved

[ ] Denied

Reason if Denied: _____

_____

_____

Date returned to Personnel _____

### PERSONNEL ONLY

Date/Time Received: _____
Leave Balance As of: _____

| Hours Available | |
|-----------------|------|
| Annual | Sick |
| | |

Date: _____

Action

Forward to Supervisor for Signature

Leave Request denied reason: _____

*WHITE - Personnel*        *YELLOW - Finance*        DCHFA        *PINK - Employee*
00498

# DC HOUSING FINANCE AGENCY

# OVERTIME APPROVAL FORM

**NAME OF EMPLOYEE:** _____

**DIVISION:** _____

**DATE OF OVERTIME REQUESTED:** _____

**PURPOSE OF OVERTIME:**

_____

_____

_____

**DATE WORKED:** _____  **TIME/FROM:** _____  **TO:** _____

**ACTUAL HOURS WORKED:** _____

_____

**EMPLOYEE'S SIGNATURE**                          **DATE**

_____

**SUPERVISOR'S SIGNATURE**                        **DATE**

_____

**EXECUTIVE DIRECTOR'S SIGNATURE**                **DATE**

_____

cc: Payroll

DCHFA
00499

## DISTRICT OF COLUMBIA HOUSING FINANCE AGENCY
## EXPENSE RECONCILIATION

Employee_____

Local Expenses ____
Out of Town Expenses ____

| Date | Item | Agency Paid | Employee Funds | Amount |
|------|------|-------------|----------------|--------|
|      |      |             |                |        |
|      |      |             |                |        |
|      |      |             |                |        |
|      |      |             |                |        |
|      |      |             |                |        |
|      |      |             |                |        |
|      |      |             |                |        |
|      |      |             |                |        |
|      |      |             |                |        |
|      |      |             |                |        |

Advance $_____

Total  $_____
Amount Due Agency $_____
Amount Due Employee $_____

Please complete the following:

If expense report is for out of town travel give location and date.
Location _____          Date_____ to _____

Are any receipts missing?          Yes [ ]          No [ ]

If you answered yes to the above question, please explain below.

_____
_____
_____

I certify that this statement is accurate and complete to the best of my knowledge.

_____          _____
    Employee Signature                          Date

_____          _____
    Supervisor                                  Date

_____          _____
    Chief Financial Officer                     Date

_____          _____
    Accounting                                  Date

DCHFA
00500

# PROCUREMENT SHEET

**Your Name:**                                 **Date:**

**Division:**

**Good/Service being sought:**

**Emergency**              ☐
**Non Emergency:**         ☐

| Name of Company | Address: | Telephone Number: | Fax Number | Local, Small of Disadvantaged Business? | Price Quote: |
|---|---|---|---|---|---|
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |

*-Local, Small or Disadvantaged Business. Please note whether or not the business is certified as a minority business.

(If you choose to more than three providers, please attach an additional page)

**Please identify which provider you recommend and give a brief explanation as to why this provider should be chosen:**

_____

_____

_____

_____

_____

_____

_____

DCHFA
00501

*Reginald L. Butler v. District of Columbia Housing Finance Agency*
Case No. 07-CV-2046 (HHK)

—Defendant's Motion for Summary Judgment—

# <u>EXHIBIT 11</u>

## Employee Acknowledgement

I have received a copy of the Agency's Employee Handbook. I understand that I am responsible for reading its contents, familiarizing myself with the policies and benefits and for following the rules that have been established under it. I also acknowledge that the Agency may change any provision in the handbook at any time, with or without notice to me, and that nothing in the handbook changes my status as an at will employee of the Agency.

This handbook, dated June 2006, replaces and supersedes all previous Employee Handbooks that have been issued by the Agency. All such previous handbooks are null and void.

*Reginald L. Butler*
Print Name

*Reginald Butler*
Employee's signature

7/5/06
Date

38

DCHFA
00021

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

REGINALD L. BUTLER,

        *Plaintiff*,

*v.*

DISTRICT OF COLUMBIA HOUSING
FINANCE AGENCY,

        *Defendant*.

_____

Case No.: 07-CV-2046 (HHK)

## PROPOSED ORDER ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

      AND NOW, upon consideration of Defendant District of Columbia Housing Finance Agency's Motion for Summary Judgment, any opposition thereto, and the record in this case, and pursuant to the undisputed facts and the reasons set forth in the Motion for Summary Judgment, it is hereby ORDERED that Defendant's Motion is GRANTED.

      Accordingly, the Court enters JUDGMENT in favor of the District of Columbia Housing Finance Agency on all counts alleged in Plaintiff Reginald L. Butler's Second Amended Complaint.


_____                   _____
Date                                         Henry H. Kennedy
                                           United States District Judge

Copies of the foregoing Order shall go to:

Constantinos G. Panagopoulos
Jeffrey W. Larroca
Charles W. Chotvacs
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
601 13th Street, N.W.
Suite 1000 South
Washington, D.C.  20005-3807
*Counsel for Defendant*
*District of Columbia Housing Finance Agency*

Jonathan L. Gould
LAW OFFICE OF JONATHAN L. GOULD
1730 M Street, N.W.
Suite 412
Washington, D.C.  20036
*Counsel for Plaintiff*
*Reginald L. Butler*