## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **REGINALD L. BUTLER,**<br><br>**Plaintiff,**<br><br>v.<br><br>**DISTRICT OF COLUMBIA HOUSING FINANCE AGENCY,**<br><br>**Defendant.** | **Civil Action 07-02046  (HHK)** |

### MEMORANDUM OPINION AND ORDER

This case is brought under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et. seq.*

("FMLA") and the District of Columbia Family and Medical Leave Act, D.C. Code § 32-501 *et. seq.*

("DCFMLA") (together, "Acts").  Plaintiff Reginald L. Butler ("Butler") alleges that defendant

District of Columbia Housing Finance Agency ("DCHFA") retaliated against him and interfered with

his rights under the Acts because he took a period of leave to care for his mother and because, upon

returning from that period of leave, he requested additional leave to care for his mother further.

DCHFA has moved for summary judgment on all of Butler's claims [#17].  Upon consideration of

the motion, the opposition thereto, and the record of this case, the court concludes that the motion

should be denied.

### I.  BACKGROUND

Butler began working for DCHFA in 1981.  By 2006, when the events that gave rise to this

litigation took place, Butler had risen to the position of Director of Business Services.  In this

position, Butler's responsibilities included managing the cleaning and repair of the DCHFA facility

and overseeing all ancillary services associated with the facility.  Butler was also responsible for

coordinating inspections and certifications, maintaining DCHFA vehicles, and handling the security and telephone systems.  Important to this litigation, Butler directly supervised the employee responsible for opening the facility each day ("Ulmer").  In Ulmer's absence, it fell to Butler to either open the facility himself or to make arrangements for someone else to do so.

In June 2006, Harry Sewell was appointed Execute Director of DCHFA.  During his first ninety days on the job, Sewell assessed the performance of the three employees who reported directly to him: Butler, Harry Alexander (General Counsel), and Francis Dyson (Executive Assistant).  Concerning his evaluation of Butler's performance, Sewell testified that he considered the condition of the building, attendance at meetings, completion of assignments, and other similar items.  In September 2006, Sewell provided each with an oral performance review.[1]  Sewell gave Alexander a positive review, but Butler and Dyson received negative reviews.[2]  Specifically, Sewell told Butler that the facility was not sufficiently clean and that Butler's performance had been unsatisfactory during the preceding three-month evaluation period.[3]  Around this time, Sewell also discussed with Alexander that he was "was going down th[e] path" to terminate Butler because of his unsatisfactory performance and requested legal advice concerning that termination.

Sewell's dissatisfaction with Butler came to a head less than three weeks after Butler's performance review.  On October 13, 2006, Butler planned to open the DCHFA facility himself

---

[1]  All reviews were delivered orally; no employee received a written review even though the Employee Handbook indicated that written reviews *may* be given.

[2]  Dyson ultimately was terminated.

[3]  Sewell testified that he was concerned about other issues within Butler's areas of responsibility, including:  insect problems; rodent droppings; problems with the garage, roof, and elevator; and issues with DCHFA vehicle insurance and registration.  It is unclear, however, whether Sewell described these concerns to Butler during the oral performance evaluation.  Butler testified that Sewell conveyed only his concerns about cleanliness and his view that Butler's performance was unsatisfactory.

because Ulmer was unable to do so.  When Sewell arrived at DCHFA that day, however, he found a line of employees outside because neither the gate to the parking lot nor the building itself had been unlocked.  Sewell unlocked the facility.  According to Sewell, Butler's failure to open DCHFA for business that day was the "straw that broke the camel's back," and he immediately decided to terminate Butler's employment.[4]  When Butler did arrive at work, Sewell told him that they needed to discuss his failure to open the facility that day, but they could not discuss it at that time because Sewell needed to attend a meeting.  Butler sensed that Sewell was displeased with him.

Later that same day, October 13, Butler left early for a pre-planned period of leave.  The facts surrounding Butler's leave are in dispute.  Butler submitted a leave request that did not mention his mother's illness, and it is unclear when that request was submitted and approved.[5]  Additionally, Butler contends that he left Sewell a voicemail explaining that he was taking leave beginning on October 14 to care for his sick mother.  Butler contends that he gave a similar message to Sewell's assistant, in-person, and that he mentioned his mother's illness to Sewell earlier that day.  Sewell, however, asserts that Butler never informed him of the leave request and that he had no idea Butler was taking leave to care for his mother.  Sewell did not speak with Butler while he was on leave. After twice extending his leave, Butler returned to work on the afternoon of October 23.  Because of these extensions, however, Butler missed a meeting he previously had scheduled with a vendor causing Sewell to attend the meeting alone.

---

[4]  According to Sewell, he discussed this decision with Alexander at some point prior to Butler requesting family medical leave on October 26, but neither he nor Alexander are clear as to when those discussions were. Nevertheless, there is agreement that the decision was made by Sewell alone.

[5]  The request appears to be dated either October 20 or October 30.  These dates are troubling because Butler was on leave on October 20, and he had been terminated by October 30.  The request also lists "sick" as the reason for leave but indicates nothing about Butler's mother.

Butler and Sewell first spoke following Butler's return from leave on October 25.  During that conversation, Butler asked Sewell about the vendor meeting that he had missed.  Sewell did not provide him with details and told Butler that he would handle it.  Butler again sensed that Sewell was displeased with him.  The following day, October 26, Sewell sent Butler an email asking him to confirm whose responsibility it was to open the parking lot and building each morning.  Butler responded that he was ultimately responsible.  That same day, Butler submitted a request for an additional 25 days of medical leave to care for his mother to the Human Resources Director ("Thomas").  Butler did not discuss this request for additional leave with Sewell.  Thomas, however, transmitted the request form to Sewell for his approval later that same day.

The following morning, October 27, Sewell held a meeting with Thomas and Alexander and informed them that Butler would be terminated that day.  There is some confusion in the record on the following point, but the court can discern that Thomas advised Sewell to the effect that Butler could not be terminated either because of his FMLA request or while on FMLA leave or both.[6] Sewell acknowledged Thomas's advice, but indicated that he would go ahead with the termination. These three men then held a termination meeting with Butler during which Sewell informed Butler that he was being terminated because of his unsatisfactory performance.  Sewell provided Butler with a termination letter to that effect, which Alexander previously had prepared for Sewell's signature.[7] DCHFA did not hire anyone to replace Butler.  His responsibilities were folded into an existing position.

---

[6] Thomas also eventually was terminated from DCHFA for what appears to have been performance reasons.  It is unclear whether Sewell played a part in Thomas's termination.

[7] There is no question that Alexander prepared the letter before the October 27 termination, but Alexander cannot recall when he prepared it.  The preparation date matters because the letter may support DCHFA if it was prepared on or about October 13 and may support Butler if it was prepared on or about October 27.

.

## II.  ANALYSIS

This suit is based essentially on Butler's claims that DCHFA violated the Acts when Sewell terminated him because he took one week of leave and requested an additional 25 days of leave to care for his ill mother.  The court agrees with Butler that  DCHFA's  motion for summary judgment devolves into a single straight forward issue: could a reasonable jury find that he was terminated because he took or requested protected leave rather than because of his unsatisfactory performance. *See Aka v. Washington Hosp. Center*, 156 F.3d 1284, 1290 (D.C. Cir. 1989).   To decide this issue on summary judgment, the court must determine whether there is a genuine issue of material fact regarding what motivated Sewell's decision.

## A.      Governing Law[8]

The court analyzes Butler's claims according to the familiar *McDonnell Douglas* framework. *See Gleklen v. Democratic Congressional Campaign Comm., Inc.*, 199 F.3d 1365, 1367 (D.C. Cir. 2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).[9]   Under this framework: (1) Butler must establish a prima facie case that DCHFA terminated him in violation of the Acts; (2) if Butler meets that burden, the burden shifts to DCHFA to articulate a legitimate, non-Acts-violating reason for his termination; and (3) if DCHFA meets its burden, the burden shifts to Butler to produce substantial evidence that DCHFA's proffered reason is merely a pretext for terminating him because he exercised his rights under the Acts.  *See id*. at 1367-68.  To establish a prima facie case, Butler

---

[8] The court interprets FMLA and DCFMLA similarly.  *See Winder v. Erste*, 511 F. Supp. 2d 160, 184 (D.D.C. 2007); *see also Chang v. Inst. for Public-Private P'Ships, Inc.*, 846 A.2d 318, 327 (D.C. 2004).

[9] No court has decided yet whether *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (streamlining *McDonnell Douglas* analysis), applies to claims under FMLA or DCFMLA.

must show: (a) he was engaged in an activity protected under the Acts; (b) he suffered an adverse

employment action; and (c) the protected activity and the adverse employment action were causally

connected. *See id.* at 1368 (citing *Chaffin v. John H. Carter Co.*, 179 F.3d 316, 319 (5th Cir. 1999);

*see also Winder v. Erste*, 511 F. Supp. 2d 160, 184 (D.D.C. 2007) (noting also that "the elements of

a prima facie case are the same under both the federal and the DC FMLA . . . .").

　　　DCHFA contends that Butler cannot establish a prima facie case because he cannot show

causation.[10]   And even if Butler could establish a prima facie case, DCHFA contends that it has

articulated a legitimate non-Acts-violating reason for his termination;  namely, that Sewell decided

to terminate Butler on October 13 based solely on Butler's unsatisfactory performance, including his

failure to open the facility for business that day, and long before Sewell knew anything about the

reasons for Butler's leave or requested leave.   Therefore, according to DCHFA, Butler cannot

demonstrate pretext.   Accordingly, DCHFA contends that Butler cannot establish that Sewell

terminated him because he exercised (and sought to exercise further) his rights under the Acts.

Butler counters that there are genuine issues of material fact as to whether Butler's termination was

motivated solely by his poor performance or whether it was based on the fact that he took leave and

requested further leave as protected under the Acts.[11]

　　　That is the crux of the matter.  The disputed issues — causation and pretext — turn on the

same factual predicate: whether there is a genuine issue of material fact as to whether Sewell's

termination decision was based exclusively on Butler's unsatisfactory performance and therefore

---

[10]  DCHFA concedes that Butler was seeking to exercise rights protected under the Acts and that his termination constituted an adverse employment action.  DCHFA contests only causation.

[11]  In his opposition, Butler concedes that this is not a mixed motives case.

unrelated to his protected leave.  If the court determines that there is no genuine issue of material fact concerning Sewell's motivations and if the court is satisfied that Sewell terminated Butler because of his unsatisfactory performance, the court should grant summary judgment because DCHFA is entitled to judgment as a matter of law.  If, however, the court finds a genuine issue of material fact concerning Sewell's motivations such that a reasonable jury could find that Butler was terminated in connection with his protected leave, the case must go to a jury.

## B.      Genuine Issues of Material Fact

DCHFA contends that it is entitled to summary judgment because Sewell made the final decision to terminate Butler on the morning of October 13 — immediately following his failure to open the facility and before each alleged incident from which Butler would impute knowledge of his protected leave to Sewell.[12]  This assertion, according to DCHFA, rests on undisputed facts. Therefore, according to DCHFA, there is no basis from which this court may find that Sewell terminated Butler because he exercised his rights under the Acts.

DCHFA explains that, although Sewell made the final decision to terminate Butler on October 13, he did not terminate Butler until October 27 because of various events.  Sewell was unable to talk with Butler on the morning of October 13 because Sewell needed to attend a meeting. Then, Butler was unavailable for more than a week because he left work early on October 13 and did not return until October 23.  DCHFA also contends that Sewell needed to confer with Alexander concerning the legal nuances of Butler's termination and the preparation of a termination letter. Finally, when Butler did return to work on October 23, Sewell did not see Butler for two days, and,

---

[12]  To reiterate, DCHFA contends that Sewell's decision to terminate Butler was based on Butler's history of and continuing unsatisfactory performance in managing the DCHFA facility and its various assets; the October 13 incident was merely the straw that broke the camel's back.

in any event, Sewell had decided to wait until a Friday afternoon, October 27, to terminate Butler. In short, DCHFA contends that Butler's termination was in-the-works beginning on October 13, which, based on the undisputed facts of this case, was before Sewell could have learned of Butler's protected leave.

Butler counters that he may defeat summary judgment for two reasons: first, because of the close temporal proximity between his protected leave and his termination;[13] and second, because there are genuine issues of material fact concerning whether Sewell knew of his protected leave before deciding to terminate him.[14]  With respect to Sewell's knowledge, Butler testified that before taking leave on October 13 he:  filled out a leave request noting "sick" as the reason for his absence;[15] mentioned his mother's illness to Sewell; left a voicemail for Sewell explaining that he was taking leave due to a serious illness in his family; and left a similar message with Sewell's assistant.  Butler also points to Thomas's testimony, in which Thomas stated that he delivered Butler's additional leave request to Sewell on October 26, one day before Sewell terminated Butler.

---

[13]  Butler relies on the temporal proximity between his protected acts — the October 13-23 leave and the October 26 leave request — and his October 27 termination as evidence of causation and pretext.  Although close temporal proximity between Butler's leave (and leave request) and his termination alone may be sufficient for a reasonable jury to infer *causation*, once DCHFA proffered a legitimate non-Acts-violating reason for his termination, as it did, Butler cannot rely on temporal proximity alone to establish *pretext*; he must point to additional evidence. *See Winder*, 511 F. Supp. 2d at 185 (citing *Gleklen*, 199 F.3d at 1368).  Accordingly, even if temporal proximity is sufficient to establish causation, Butler cannot rely on temporal proximity alone to defeat summary judgment because it is insufficient to establish pretext.  *See id.*

[14]  Neither party cites a controlling case, which holds that knowledge of Butler's protected leave alone is sufficient evidence of pretext to defeat summary judgment.  The court likewise finds none and makes no holding with respect to this issue of law.

[15]  Regardless of the facts and circumstances surrounding when this leave request was submitted and approved, it does nothing to support Butler's case because it lists only "sick" as the reason for his absence and describes nothing of his mother, her illness, or a need for leave to care for her.

All this, according to Butler, is sufficient to support an inference that Sewell knew of his protected leave before deciding to terminate him.

Further, Butler points to various evidence, which he claims casts doubt on Sewell's credibility and thus calls into question whether Sewell decided to terminate Butler on the morning of October 13 and whether Sewell's account of subsequent events is accurate. First, Butler contends that if the October 13 incident was the last straw, Sewell would have fired him immediately rather than waiting two weeks. Second, Butler contends that the October 26 email he received from Sewell confirming that it was Butler's responsibility to open the facility each morning proves that Sewell had not made a final decision to terminate him yet. Third, Butler contends that Thomas's testimony that he delivered Butler's leave request on October 26 refutes Sewell's testimony that he lacked knowledge of Butler's protected leave before deciding to terminate him. Fourth, Butler highlights Alexander's testimony that he was unsure of the exact dates on which Sewell discussed the termination with him or instructed him to prepare a resignation letter. Fifth, Butler points out a purported conflict between his testimony and Sewell's testimony: Sewell testified that he informed Butler during his evaluation of numerous deficiencies in his performance relating to problems with cleanliness, pests, the roof, the elevator, and the garage; whereas, Butler testified that Sewell mentioned only cleanliness generally. Sixth, Butler contends that failing to open the facility is an insufficient basis for immediate termination under the Employee Handbook and thus creates an inference that Sewell was merely looking for an after-the-fact justification for his termination. Finally, Butler contends that the animus Sewell displayed toward him about missing the vendor meeting during his October 13-23 leave is evidence that Sewell wanted to terminate him because of that protected leave. All of this, according to Butler, creates issues with respect to Sewell's

9

credibility as well as genuine issues of material fact that must be decided by a jury and therefore preclude summary judgment.

DCHFA rejoins that Butler never provided the requisite notice to make Sewell aware of his protected leave.  Even if Butler provided the requisite notice, DCHFA reiterates that Butler cannot prevail because Sewell made the final decision to terminate him on the morning of October 13, immediately following his failure to open the facility and before each alleged incident from which Butler would impute knowledge of his protected leave to Sewell.  In that regard, DCHFA contends that neither Thomas's testimony nor Butler's requests for leave prove anything.  Nor, according to DCHFA, is the fact that Butler was not terminated until October 27 of consequence because, as set forth above, Butler could not have been terminated much sooner, and Sewell had discretion to wait until the first Friday that Butler was in the office following the October 13 incident to terminate him. DCHFA also points to Alexander's testimony that he discussed Butler's termination with Sewell as early as September 2006, as evidence that Butler was well on his road to termination by the time of the October 13 incident, and therefore his termination had nothing to do with his protected leave. Additionally, DCHFA explains that the purpose of Sewell's October 26 email to Butler was not to assist Sewell in deciding whether to terminate Butler but rather to document the basis of Sewell's previously made decision.   DCHFA further explains that even if Sewell was angry at Butler for missing the vendor meeting, that anger is insufficient to support an inference of retaliation, and, in any event, the decision to terminate him had been made long before that.  Finally, DCHFA contends that the Employee Handbook proves nothing because by its own terms it contains a non-exhaustive list of potential bases for immediate termination.  In sum, DCHFA maintains that Butler was on the

road to termination at the time of his September 2006 evaluation, that the October 13 incident was the last straw, and that Sewell made the final decision to terminate him immediately thereafter.

Again, the task before the court is to determine whether, based on the foregoing, a reasonable jury could find that DCHFA terminated Butler because he took or requested protected leave. *See Aka*, 156 F.3d at 1290. The parties have not cited a dispositive or closely analogous case on this point, from this Circuit or otherwise. Other courts have held that an employee carries his burden on summary judgment with respect to the *knowledge* requirement if he presents credible testimony, including simply his own, that the defendant's decision-maker was aware of the events forming the basis of a FMLA-protected activity before making the adverse employment decision. *See e.g.*, *Schmutte v. Resort Condominium Intern., LLC*, 463 F. Supp. 2d 891, 911-12 (S.D. Ind. 2006). Neither party, however, cites a controlling case which decides this issue. The court likewise finds no case from this Circuit or District deciding whether a decision-maker's knowledge of an employee's protected leave before taking an adverse employment decision is sufficient to defeat summary judgment.

Here, Butler's best evidence that Sewell had notice of Butler's protected leave is his testimony that he left a voicemail for Sewell and gave Sewell's assistant a message to that effect. The obvious problem is that Butler cannot testify as to whether Sewell listened to the voicemail or whether his assistant conveyed the message. Yet, Thomas's testimony about passing on and discussing with Sewell the October 26 request for additional leave may bolster Butler's testimony. On the other hand, Sewell steadfastly insists that he made the final termination decision before these alleged instances of notice came to pass. And Alexander's testimony that he and Sewell discussed terminating Butler as early as September 2006 may bolster Sewell's testimony. In the end, the court

has little more before it than a swearing match between parties.  Butler has pointed to just enough direct and circumstantial evidence to allow the court, "consider[ing] all the evidence in its full context," to hold that a reasonable jury could find that he was the victim of unlawful discrimination. *Aka*, 156 F.3d at 1290.  Accordingly, the court holds that this case is unfit for summary judgment because potentially dispositive genuine issues of material fact remain, which the jury should determine based on weighing the evidence and determining the credibility of the witnesses.

## III.  CONCLUSION

For the foregoing reasons, it is this 6th day of January 2009, hereby

**ORDERED** that DCHFA's motion for summary judgment [#17] is **DENIED**.